# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
DOME PATENT L.P.                 )
                                 )
             Plaintiff,          )
                                 )
        v.                       )   Civil Action No. 07-1695(PLF)
                                 )
JON W. DUDAS,                    )
Under Secretary of Commerce      )
for Intellectual Property        )
and Director of the United       )
States Patent and                )
Trademark Office                 )
                                 )
             Defendant.          )
                                 )
_____)
```

## MOTION TO STAY DISCOVERY

The defendant, pursuant to Rule 26(c)(1) of the Federal Rules of Civil Procedure, moves the Court to deny discovery, or in the alternative, to stay discovery pending resolution of defendant's dispositive motion.

In support of this motion, the defendant submits the attached Memorandum of Points and Authorities in Support of Defendant's Motion to Stay Discovery and Exhibits 1-12

Respectfully submitted,

__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


__/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205


OF COUNSEL:
STEPHEN A. WALSH
Acting Solicitor
SHANNON M. HANSEN
HEATHER F. AUYANG
Associate Solicitors
United States Patent and Trademark Office

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DOME PATENT L.P.                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )    Civil Action No. 07-1695(PLF)
                                    )
JON W. DUDAS,                       )
Under Secretary of Commerce         )
for Intellectual Property           )
and Director of the United          )
States Patent and                   )
Trademark Office                    )
                                    )
                Defendant.          )
                                    )
_____     )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S**
**MOTION TO STAY DISCOVERY**

**INTRODUCTION**

Dome Patent L.P. ("Dome") filed this complaint against Jon

W. Dudas, Undersecretary and Director of the United States Patent

and Trademark Office ("USPTO"), under 35 U.S.C. § 145, asking

this Court to set aside the decision of the Board of Patent

Appeals and Interferences (the "Board") that found claim 1 of

U.S. Patent No. 4,306,042 (the "Neefe patent") obvious over the

prior art under 35 U.S.C. § 103 during a reexamination of this

patent.  The Board's decision was supported by the record,

legally sound, and should be affirmed by this Court by motion for

summary judgment.

Although Dome has no evidence relating to so-called

"secondary consideration of non-obviousness," and has failed to

acquire such evidence for numerous years, and failed to introduce such evidence before the Board or other District Courts, it now seeks to engage in wide-ranging discovery from numerous third parties to see if such evidence exists. In pursuit of its efforts, Dome has already tried to serve 8 broad subpoenas on third parties that seek documents, some of which are over 30 years old.  Importantly, these third parties are defendants in a patent infringement case filed by Dome in 1997. <u>Dome Patent, L.P.</u> <u>v. Permeable Technologies, Inc., et al</u>., Case No. 98CV6247L.  All activity in that case, including discovery, was stayed by District Court Judge in the Western District Court of New York in 1999.  For over 7 years, even though the District Court invited Dome to seek to reopen the case, Dome made the tactical decision not to seek to lift that stay.  Instead, without explanation, it comes to this Court and tries to circumvent the stay order of the District Court in New York by seeking discovery from the defendants in that case.

In the proceedings below, the USPTO established a <u>prima</u> <u>facie</u> case that claim 1 of Dome's patent was obvious over the prior art.  On January 19, 2001, Dome tried to rebut that finding by submitting a declaration from Russell Neefe, the inventor of the Neefe patent.  The Neefe declaration asserted that his patent was commercially successful, that virtually the entire industry was using his invention, and that the invention filled a

2

long-felt need.  As early as April 2001, the USPTO advised Dome that Mr. Neefe's statements, without supporting evidence, were insufficient to overcome the obviousness rejection of his patent. Yet Dome never submitted any data or evidence to the USPTO to support Mr. Neefe's self-serving statements that his invention was commercially successful or filled a long-felt need.

This Court should reject Dome's efforts to circumvent the New York District Court's order staying discovery.  Moreover, because this case is a review of the correctness of the Board's decision below, any new evidence an applicant seeks to introduce must be excluded if he intentionally or negligently failed to submit that evidence to the USPTO.  Given the passage of time and Dome's prior litigation in New York and California, discussed below, it has no right to now try and discover hypothetically relevant evidence that might hypothetically exist.  This Court should stay (or even deny) the discovery Dome seeks.  A Section 145 case should not be used as a vehicle for circumventing another Court's Order, for rectifying a party's past lack of diligence or bad litigation tactics, or for engaging in a full-blown patent litigation between private parties.

## BACKGROUND

### A.    The Patent and Relevant Prior Art

Dome purports to be the owner of the Neefe patent which claims a method of making a contact lens material that is permeable to oxygen (Ex. 1).  This claimed material can then allegedly be used to make rigid, gas-permeable contact lenses. The Neefe patent was filed on September 9, 1980.  It issued on December 15, 1981, and expired on September 8, 2000. Id.

The Board found claim 1 of the Neefe patent obvious over the prior art under 35 U.S.C. § 103 during a reexamination of this patent.   Only claim 1 of the Neefe patent was at issue below, and it has two parts:  (1) preparing a monomer called TRIS using 5 particular steps; and (2) forming an oxygen-permeable material by copolymerizing TRIS with a surface wetting agent, and an oxygen-permeable cross-linking agent (Ex. 1).  TRIS is a well-known material used for making oxygen-permeable contact lens material, and can be made by different methods.  There is no evidence that Dome has ever determined which method of manufacture any particular company uses; if it did, Dome failed to submit any such evidence before the USPTO.

### B.    The Prior Litigation in California found No Infringement of the Neefe Patent.

In 1992, eleven years after the Neefe patent issued, Dome sued Pilkington Visioncare, Inc. ("Pilkington") in the Northern

4

District of California, asserting that Pilkington's products infringed the Neefe patent.  In that case, as here, Dome asserted that claim 1 of its patent fulfilled a long-felt need in the industry, and was commercially successful (Ex. 2 at App., pp. 11-12 (Court's Order on Summary Judgment).  Dome had no products of its own, nor any data to support its assertions.  It merely pointed to Pilkington's products, which it claimed infringed its patent.  Id.  The District Court correctly held that unless and until Dome proved that Pilkington did infringe its patent, it could not "bootstrap its commercial success factor on Pilkington's success." Id.  The Court also observed that Dome had never succeeded in licensing the Neefe patent, nor provided any other evidence that products made by its claimed method were commercially successful.  Id.

Finally, the Court found that Pilkington's products did not literally infringe the Neefe patent, because it did not make the material the same way claimed in the Neefe patent (Ex. 2 at App., pp. 14-15).  Thus, Pilkington's products cannot be used to support Dome's claims of commercial success and Dome has not contended otherwise.

      C.   **The Pending Litigation in New York.**

More than two years later, in 1997, Dome filed another suit for infringement against 6 other companies that manufactured contact lenses.  That case is currently pending in the United

States District Court in the Western District of New York. <u>Dome
Patent, L.P. v. Permeable Technologies, Inc., et al</u>., Case No.
98CV6247L.  In 1998, at the request of the defendants, the case
was stayed pending the resolution of the reexamination of the
Dome patent by the USPTO (Ex. 3. (1999 Order Granting Stay)).

In March 2000, the Court sent a letter to the parties that
denied Dome's request to lift the stay at that time, but allowed
Dome to renew its request at any time, and the Court advised it
would revisit the matter (Ex. 4 (2000 Letter)).   Indeed, in
March 2005, the Court asked the parties whether discovery was
complete or whether a conference with the Court would assist the
parties (Ex. 5 (March 2005 OSC)).  This occurred after the Patent
Examiner had twice pointed out the deficiencies of the Neefe
declaration, noting it did not include any evidence to support
its assertions that the patent had achieved commercial success,
that the industry was using his invention, or that his invention
had filled a long-felt need in the industry (Ex. 6 (April 16,
2001 Office Action) and Ex. 7 (May 23, 2002 Office Action)).
Yet, instead of asking the Court in New York to lift the stay and
have discovery proceed, Dome (jointly with the defendants)
advised the District Court that the stay should remain in place
(Ex. 8 (Response to OSC)).

D.   **The Proceedings Before the USPTO Found Claim of the
Neefe Patent Obvious.**

After the Examiner rejected claim 1 of the Neefe patent,

6

Dome appealed to the Board.  Although Dome did not initially raise any arguments relating to secondary considerations of non-obviousness in either its appeal brief or its initial reply brief it did so in a second reply brief (Ex. 9).  And, for the first time, Dome also argued that most of the industry had copied its claimed method (Compare Ex. 9 with Exh. 10 (Neefe declaration)).

The Board affirmed the Examiner's rejection of claim 1 of the Neefe patent as obvious over the prior art, and this appeal followed.  To date, Dome has attempted to serve 8 subpoenas on third parties, including 3 subpoenas on one party (Ex. 11).  At least two of the third parties have been served, and have responded and objected to the subpoenas (See e.g., B & L Responses, Ex. 12).

## THE LAW OF OBVIOUSNESS

A claimed invention is unpatentable if the differences between it and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  35 U.S.C. § 103(a); In re Kahn, 441 F.3d 977 (Fed. Cir. 2006).  Obviousness is a question of law, reviewed de novo, based upon underlying factual questions which are reviewed for clear error.  These underlying factual inquiries include:  (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior

art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence ("secondary considerations") of nonobviousness, such as commercial success, long-felt but unresolved need, the failure of others to develop the invention and praise for the invention.  In re Dembiczak, 175 F.3d 994, 996 (Fed. Cir. 1999).

To reject claims in an application under Section 103, an examiner must establish a prima facie case of obviousness.  Once the examiner has done this, an applicant may overcome that rejection by either showing insufficient evidence of prima facie obviousness or by rebutting the prima facie case with evidence of secondary considerations of nonobviousness.  In re Kahn, 441 F.3d 977 (Fed. Cir. 2006).  Mere arguments or unsupported assertions that secondary considerations exist are insufficient to overcome a prima facie showing, however.  A party must submit actual evidence.  Id.; see also In re Huang, 100 F.3d 135, 139 (Fed. Cir. 1996) (because the USPTO lacks the means and resources to gather evidence that supports or refutes the applicant's assertions of commercial success, the applicant must present hard evidence that the commercial success is a direct result of the claimed invention).

Nonetheless, even if a party has actual evidence of commercial success, that does not require a finding of non-obviousness.  Evidence of commercial success, or any of the

8

other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success. Ormco Corp. v. Align Technology, Inc., 463 F.3d 1299, 1312-13 (Fed. Cir. 2006) (finding evidence of commercial success not due to the claimed and novel features of the patent; the asserted commercial success must be due to the merits of the claimed invention beyond that readily available in the prior art); Medtronic, Inc. v. Intermedics, Inc., 799 F.2d 734, 740 (Fed. Cir. 1986) ($1 million in sales not sufficient to rebut prima facie case of obviousness where sales not correlated to inclusion of claimed features in device sold); In re GPAC, 57 F.3d 1573 (Fed. Cir. 1995) (to prove a long-felt, but unsolved need, one must show that others tried and failed to solve the problem that was ultimately solved by the inventors).  Plaintiff has had ten years to acquire evidence of commercial success and demonstrate a nexus but has failed to do so.

**ARGUMENT**

**A.     The Court Should Exercise its Broad Discretion to Stay Discovery**

As a general matter, the Court has broad discretion to deny or limit discovery to protect a party or any third party from undue burden or expense, and to promote a case's efficient resolution.  See Fed. R. Civ. P. 26(c); see also Brennan v. Local Union No. 639, 494 F.2d 1092, 1100 (D.C. Cir. 1974).  Such an order may provide, among other things, that discovery not be had,

9

that it be delayed, or that it be had only be a method other than
that selected by the asking party.  Fed. R. Civ. P. 26(c)(1)-(3).
Given this broad discretion, the Court "should not hesitate to
exercise appropriate control over the discovery process."
Herbert v. Lando, 441 U.S. 153, 177 (1979).  Here, discovery
should be stayed.

        The discovery Dome seeks is from defendants in a case in the
Western District of New York where the Court has stayed
discovery.  Dome should not be allowed to end-run that stay by
seeking discovery here.   The subpoenas essentially seek the
entire technical and business files of these companies for a 25-
year period and some of the documents sought, if available, are
more than 30 years old (Exs. 11 and 12).

    **B.    Dome Was Not Diligent in Trying to Procure the Evidence
            it Now Seeks.**

        Clearly, Dome has not been diligent, and either
intentionally or negligently failed to provide the evidence it
now seeks to the USPTO.  In a Section 145 case such as this, a
plaintiff may not introduce new evidence if it was previously
available or if it was not diligent in trying to obtain that
evidence. DeSeversky v. Brenner, 424 F.2d 857, 858 (D.C. Cir.
1970); Hyatt v. Dudas, No. 03-0901, 2006 WL 4606037, at *2
(D.D.C. Sept. 30, 2006) (citing Holloway v. Quigg, 9 USPQ. 2d
1751, 1752 (D.D.C. 1988)).  Dome may not now try reconstruct its
case based on a new litigation strategy, leapfrogging the

10

administrative process below.  <u>Conservolite v. Widmayer</u>, 21 F.3d
1098, 1102-3 (Fed, Cir. 1994); <u>Velsicol Chemical Corp. v.
Monsanto Co.</u>, 579 F.2d 1038, 1039 (7th Cir. 1978)(Plaintiff's
lack of effort in not contacting witnesses to testify before the
Board demonstrated a lack of due diligence, which waived his
right to introduce that testimony); <u>Kirshke v. Lamar</u>, 42 F.2d
870, 874 (8th Cir. 1970)(the viability of the administrative
process presupposes that the pertinent and available testimony
will be presented before the board).  Dome, despite notice of the
deficiencies of its evidence since 2001, has failed to provide
the necessary evidence of secondary considerations to the USPTO
during the reexamination process.  It should not be permitted to
do so here.

      Finally, even if Dome had the documents it now seeks (if
they exist), those documents alone are insufficient to
demonstrate secondary considerations of nonobviousness, such as
commercial success.  Dome must first prove that these companies'
products infringe claim 1 of its patent.  Dome needs to prove
that any commercial success of these products was due to the
novel features of its invention, rather than some other reason.
For example, Dome has never provided evidence to the USPTO that
it tested the products to determine whether third parties  have
infringed its patent.  In other words, Dome would need to proceed
with a full-blown validity and infringement trial against the

third parties.  This still would not likely lead to evidence that would support a reversal of the Board's decision that claim 1 of the patent was obvious, as the Board's findings are the evidentiary core of this case.  <u>See</u> <u>In re Huang</u>, 100 F.3d at 139; <u>Fregeau v. Mossinghoff</u>, 776 F.2d 1034, 1037 (Fed. Cir. 1985) ("[T]he board's decision is the jurisdictional base for the suit and the record before the office is the evidentiary nucleus.").

As the Court in the Northern District of California admonished Dome in 1994, Dome cannot "bootstrap its commercial success factor on [another party's] success" without first proving that the party infringed its valid patent (Ex. 2 at App., pp. 11-12).

<u>**CONCLUSION**</u>

Dome has had ample opportunity to discover and present any available evidence to the USPTO regarding secondary considerations, but failed to do so.  Under applicable law, Dome has waived its right to take the discovery it seeks.  Accordingly, the defendant respectfully asks the Court to deny discovery in this case.

Respectfully submitted,

__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


__/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205


OF COUNSEL:
STEPHEN A. WALSH
Acting Solicitor
SHANNON M. HANSEN
HEATHER F. AUYANG
Associate Solicitors
United States Patent and Trademark Office

13

Ex. 1

# United States Patent [19]

## Neefe

[11] **4,306,042**

[45] **Dec. 15, 1981**

[54] **METHOD OF MAKING A CONTACT LENS MATERIAL WITH INCREASED OXYGEN PERMEABILITY**

[76] Inventor: Russell A. Neefe, P.O. Box 429, Big Spring, Tex. 79720

[21] Appl. No.: 185,000

[22] Filed: Sep. 8, 1980

[51] Int. Cl.³ .......................... C08F 2/00; C08F 30/08; C08F 230/08
[52] U.S. Cl. .................................. 526/75; 204/159.13; 264/1.1; 526/279; 556/433
[58] Field of Search ...................... 526/279, 75; 264/1; 556/433; 204/159.13

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,808,178 | 4/1974 | Gaylord ............................ | 526/279 |
| 4,152,508 | 5/1979 | Ellis et al. ..... ................... | 526/279 |
| 4,153,641 | 5/1979 | Deichert et al. ..................... | 526/279 |
| 4,189,546 | 2/1980 | Deichert et al. ..................... | 528/26 |

*Primary Examiner*—Herbert J. Lilling

[57] **ABSTRACT**

An oxygen permeable contact lens fabricated from a copolymer of a (a) siloxanyl alkylester, an ester derivative of acrylic or methacrylic acid, surface wetting agent and an oxygen permeable crosslinking agent. The copolymer can be made either hard, soft or elasticmeric with improved oxygen permeability.

**4 Claims, No Drawings**

08/27/1998

4,306,042

**1**

# METHOD OF MAKING A CONTACT LENS MATERIAL WITH INCREASED OXYGEN PERMEABILITY

## BACKGROUND OF THE INVENTION

The human cornea is an independent organism that obtains its life sustaining oxygen from the tears of the eye. The oxygen consumption rate of the human cornea is approximated to be 2.8 ml/cm$^2$-hr. This value has been determined by Jauregui and Fatt, "Estimation of the Vivo Oxygen Consumption of the Human Corneal Epthelium", in the American Journal of Optometry and Archives of American Academy of Optometry, June 1972, page 507.

Contact lenses have been made from various materials since the early 1950's. Table I illustrates some of the materials, the common term, its composition and its disadvantages.

### TABLE I

| COMMON TERM | COMMON COMPOSITION | DISADVANTAGE |
|---|---|---|
| Hard | 95% + Poly-methylmethacrylate | Very low gas permeability |
| Semi-Rigid | 90% + Cellulose Acetate Butyrate | Poor stability |
| Soft | 60% + Polyhydroxy-Methacrylate | Poor durability |
| PMMA/Silicone | 40%-60% Poly-methylmethacrylate & 40%-60% Siloxane alkyl ester | Marginal oxygen permeability & stability |
| Silicone | 10%-90% Phenyl-siloxanes and 10%-90% Methylvinylsiloxanes | Poor surface wettability & poor durability |

Attempts have been made in correcting these disadvantages. Some of these attempts have been some what successful, but not entirely. In U.S. Pat. No. 4,152,508, they deal with stability, and the increasing of oxygen permeability was never really attained, due to the use of non-oxygen permeable crosslinking agents. The use of dimethacrylates (the preferred embodiments) did improve the stability over that of U.S. Pat. No. 3,808,178, but did decrease oxygen permeability to some degree. Thus, a material with excellent oxygen and carbon dioxide permeability is preferably for metabolic action of the cornea. The surface of the material must be wettable and compatible with fluids of the eye.

## SUMMARY OF THE INVENTION

The primary object of this invention is to provide a novel contact lens material which is prepared from a combination of monomers so as to have high oxygen, carbon dioxide permeability and a hydrophilic surface. It would be preferable to have sufficient mechanical strength to permit precision machining and polishing. Although, lenses could be fabricated by casting or molding if an elastomeric material is preferable.

According to the invention a contact lens material is prepared by copolymerizing:

(a) from 5 to 90% by weight of a siloxanyl alkyl ester monomer with;

(b) from 3 to 90% by weight of an ester of acrylic or methacrylic acid;

(c) from 0.5 to 90% by weight of a surface wetting agent;

**2**

(d) from 0.01 to 90% by weight of an oxygen permeable crosslinking agent.

Representatives of (a) a siloxanyl alkyl ester monomers included but not restricted to the following:
Methacryloxypropylheptamethylcyclotetrasiloxane
Methyldi(trimethylsiloxy)methacryloxymethylsilane
n-pentylhexamethyltrisiloxanylmethyl methacrylate
Pentamethyldisilanyldi(trimethylsiloxy)acryloxyme-thylsilane
tris(pentamethyldisiloxy)methacryloxyproplsilane
.tri-i-propyltetramethyltrisiloxanylethyl acrylate
1,1,1 tris(trimethylsiloxy)methacryloxypropylsilane

Representatives of (b) an ester derivatives of acrylic or methacrylic acid monomer include but not restricted:

| Butyl | acrylate and methacrylate |
|---|---|
| Ethyl | acrylate and methacrylate |
| 2-ethyl | acrylate and methacrylate |
| Glycidyl | acrylate and methacrylate |
| Hexyl | acrylate and methacrylate |
| Lauryl | acrylate and methacrylate |
| Methyl | acrylate and methacrylate |
| Stearyl | acrylate and methacrylate |

Representatives of (c) a surface wetting agent include but not restricted:
Acrylamide
t-Butylaminoethyl methacrylate
Dimethylaminoethylacrylate and methacrylate
N-(1,1-Dimethyl-3-Oxobutyl)-acrylamide
Ethylene Gylcol Monoacrylate and Monomethacrylate
Glacial acrylic and methacrylic acid
Glycidyl acrylate and methacrylate
Propylene glycol monoacrylate and monomethacrylate
Methacrylamide
Morpholinoethyl acrylate and methacrylate
Piperidinoethyl acrylate and methacrylate
Triethylene glycol methacrylate
N-vinyl pyrrolidone

The preferred (d) oxygen permeable crosslinking agents include but not restricted to the following:
Dimers, trimers and tetramers of (a) siloxanyl alkylesters
N-(1,1-Dimethyl-3-Oxobutyl)-acrylamide
1,3 Bis(glycidoxypropyl)tetramethyldisiloxane
Divinyl Diphenyl Silane
Tetravinylsilane
Vinyl Trialloxyl Silane
Vinyl Trichloro Silane
Propylene Glycol Monoacrylate and monomethacry-late
Ethylenglycol monoacrylate and monomethacrylate

The copolymers of this invention is prepared by conventional polymerization by either free radical initiators or by photoinitiators. Representatives of free radical initiators include but not restricted:
Acetyl Peroxide
2,2,Azobis(2-methylpropinitrile)
Benzoyl peroxide
t-Butyl peroctoate
Caprylyl peroxide
Decanoyl peroxide
Diisopropyl peroxydicarbonate
2,5-dimethyl-2,5-bis(2-ethyl hexanoylperoxy)hexane
Lauroyl peroxide
Tertiarybutyl peroctoate
Tertiarybutyl peroxypivalate

08/27/1998

4,306,042

4,306,042

4,306,042

**3**

Representatives of photo-initiators include but not restricted:

Benzoin

Benzophenone

2,2 Azobis(2-methylpropionitrile)

## THE PREFERRED EMBODIMENT

The following examples are presented to illustrate the invention but not restricted to the following:

### EXAMPLE I

This example demonstrates the synthesis of a siloxanyl alkyl ester monomer representative, 1,1,1 Tris(trimethylsilyoxy)methacryloxypropyl silane (TRIS), as used in U.S. Pat. No. 3,808,178. The present process is far less expensive and gives higher oxygen permeability due to the absence of non oxygen permeable by products. 23.9 g (0.1 mole) of methacryloxypropyltrimethoxysilane is mixed with 429 g (4 mole) trimethylchlorosilane. The mixture is then added to 3 liters of water. The water is used as a catalyst and for cooling. After the mixture is added to the water, it is stirred for approximately 24 hours at room temperature. After allowing to set for 30 minutes, the upper layer is then separated, dried over calcium or sodium sulfate, and then filtered. Using a vacuum still, the hexamethyldisilane by product is stripped off. (With a sufficient vacuum, the distillation temperature can be kept down to 30°-40° C.

### EXAMPLE II

This example demonstrates the synthesis of 1,1,3,3 tetrakis(trimethylsilory)1,3 bis(methacryloxypropyl)-disiloxane(Di), a crosslinking dimer of 1,1,1 tris(trimethylsiloxy)methacryloxypropylsilane.

23.9 g of methacryloxypropyltrimethoxysilane is added to a mixture of 50 ml water and 5 ml diluted acetic acid. The mixture is stirred for 3 hours with a magnetic stirrer. Then the procedures of Example I are followed.

### EXAMPLE III

This example demonstrates the polymerization of the novel polymer by use of the siloxanyl alkyl ester prepared in Example I and the oxygen permeable crosslinking agent in Example II.

A rod is prepared by polymerizing 50 parts of TRIS, 40 parts methyl methacrylate (MMA), 3.5 parts of 1,1,3,3 tetrakis(trimethylsiloxy)1,3 bis(methacryloxypropyl)disiloxane(Di), and 6.5 parts of N-(1,1-Dimethyl-3-Oxobutyl)acrylamide (DAA) in the presence of 0.25 parts benzoyl peroxide (BPO) at 70° C. with water bath for 12 hours and a post cure at 100° C. for 24 hours. Contact lens blanks are fabricated to a ½ inch round diameter and 3/16 inch thick by lathe cutting. Lens are prepared by conventional techniques and are hard, transparent, and highly oxygen permeable.

### EXAMPLE IV

This example demonstrates the synthesis of 1,5 Bis(-methacryloxypropyl) 1,1,5,5 tetra kis(trimethylsiloxy) 3,3 dimethyl trisiloxane (BIS) a dimer of TRIS. 13 g sulfuric acid is added in a dropwise manner to 15 g ethanol (medical grade) and 10 g of water in a flask equipped with a magnetic stirrer. If the sulfuric acid is added at a rate of one to two drops per second, a water bath is not necessary (any faster drop rate, and a water bath should be used for cooling).

**4**

49.62 g (0.2 mole) of methacryloxypropyl trimethoxy silane, 17.63 g (0.1 mole) of dimethyldiacetoxysilane, and 43.48 g (0.4 mole) of trimethyl acetoxy silane are placed in a flask equipped with an ice bath and a magnetic stirrer. Then 13 g of ethanol/sulfuric acid is added in a dropwise manner to the mixture while stirring. Continue ice bath for five minutes after the entire amount of ethanol/sulfuric acid has been added to the mixture. The mixture should be stirred for up to three days at room temperature to assure complete reaction. The upper layer is separated from the rest and filtered. The remaining by-product (ethyl acetate) is stripped off by means of a vacuum stripper or a vacuum still at a temperature ranging from 25° to 45° C. depending upon the degree of vacuum pulled. Refrigerated storage is recommended to prevent premature reactions.

### EXAMPLE V

This example demonstrates the polymerization of the novel polymer by use of the siloxayl alkyl ester prepared in Example I and the oxygen permeable crossling agent in Example IV.

A rod is prepared by polymerizing 45 parts by weight of TRIS, 45 parts by weight of MMA, 5 parts by weight of BIS and 5 parts by weight of DAA in the presence of 0.25 parts by weight of BPO. Heat at 70° C. with a water bath for 12 hours and post cure with a water bath at 85° C. for 24 hours. Contact lens blanks and lenses are prepared by conventional lathe cutting techniques. The lenses are hard, transparent, and highly oxygen permeable.

### EXAMPLE VI

This example demonstrates the synthesis of 1,5,9-tris(methacryloxypropyl) 1,1,5,9,9-penta kis(trimethyl silane)tetramethylpentasiloxane (PENTA) a trimer of TRIS.

Procedures in Example IV are exactly followed except 23.51 g (0.1333 mole) of dimethyldiacetoxy silane and 44.07 g (0.333 mole) trimethylacetoxysilane are used to form a more complex molecule having three methacryl end groups for crosslinking.

### EXAMPLE VII

This example demonstrates the polymerization of the novel polymer by use of the siloxanyl alkyl ester prepared in Example I and the oxygen permeable crosslinking agent prepared in Example VI.

A rod is prepared as demonstrated in Example V except PENTA as prepared in Example VI is used instead of BIS. Al procedures are followed exactly.

### EXAMPLE VIII

This example demonstrates the synthesis of 1,5,9,13-tetrakis(methacryloxpropyl)    1,1,5,9,13,13-hexakis-(trimethylsiloxyl)hexamethylhepta siloxane (HEXA) a tetramer of TRIS.

Procedures in Example IV are followed exactly except 25.45 g (0.15 mole) of dimethyldiacetoxy silane and 39.66 g (0.30 mole) of trimethylacetoxy silane for a complex molecule having molecular weight of 14241.1 and four methacryl end groups for crosslinking.

### EXAMPLE IX

This example demonstrates the polymerization of the novel polymer by use of the siloxanyl alkyl ester prepared in Example I and the oxygen permeable crosslinking agent prepared in Example VIII.

*(handwritten margin notes: "DIMER OF TRIS", "TRIMER OF TRIS", "TETRAMER OF TRIS")*

8

4,306,042

5

A rod is prepared as demonstrated by Example V except that HEXA is used instead of BIS, all procedures are followed exactly.

Other poly functional derivatives of a siloxanyl alkyl ester can be prepared to have numerous reactive sites by changing the molar relationships of the intermediaries. Oxygen permeable crosslinking agents of poly(organosilane) $\alpha,\omega$ terminally bonded through a divalent hydrocarbon group to a polymerized activated unsaturated group. Typically the poly(organosiloxanes) i.e. monomers, employed are of the following formula:

$$A-R-\underset{\underset{R_2}{|}}{\overset{\overset{R_1}{|}}{Si}}-\left[O-\underset{\underset{R_4}{|}}{\overset{\overset{R_3}{|}}{Si}}\right]_n-O-\underset{\underset{R_2}{|}}{\overset{\overset{R_1}{|}}{Si}}-R-A \qquad 15$$

whereas A is an activated unsaturated group, $R_1$, $R_2$, $R_3$ and $R_4$ can be the same or different and each is one of a monovalent hydrocarbon radical or a halogen substituted monovalent hydrocarbon radical each containing from 0 to 15 carbon atoms, R is a divalent hydrocarbon radical containing from 1 to 20 carbon atoms, and n is an integer of zero to 1,000.

Various modifications can be made without departing from the spirit of this invention or the scope of the appended claims. The constants set forth in this disclosure are given as examples and are in no way final or binding. In view of the above, it will be seen that the several objects of the invention are achieved and other advantages are obtained. As many changes could be made in the above constructions and methods without departing from the scope of the invention, it is intended that all matter contained in the above description shall be interpreted as illustrative and not in a limiting sense.

What is claimed:

1. A method of making an oxygen permeable material for the manufacture of contact lens by the synthesization of the monomer 1,1,1-tris(methylsiloxy)methacryloxypropylsilane (a siloxanyl alkyl ester) by the following procedures:

(a) a mixture is prepared having the relationship of one mole of methacryloxypropyltrimethoxysilane with three to forty moles of trimethylchlorosilane;

(b) the mixture is then added to water whose volume is from 3 to 10 times that of the mixture;

(c) agitation is maintained for 30 minutes to 48 hours;

(d) then allow the mixture to separate into layers, remove and filter the upper organic layer;

(e) the unwanted by-product (hexamethyldisilane) is then removed by vacuum distillation;

(f) forming an oxygen permeable contact lens material by copolymerizing from 5% to 90% by weight of the 1,1,1-tris(trimethylsiloxy)methacryloxypropylsilane prepared above; 3% to 90% by weight of an ester of acrylic or methacrylic acid; from 0.05% to 90% by weight of a surface wetting agent, from 0.01% to 90% by weight of an oxygen permeable crosslinking agent selected from the class of multifunctional siloxanyl alkyl esters in the presence of a free radical or a photo initiator.

2. A method of making an oxygen permeable material for the manufacture of contact lens by utilizing the synthesization of 1,5 bis(methacryloxypropyl) 1,1,5,5-tetrakis(trimethylsiloxy)dimethyltrisiloxane (an oxygen

6

permeable crosslinking agent that is a dimer of siloxanyl alkyl ester) by the following procedure:

(a) a mixture is prepared with the relationship of: (1) 2 moles methacryloxypropyltrimethoxysilane; (2) 1 mole dimethyldiacetoxysilane; and (3) 4 moles trimethylacetoxysilane; the mixture is placed in a container that is equipped with a method of cooling and agitating;

(b) start agitation and cooling and in a dropwise manner add 65g of ethanol/sulfuric acid solution (the catalyst solution consists of 34.2% by weight of concentrated sulfuric acid, 39.5% by weight of medical grade ethanol and 26.3% by weight of distilled water) to one mole of methacryloxypropyltrimethoxysilane;

(c) after entirety of ethanol/sulfuric acid solution is added, continue the agitation for 24 to 72 hours;

(d) discontinue agitation and allow the mixture to separate into two layers, remove the upper layer;

(e) the unwanted by-products are then removed by vacuum distillation;

(f) forming an oxygen permeable contact lens material by copolymerizing from 5% to 90% by weight of a siloxyl alkyl ester, from 3% to 90% by weight of an ester of acrylic or methacrylic acid; from 0.5% to 90% by weight of surface wetting agent, from 0.01% to 90% by weight of the 1,1,5,5-tetrakis(trimethylsiloxy) 1,3-bis(methacryloxypropyl)dimethyltrisiloxane prepared above, and in the presence of a free radical or photo initiator.

3. A method of making an oxygen permeable contact lens material utilizing the synthesization of 1,5,9 tris(methacryloxypropyl)-1,1,5,9,9-pentakis(trimethylsiloxy)-tetramethylpentasiloxane (an oxygen permeable crosslinking agent that is a trimer of a siloxanyl alkyl ester) by the following procedures:

(a) a mixture is prepared with the relationship of: (1) 3 moles methacryloxypropyltrimethoxysilane; (2) 2 moles dimethyldiacetoxysilane; and (3) 5 moles trimethylacetoxysilane; the mixture is placed in a container that is equipped with a method of cooling and agitating;

(b) start agitation and cooling and in a dropwise manner add 65 g of ethanol/sulfuric acid solution (the catalyst consists of 34.2% by weight of concentrated sulfuric acid, 39.5% by weight of medical grade ethanol, and 26.3% by weight of distilled water) to one mole of methacryloxypropyltrimethoxysilane;

(c) after entirety of ethanol/sulfuric acid solution is added, continue agitation for 24 to 72 hours;

(d) discontinue agitation and allow the two layers to separate, remove the upper layer;

(e) the unwanted by-products are then removed by vacuum distillation;

(f) forming an oxygen permeable contact lens material by copolymerizing from 5% to 90% by weight of a siloxanyl alkyl ester, from 3% to 90% by weight of an ester of acrylic or methacrylic acid, from 0.5% to 90% by weight of a surface wetting agent, from 0.01% to 90% by weight of the 1,5,9-tris(methacryloxypropyl) 1,1,5,9,9-pentakis(trimethylsiloxy)tetramethylpentasiloxane prepared above, and in the presence of a free radical or photo initiator.

4. A method of making an oxygen permeable contact lens material by utilizing the synthesization of 1,5,9,13 tetrakis(methacryloxypropyl) 1,1,5,9,13,13-hexakis(-

3-90%
0.05-90% wetting
0.01-90% oxyg.

9

7

4,306,042

8

trimethylsiloxy)hexamethylheptasiloxane (an oxygen permeable crosslinking agent that is a tetramer of a siloxanyl alkyl ester) by the following procedures:

(a) a mixture is prepared with the relationship of: (1) 4 moles methacryloxypropyltrimethoxysilane; (2) 3 moles dimethyldiacetoxysilane, and (3) 6 moles trimethylacetoxysilane; this mixture is placed in a container that is equipped with a method of cooling and agitating;

(b) start agitation and cooling and in a dropwise manner add 65 g of ethanol/sulfuric acid solution (the catalyst solution consists of 34.2% by weight of concentrated sulfuric acid, 39.5% by weight of medical grade ethanol, and 26.3% by weight of distilled water) to one mole of methacryloxypropyltrimethoxysilane;

(c) after entirety of ethanol/sulfuric acid solution is added, continue agitation for 24 to 72 hours;

(d) discontinue agitation and allow the two layers to separate, remove the upper layer;

(f) forming an oxygen permeable contact lens material by copolymerizing from 5% to 90% by weight of a siloxanyl alkyl ester from 3% to 90% by weight of an ester of acrylic or methacrylic acid, from 0.5% to 90% by weight of a surface wetting agent, from 0.01% to 90% by weight of the 1,5,9,13-tetrakis(methacryloxypropyl) 1,1,5,9,13,13-hexakis(trimethylsiloxy)hexamethylheptasiloxane prepared above, and in the presence of a free radical or photo initiator.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO. : 4,306,042

DATED : December 15, 1981

INVENTOR(S) : Russell A. Neefe

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

Column 3, Line 25, "hexamethyldisilane" should be-- hexamethyldisiloxane--

Column 5, Line 53, "hexamethyldisilane" should be -- hexamethyldisiloxane--

Column 5, Line 60, "0.05%" should be --0.5%--

Column 6, Line 24, "siloxyl" should be --siloxanyl--

Signed and Sealed this

Tenth Day of January, 1995

Attest:

*Bruce Lehman*

BRUCE LEHMAN

*Attesting Officer*                     *Commissioner of Patents and Trademarks*

08/27/1998

Ex. 2

1

<u>DO NOT PUBLISH OR INCLUDE IN DATABASE</u>

RECEIVED
AUG - 8 1994

2

3          **ORIGINAL**

4          **F I L E D**

5          AUG - 3 1994

6          RICHARD W. WIEKING
           CLERK, U. S. DISTRICT COURT
           **NORTHERN DISTRICT OF CALIFORNIA**

7

8

9

10

11          UNITED STATES DISTRICT COURT

12          NORTHERN DISTRICT OF CALIFORNIA

13  DOME PATENT L.P.,                      )
    a California limited partnership,      )
14                                         )
                         Plaintiff,        )    No. C 92-4758 WHO
15                                         )
    vs.                                    )    **MEMORANDUM DECISION**
16                                         )    **AND ORDER**
    PILKINGTON VISIONCARE, INC.,           )
17  a Delaware corporation, dba            )
    Paragon Optical and Sola              )
18  Barnes Hind,                           )
                                           )
19                       Defendant.        )
    _____       )

20

21          This is an action brought by plaintiff Dome Patent L.P.

22  ("Dome") against defendant Pilkington Visioncare, Inc.

23  ("Pilkington") for patent infringement.  Pilkington has moved for

24  summary judgment, asserting two defenses:  first, that Dome's

25  patent is invalid on the grounds of obviousness; and second, that

26  Pilkington has not infringed Dome's patent.  For the reasons

27  hereinafter stated, Pilkington's motion for summary judgment is

28  DENIED.

-1-

1

2    I.

3    The patent, which is the basis of this lawsuit, was

4    obtained by Russell A. Neefe ("Neefe") and is now owned by Dome,

5    is U.S. Patent No. 4,306,042 ("the Neefe Patent"), entitled

6    "Method of Making a Contact Lens Material with Increased Oxygen

7    Permeability," granted to the inventor, Neefe.

8    The Neefe Patent was filed on September 8, 1980, and

9    was issued by the U.S. Patent & Trademark Office on December 15,

10   1981.   It includes four claims, each of which relates to a method

11   of making oxygen permeable material for the manufacture of

12   contact lens.   Claim 1 involves a method of making an oxygen

13   permeable material for the manufacture of contact lens using the

14   silicone monomer 1,1,1-tris (trimethylsiloxy)

15   methacryloxpropylsilane ("TRIS") which is a siloxanyl alkyl

16   ester.[1]

17   ------------------------------

18   [1]   Specifically, Claim 1 of the Neefe Patent describes a
     six-step method of making an oxygen permeable material for the
     manufacture of contact lens.   The first five steps describe the
     synthesis of TRIS.   The sixth step describes the polymerization
     of TRIS with other chemicals, including a crosslinking agent
     selected from a specified class.   The steps are as follows:
             (a) a mixture is prepared having the relationship of
     one mole of methacryloxypropyltrimethoxysilane with three to
     forty moles of trimethylchlorosilane;
             (b) the mixture in (a) is then added to water whose
     volume is from 3 to 10 times that of the mixture;
             (c) agitation is maintained for 30 minutes to 48 hours;
             (d) the mixture is allowed to separate into layers,
     then the upper organic layer is removed and filtered;
             (e) the unwanted by-product (hexamethyldisiloxane) is
     then removed by vacuum distillation; and
             (f) the oxygen permeable contact lens material is made
     by copolymerizing

             1)   5% to 90% by weight of the TRIS, as prepared
                  above;
             2)   3% to 90% by weight of an ester of acrylic or
                  methacrylic acid;
             3)   0.5% to 90% by weight of a surface wetting
                  agent;

II.

A.

     Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

     The Supreme Court's 1986 "trilogy" of <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), and <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986), requires that a party seeking summary judgment identify evidence that shows the absence of a genuine issue of material fact. Once the moving party has made this showing, the non-moving party must "designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Liberty Lobby</u>, 477 U.S. at 249-50 (citations omitted).

     Dome has alleged that Pilkington has infringed Claim 1

---

    4)    0.01% to 90% by weight of an oxygen permeable crosslinking agent selected from the class of multifunctional siloxanyl alkyl esters; and

    5)    a free radical or photo initiator.

of the Neefe Patent.  Pilkington has moved for summary judgment,
asserting two defenses:  first, that Claim 1 of the Neefe Patent
is invalid on the grounds of obviousness; and second, that
Pilkington has not infringed Claim 1 of the Neefe Patent.  The
Court will consider Pilkington's invalidity and non-infringement
defenses in turn.

B.

        Pilkington argues that it is entitled to summary
judgment because Claim 1 of the Neefe Patent is invalid on the
grounds of obviousness.  Under 35 U.S.C. § 103, a patent is
invalid:

> if the differences between the subject matter
> sought to be patented and the prior art are
> such that the subject matter as a whole would
> have been obvious at the time the invention
> was made to a person having ordinary skill in
> the art to which said subject matter
> pertains.

        Obviousness under 35 U.S.C. § 103 is a question of law
based on the underlying factual inquiries set forth by the
Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 17 (1966):
(1) the scope and content of the prior art; (2) the differences
between the prior art and the claims at issue; (3) the level of
ordinary skill in the art; and (4) objective evidence of
secondary considerations.[2]  See, e.g., Loctite Corp. v.
Ultraseal Ltd., 781 F.2d 861, 872 (Fed. Cir. 1985).

        Because the Neefe Patent was examined by a U.S. Patent
Examiner, and the Examiner granted the patent on the invention,
under 35 U.S.C. § 282, the patent "shall be presumed valid . . .

_____

    [2]  These factual inquiries are commonly referred to as the
"Graham factors."

-4-

1  [and] [t]he burden of establishing invalidity of a patent or any

2  claim thereof shall rest on the party asserting such invalidity."

3  The party asserting invalidity must prove it with "facts

4  supported by clear and convincing evidence." Loctite, 781 F.2d

5  at 872 (citing SSIH Equipment, S.A. v. USITC, 718 F.2d 365, 375

6  (Fed. Cir. 1983)).

7          The only two Graham factors that are hotly contested at

8  this stage of the proceedings are (1) the scope and content of

9  prior art; and (2) the differences between the prior art and the

10  claims at issue.

11          1.    Scope and Content of Prior Art.

12          Dome argues that the Neefe Patent contains two novel

13  improvements over prior art: (1) the use of trimethylchlorosilane

14  (a less expensive material used in making TRIS than had been used

15  by Gaylord) as the source of trimethylsiloxy groups to produce a

16  siloxanyl alkyl ester (the method for manufacturing TRIS)(Claim

17  1, step (a)); and (2) the use of an oxygen permeable cross-

18  linking agent selected from the class of multifunctional

19  siloxanyl alkyl esters (Claim 1, step (f)).  (Pl.'s Opp'n to

20  Invalidity Claim, at 4.)  These two improvements, according to

21  Pilkington, were already established by the Quaal Patent

22  (manufacture of TRIS) and the Tanaka, Merker, and Deichert

23  Patents (use of an oxygen permeable cross-linking agent).

24          For reasons set forth at length in Appendix A, the

25  Court finds that the Quaal, Merker, and Tanaka Patents are

26  relevant prior art; Quaal as it relates to the first of Neefe's

27  claimed novel improvements over prior art (a cheaper way to

28  manufacture TRIS), and Merker and Tanaka as they relate to the

1    second of Neefe's claimed novel improvements (use of an oxygen

2    permeable cross-linking agent selected from the class of

3    multifunctional siloxanyl alkyl esters).

4          Dome argues that the Quaal and Merker Patents taught

5    away from use in contact lens manufacture, and, therefore, are

6    not relevant prior art for the Neefe Patent.  Until 1972, when

7    Dr. Gaylord applied for his patent, the Quaal and Merker Patents

8    did indeed teach away from use in contact lens manufacture.  The

9    Gaylord Patent, however, provides the crucial link between the

10   materials discussed in the Quaal and Merker Patents and contact

11   lenses, making the Quaal and Merker Patents relevant prior art in

12   this action.

13         The Court also rejects Dome's contention that the

14   Tanaka Patent is not prior art, because the Patent Examiner

15   considered the Tanaka Patent in issuing the Neefe Patent in suit.

16   As Pilkington has pointed out, Tanaka filed his application for a

17   patent on September 22, 1978, and his patent was issued on

18   November 25, 1980.  Neefe filed his patent application on

19   September 8, 1990.  "The patent examiner would not have found an

20   unissued patent."  (Def.'s Charts in Supp. of Summ. J., at

21   Tab 3.)

22         2.   Difference Between Neefe Patent and Prior Art.

23         The Court finds that there is a genuine issue of

24   material fact as to whether prior art differs from the Neefe

25   Patent in teaching the use of oxygen permeable crosslinking

26   agents selected from a class of multifunctional esters (the

27   second of Neefe's two claimed novel improvements).  The

28   declarations of the parties' experts differ sharply on this

1  point.  (See Appendix A.)  Thus, the Court denies Pilkington's

2  motion for summary judgment on the ground of invalidity.

3  C.

4  Pilkington has also moved for summary judgment on the

5  ground that it does not infringe Dome's patent.  Dome contends

6  that Pilkington has alleged Claim 1 of the Neefe Patent:

7  in its use [of] the claimed method, or its
   equivalent, in producing its contact lenses
8  . . . Dome understands that Pilkington
   purchases a polymerizable mixture from Huls
9  America.  The mixture is prepared by the
   method set forth by the [Neefe] patent, and
10  defendant polymerizes the mixture to obtain a
   solidified product suitable for manufacturing
11  contact lens blanks.

12  (Smith Decl. at Ex. 12, Dome's Resps. to Interrog., Set One,

13  pp. 3-4).

14  Pilkington contends that it does not infringe any of

15  the claims of the Neefe patent literally or under the doctrine of

16  equivalents.  To establish infringement of a patent,

17  every limitation set forth in a claim must be
   found in an accused product exactly or by a
18  substantial equivalent.  Determination of
   patent infringement is a two-step process:
19  'the meaning of the claims must be learned
   from a study of all relevant patent
20  documents; and the claims must be applied to
   the accused structures [or methods].'
21  Caterpillar Tractor Co. v. Berco, S.P.A., 714
   F.2d 1110, 1114 (Fed. Cir. 1983).

22

23  Becton Dickinson and Co. v. C.R. Bard, Inc., 922 F.2d 792, 796

24  (Fed. Cir. 1990) (citations omitted).

25  1.   Literal Infringement.

26  For reasons set forth at length in Appendix B, the

27  Court finds that Pilkington has demonstrated that there was no

28  literal infringement of the patent.  The process set forth in the

-7-

Neefe Patent begins with two reactants: trimethylchlorosilane (or "TMCS") and methacryloxypropyltrimethoxysilane. In the fifth step of Claim 1 of the Neefe Patent, the process calls for the removal of the "unwanted by-product" hexamethyldisiloxane (also referred to as "HMDO"). In contrast, the allegedly infringing process begins with methacryloxypropyltrimethoxysilane (one of the reactants used in the Neefe process) and HMDO (rather than the TMCS used as the second reactant in the Neefe process). Thus, because the allegedly infringing process begins with HMDO, which is referred to as an "unwanted by-product" in the Neefe process, rather than TMCS, as one of the two starting reactants, there is no literal infringement.

2.    Infringement Under the Doctrine of Equivalents.

The Court finds that there exist genuine issues of material fact that preclude the Court from granting summary judgment on the issue of whether there was infringement under the doctrine of equivalents. (See extended discussion in Appendix B.) Such issues of fact include, but are not limited to, the following issues: (1) whether HMDO and TMCS are equivalent as reactants; (2) whether there is a presence of a significant amount of silanol in the allegedly infringing process, and none in the Neefe process; (3) whether PSX198 has always been formulated the same way and, specifically, whether it has always had a high Dimer content; and (4) whether Huls ever changed reactants in making its products.

Accordingly,

//

//

-8-

1        **IT IS HEREBY ORDERED** that Pilkington's motion for

2 summary judgment is DENIED.

3       Dated:  July  **31** , 1994.

4

5                          _William H. Orrick_

6                         William H. Orrick
                        United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX A

Pilkington's Motion for Summary Judgment on Invalidity

Essentially, Pilkington's invalidity argument is that the Neefe Patent is obvious in view of a combination of six patents: (1) the Quaal Patent, (2) the Merker Patent, (3) the Gaylord Patent, (4) the Ellis Patent, (5) the Deichert Patent, and (6) the Tanaka Patent. Specifically, Pilkington argues that the novel steps set forth in Claim 1 of the Neefe Patent were known in the art prior to Neefe's invention. Pilkington contends that:

(1)  the method of manufacturing TRIS set forth in Claim 1, part (a) of the Neefe Patent (reacting methacryloxy-propyltrimethoxysilane with trimethylchlorosilane) is taught by the Quaal Patent (Lyman Decl. at ¶12);

(2) the use of oxygen permeable crosslinking agents selected from a class of multifunctional siloxanyl alkyl esters in the manufacture of contact lens materials set forth in Claim 1, part (f) of the Neefe Patent is taught by the Tanaka Patent, the Deichert Patent, and the Merker Patent. (Lyman Decl. at ¶ 13);

(3)  the use of esters of acrylic or methacrylic acid in the manufacture of contact lens materials set forth in Claim 1, part (f) was taught by the Gaylord Patent and the Ellis Patent;

(4)  the use of surface wetting agents in the manufacture of contact lens materials set forth in Claim 1, part (f) was taught by the Gaylord Patent and the Ellis Patent;

(5)  the use of a free radical or photo initiator to

1  start the copolymerization process set forth in Claim 1, step (f)
2  had been established by the Ellis Patent (free radical) and the
3  Deichert Patent (photo initiator).
4       Dome states in its brief that the two improvements of
5  the Neefe Patent over prior art are:  (1) the use of trimethyl-
6  chlorosilane as the source of trimethylsiloxy groups to produce a
7  siloxanyl alkyl ester (Claim 1, step (a)); and (2) the use of an
8  oxygen permeable cross-linking agent selected from the class of
9  multifunctional siloxanyl alkyl esters (Claim 1, step (f)).
10 (Pl.'s Opp'n to Invalidity Claim, at 4.)  These two improvements,
11 according to Pilkington, were already established by the Quaal
12 Patent (manufacture of TRIS) and the Tanaka, Merker, and Deichert
13 Patents (use of an oxygen permeable cross-linking agent).
14      Three of the above six patents cited by Pilkington were
15 considered by the Patent Examiner during the examination of the
16 Neefe Patent application:  the Gaylord Patent, the Ellis Patent,
17 and the Deichert Patent.  The Examiner concluded that the Neefe
18 Patent was not obvious, and granted the patent.  As Dome has
19 correctly stated in its brief, when the prior art before the
20 court is the same as that before the Patent and Trademark Office,
21 the burden on the party asserting invalidity is more difficult to
22 meet.  Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, 796 F.2d
23 443, 447 (Fed. Cir. 1986).  Therefore, the analysis of the Court
24 focuses primarily on the other three patents:  the Quaal, Merker,
25 and Tanaka Patents, particularly since those three patents are
26 the ones that Pilkington contends make obvious Dome's two claimed
27 improvements over prior art.
28      Obviousness under 35 U.S.C. § 103 is a question of law

1  based on the underlying factual inquiries set forth in the
2  forties, only two of which are contained here, (1) the scope and
3  content of the prior art and (2) the differences between the
4  prior art and the claims at issue.  A district court may properly
5  grant a motion for summary judgment on patent invalidity "when
6  the factual inquiries into obviousness present no genuine issues
7  of material facts." Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d
8  714, 716 (Fed. Cir. 1991).

9              1.  Scope and Content of the Pertinent Prior Art.

10             In Ryko, the Federal Circuit stated that "'[t]he
11 relevant art is defined by the nature of the problem confronting
12 the would-be inventor.'" Id. at 716 (quoting Orthopedic Equip.
13 Co. v. United States, 702 F.2d 1005, 1008 (Fed. Cir. 1983).
14 Pilkington, relying on Neefe's deposition, has identified the
15 problem facing Neefe as being two-fold:  (1) the desire to
16 manufacture a contact lens material with increased oxygen
17 permeability (Def.'s Mem. in Supp. of Invalidity Motion at 11
18 (citing Smith Decl., Ex. 14, Neefe Dep. at 122:4 through
19 126:14)); and (2) the desire to find a cheaper way to produce the
20 primary silicone material, the TRIS compound (Id.)(citing Smith
21 Decl., Ex. 14, Neefe Dep. at 156:4-9).

22             Pilkington, having identified its view of the problem
23 facing Neefe, states that relevant prior art had established
24 (1) that contact lens materials with increased oxygen
25 permeability could be made by using oxygen permeable crosslinking
26 agents selected from a class of multifunctional siloxanyl alkyl
27 esters (Tanaka, Deichert, and Merker Patents); and (2) that TRIS
28 could be manufactured by reacting methacryloxypropyltri-

methoxysilane with trimethylchlorosilane (Quaal Patent). Thus, Pilkington includes the Tanaka, Merker, and Quaal Patents as being within the scope of relevant prior art.

Dome takes exception with Pilkington's statement of the scope and content of the relevant prior art. First, Dome argues that Pilkington has taken a "piecemeal" approach in attempting to show that the Neefe Patent is obvious, when 35 U.S.C. § 103 mandates that the Court consider the invention as a whole in its obviousness determination. Dome further contends that Pilkington's statement of the two-fold problem facing Neefe prior to his invention is an improper result of hindsight.

Dome cites several cases in support of its position. In In re Fritch, 972 F.2d 1260, 1266 (Fed. Cir. 1992), the Federal Circuit held that it is "impermissible to use the claimed invention as an instruction manual or 'template' to piece together the teachings of prior art so that the claimed invention is rendered obvious." In Interconnect Planning Corp. v. Feil, 774 F.2d 1132 (Fed. Cir. 1985), the Federal Circuit vacated and remanded the lower court's grant of summary judgment, because invalidity under 35 U.S.C. § 103 had not been proven by clear and convincing evidence. The court held that "there must be some reason for the combination other than the hindsight gleaned from the invention itself." Id. at 1143.

Besides this general criticism of Pilkington's approach, Dome argues that there is a genuine issue of material fact as to whether the Quaal, Merker, and Tanaka Patents are relevant prior art.

(a)  The Quaal Patent.

1    Dome's contention with regard to the Quaal Patent is

2    particularly important, because none of the five other patents

3    cited by Pilkington disclose making TRIS using

4    trimethylchlorosilane.  Dome argues that the Quaal Patent, which

5    taught many different methods of making TRIS, disclosed making

6    TRIS for use as a water repellant and "has nothing whatsoever to

7    do with the field of contact lenses."  (Pl.'s Mem. in Opp'n at

8    8.)  Dome argues that the Quaal Patent "taught away" from using

9    TRIS to manufacture contact lens materials, because a contact

10   lens must be hydrophilic (water-loving) and cannot have water-

11   repelling properties.  Furthermore, while permeability is

12   desirable in a contact lens, a water repellant compound is

13   specifically intended not to be permeable.  Thus, Dome argues,

14   one of ordinary skill in the art would not look to the water

15   repellant compounds disclosed by the Quaal Patent for use as a

16   contact lens material, because the differences in application are

17   too great.

18       Dome bolsters this contention, as it argues that the

19   doctrine of collateral estoppel prevents Pilkington from arguing

20   that the Quaal Patent is prior art.  Dome cites Syntex (U.S.A.)

21   Inc. v. Paragon Optical, Inc., 7 USPQ 2d (BNA) 1001 (D. Ariz.

22   1987).  Pilkington is the successor by assignment to the

23   plaintiff in Syntex.

24       In Syntex, the plaintiff brought a patent infringement

25   action against the defendant, Paragon Optical.  Paragon argued

26   that the patent at issue, the Gaylord Patent,[3] was invalid on

27   grounds of obviousness (the same argument that Pilkington has

28

---

[3]   Awarded as U.S. Patent No. 3,808,178.

1    made against the Neefe Patent in this action).  In Syntex, Judge

2    Copple addressed the issue of whether the Quaal and Merker

3    Patents, invented by employees of Dow Corning, were relevant

4    prior art in relation to the Gaylord Patent.  Judge Copple

5    concluded that the Merker and Quaal Patents were not relevant

6    prior art:

7              Dr. Bailey also testified about some patents
               by Dow Corning.  He admitted that Dow
8              Corning, who was the employer of both Dr.
               Merker, the inventor of the Merker patent,
9              and also of Quaal, the inventor of the [TRIS]
               monomer and the Quaal patent, did not come up
10             with Dr. Gaylord's invention.

11             The evidence also is that Burdick was also
               working at Dow Corning in this area.  But Dow
12             Corning somehow never came up with Dr.
               Gaylord's invention even though Merker at Dow
13             [w]as making silicone/MMA copolymers before
               1972.
14
15             One reason is that Merker reported that his
               materials were as water repellant as silicone
16             rubber, a property which would have led
               persons skilled in the art away from using
               them as contact lenses.
17

18   7 USPQ 2d at 1006 (emphasis added).

19        Dome's collateral estoppel argument, although

20   superficially convincing, fails for one reason:  Judge Copple

21   found that the Merker and Quaal Patents were not relevant prior

22   art in 1972, when Dr. Norman Gaylord applied for his patent:

23   "[t]he evidence is overwhelming and uncontradicted that Dr.

24   Gaylord's invention of the silicone/MMA contact lenses to solve

25   these problems was not obvious to these people over the prior art

26   as of 1972."  7 USPQ 2d at 1006.  Judge Copple's ruling as to the

27   state of prior art in 1972 stands unchallenged.  Judge Copple did

28   not, however, rule on relevant prior art in 1980.  By 1980, when

1   Neefe filed his patent application, there was something that

2   connected TRIS to the manufacture of contact lenses:  the Gaylord

3   Patent.

4         Gaylord's June 1972 patent application was for an

5   invention which related to (1) a novel copolymer composition

6   ("TRIS") and (2) contact lenses made from "TRIS" and related

7   compositions that had increased oxygen permeability.  (Drummond

8   Decl. ¶ 2.)  A patent was awarded to Gaylord on April 30, 1974.

9   As Judge Copple recognized, prior to the Gaylord invention, there

10  was nothing in the prior art that suggested the desirability of

11  using TRIS to make contact lens material.  It was Gaylord who

12  made the initial discovery that TRIS could be used in making

13  oxygen permeable contact lens material.  See 7 USPQ 2d at 1033.

14  It is true that Gaylord's patent did not list the method of

15  making the TRIS that is set forth in the Neefe Patent, but it did

16  establish the crucial connection between TRIS and contact lenses.

17  The Quaal Patent, which teaches many methods of making TRIS,

18  teaches that TRIS may be made by reacting methacryloxypropyltri-

19  methoxysilane with trimethylchlorosilane (the method set forth in

20  the Neefe Patent).  Thus, in light of the Gaylord Patent, Dome's

21  argument that the Quaal Patent is not relevant prior art because

22  its applications were not obviously relevant to making contact

23  lens materials is not persuasive.[4]  Therefore, the Court finds

24  that the Quaal Patent is relevant prior art in assessing the

25  validity of the Neefe Patent.

26  //

27

28

---

[4]  Dome makes a virtually identical argument with respect to
the Merker Patent, but it fails for the reasons stated above.

(b)   <u>Tanaka Patent</u>.

Pilkington argues that the Tanaka Patent is prior art for the second claimed improvement set forth in the Neefe Patent: the use of an oxygen permeable cross-linking agent selected from the class of multifunctional siloxanyl alkyl esters to improve the permeability of contact lens material.  Pilkington states that:  "the Tanaka patent teaches that the oxygen permeability of contact lens materials can be increased by using a crosslinking agent selected from a class of multifunctional siloxanyl alkyl esters . . . the Tanaka patent teaches that the crosslinking agents used in the claimed inventions are more oxygen permeable than crosslinking agents such as ethylene glycol dimethacrylate, which Gaylord used in his invention."  (Def.'s Charts in Supp. of Summ. J., filed March 24, 1994, at Tab 2.)

Dome argues that the Tanaka Patent is not prior art because it was "familiar" to the Patent Examiner.  (Dome Patent's Memo Re Tutorial, at 12.)  "While [the Patent Examiner] did not cite Tanaka as relevant prior art in the Neefe patent in suit, he did cite it in the follow-on Neefe patent 4,414,375.  Moreover, both Neefe patents and . . . the Tanaka patent are classified in class 526, subclass 279, assuring that the Examiner considered all of them before issuing the Neefe patent in suit."  (<u>Id</u>.)

Dome's argument that the Patent Examiner considered the Tanaka Patent in issuing the Neefe Patent in suit is not persuasive.  As Pilkington has pointed out, Tanaka filed his application for a patent on September 22, 1978, and his patent was issued on November 25, 1980.  Neefe filed his patent application on September 8, 1990.  "The patent examiner would not

1  have found an unissued patent." (Def.'s Charts in Supp. of Summ.

2  J., at Tab 3.)

3      The Court concludes that the Tanaka Patent is relevant

4  prior art.

5

6      2.   The Differences Between Prior Art and the Claims
           at Issue.

7      Pilkington contends that there is no difference between

8  the prior art and the Neefe Patent, "as measured from the Gaylord

9  Patent, the Quaal Patent and the Patents teaching the use of

10 oxygen permeable crosslinking agents selected from a class of

11 multifunctional esters (Tanaka Patent, Deichert Patent and Merker

12 Patent). . ." (Def.'s Mem. in Supp. of Invalidity Mot. at 13.)

13     Dome, however, argues that there is considerable

14 difference between the prior art and Claim 1 of the Neefe Patent.

15 Of course, as discussed above, Dome proceeds from the assumption

16 that the Quaal Patent, the Merker Patent, and the Tanaka Patent

17 are not within the scope of relevant prior art. For the reasons

18 discussed above, Dome is not correct in that assumption.

19     Dome does not rest its argument solely on its attempt

20 to exclude relevant prior art, however. In relation to the

21 second claimed improvement of the Neefe Patent, the use of an

22 oxygen permeable cross-linking agent selected from the class of

23 multifunctional siloxanyl alkyl esters (Claim 1, step (f)), Dome

24 also argues that, even if Tanaka is prior art, it fails to

25 disclose what is taught by the Neefe Patent. (Pilkington has

26 argued that this claimed improvement is taught by the Tanaka,

27 Deichert, and Merker Patents.)

28     Dome states that Claim 1 calls for (1) TRIS, (2) ester,

1    (3) wetting agent, (4) oxygen permeable cross-linking agent and

2    (5) initiator.  According to Dome:

3        Tanaka does <u>not</u> use TRIS, but rather an
4        organosilane monomer that has a different
         structure.  (Tanaka patent, Col. 2, 1. 10-
5        25).  Tanaka does include an ester, and 'the
         feature of the [Tanaka] invention lies in the
6        use of particular methacrylic and ester
         derivatives.' (Col. 2, 1.65-66).  Neefe does
7        not use those esters.  Tanaka does not teach
         the combination of the Neefe patent even if
         it were deemed to be prior art.

8

9    (Pl.'s Mem. in Opp'n at 12.)

10       The Court finds that there <u>is</u> a genuine issue of

11   material fact as to whether prior art differs from the Neefe

12   Patent in teaching the use of oxygen permeable crosslinking

13   agents selected from a class of multifunctional esters.

14       3.  <u>Level of Ordinary Skill in the Pertinent Art</u>.

15       In determining whether an invention would have been

16   obvious to someone skilled in the art at the time of invention,

17   the focus of the inquiry is on "what would have been objectively

18   obvious to one of ordinary skill in the art at such time" and not

19   "what was subjectively obvious to the inventor at the time of the

20   invention."  <u>Ryko</u>, 950 F.2d at 718.

21       In <u>Bausch & Lomb, Inc. v. Barnes/Hind Hydrocurve, Inc.</u>,

22   the Federal Circuit listed six factors relevant to a determina-

23   tion of the level of ordinary skill in the art: educational level

24   of the inventor, type of problems encountered in the art, prior

25   art solutions, rapidity of innovation, sophistication of

26   technology, and educational level of active workers in the field.

27       Pilkington states:

28       As early as 1978, the synthesis of oxygen
         permeable contact lens materials containing

1    siloxanyl crosslinking agents and the
2    synthesis of TRIS were known.  These
     syntheses involved knowledge of organic,
3    silicone and synthetic-organic chemistry.
     Therefore, by 1978, with the knowledge of
4    these types of chemistries, one should have
     been able to hypothesize and predict the
     probable effect of molecular structure on a
5    desired property such as oxygen permeability
     in a contact lens material.  Thus, as early
6    as 1978, someone engaged in the synthesis of
     contact lens materials and the synthesis of
7    TRIS would have had that understanding and
     ability.
8

9    (Def.'s Mem. in Supp. of Invalidity Mot. at 14-15.)

10        Dome did not address this factual inquiry in its

11   papers, nor did it point out any disputed issue of material fact

12   as to the level of ordinary skill in the art.

13        4.  Secondary Considerations.

14        In Graham, the Supreme Court held that "[s]uch

15   secondary considerations as commercial success, long felt but

16   unsolved needs, [and] failure [to invent] are also relevant to

17   the obviousness inquiry."  338 U.S. at 17-18.

18        Pilkington has consistently taken the position that the

19   cheaper way of manufacturing TRIS was invented in 1968 by Quaal,

20   and the use of multifunctional siloxanyl alkyl esters as oxygen

21   permeable crosslinking agents to make contact lens material was

22   known by many others prior to Neefe's patent.  Thus, Pilkington

23   argues that this is dispositive of the long felt but unsolved

24   needs issue and the failure to invent issue.  As to commercial

25   success, Pilkington stresses that Neefe and Dome have never

26   succeeded in licensing the patent.  (Smith Decl. at Ex. 13

27   (Dome's Interrog. Resps., Set Two, at 11)).

28        Dome argues that the Neefe Patent was an improvement

Appendices - Page 11

1    over the Gaylord Patent and, thus, fulfilled a long-felt need.

2    (Neefe Decl. ¶ 10.)    Furthermore, Dome asserts that Pilkington's

3    products infringe the Neefe Patent, and are successful in the

4    marketplace, (Auyang Decl., Ex. 4, ¶ 5), and that this allows

5    Dome to assert that the Neefe Patent is commercially successful.

6    Cf. Rexnord, Inc. v. Laitram Corp., 6 U.S.P.Q.2d 1817 (E.D. Wis.

7    1988) (court held commercial success based solely on infringer's

8    products provided objective evidence that the invention was non-

9    obvious).

10        This argument obviously rests on the assumption that

11    Pilkington is, indeed, infringing the Neefe Patent.    Pilkington

12    denies infringement, and, thus, asserts that Dome cannot

13    bootstrap its commercial success factor on Pilkington's success.

14        5.    Conclusion.

15        The Court finds that the Quaal, Merker, and Tanaka

16    Patents are relevant prior art.    The Court further finds that

17    there is a genuine issue of material fact as to whether prior art

18    differs from the Neefe Patent in teaching the use of oxygen

19    permeable crosslinking agents selected from a class of

20    multifunctional esters.

21                              *****

22

23

24

25

26

27

28

APPENDIX B

Pilkington's Motion for Summary Judgment on Infringement

Dome has alleged that Pilkington has alleged Claim 1 of the Neefe Patent:

> in its use [of] the claimed method, or its equivalent, in producing its contact lenses . . . Dome understands that Pilkington purchases a polymerizable mixture from Huls America.  The mixture is prepared by the method set forth by the [Neefe] patent, and defendant polymerizes the mixture to obtain a solidified product suitable for manufacturing contact lens blanks.

(Smith Decl. at Ex. 12, Dome's Resps. to Interrog., Set One, pp. 3-4)).

Pilkington argues in its original moving papers "that there is no evidence that any of the methods used in making Pilkington's lens materials [are] the same as or equivalent to the method described in claim 1 of the Neefe patent." (Def.'s Mem. in Supp. of Noninfringement Mot.)  Dome, on the other hand, asserts that it has met its burden, and there are genuine issues of material fact as to whether Pilkington has infringed the Neefe Patent.

In manufacturing eight out of eleven of its contact lens materials, Pilkington uses, among other things, a substance called PSX198, which is comprised of the TRIS monomer, Dimer, and silanol, and is prepared by blending intermediate PSX198 with intermediate PSX224 and/or PSX5269 to meet the specifications. Pilkington purchases all its supplies from Huls America, Inc. ("Huls").  Dome asserts that there is a close link between Neefe and Huls.  Essentially, Dome's claim is that Neefe taught Huls, formerly known as Petrarch Systems, Inc. ("Petrarch"), how to

make TRIS according to the method taught by the Neefe Patent.
Furthermore, Dome asserts that after Neefe Optical Laboratory
closed down in 1983, Petrarch began offering for sale, as its
own, TRIS products containing Dimer, which were made according to
the process it had learned about from Neefe.  Petrarch was later
acquired by Huls, and for the last six years Pilkington has
purchased its entire supply of PSX198, TRIS, and Dimer from Huls.

      1.  <u>Literal Infringement</u>.

      Dome essentially concedes that Pilkington has not
literally infringed the Neefe Patent.  The process set forth in
the Neefe Patent begins with two reactants:  trimethyl-
chlorosilane (or "TMCS") and methacryloxypropyltrimethoxysilane.
In the fifth step of Claim 1 of the Neefe Patent, the process
calls for the removal of the "unwanted by-product"
hexamethyldisiloxane (also referred to as "HMDO").

      In contrast, Huls begins its process of manufacturing
PSX198 with methacryloxypropyltrimethoxysilane (one of the
reactants used in the Neefe process) and HMDO (rather than the
TMCS used as the second reactant in the Neefe process).  Thus,
Huls uses HMDO, which is referred to as an "unwanted by-product"
in the Neefe process, rather than TMCS, as one of the two
starting reactants.

      Dome argues that, because HMDO is a <u>by-product</u> of TMCS,
it is equivalent to TMCS as a starting material for making TRIS:
"The goal is the same:  to provide trimethylsiloxy groups on the
polymerized material; and the means is essentially the same, with
TCMS having an intermediate stop as an unwanted by-product that
is recycled."  (Pl.'s Supp. Mem. in Opp'n on Noninfringement, at

1    6.)

2           With the phrase "the means is essentially the same,"

3    Dome has conceded that there is no literal infringement.

4           2.  Doctrine of Equivalents.

5           Dome does assert, however, that, despite the difference

6    in the processes referred to above, Pilkington infringes Dome's

7    patent under the doctrine of equivalents.  Courts have held that,

8    "[u]nder the doctrine of equivalents, infringement may be

9    found . . . if an accused device performs substantially the same

10   overall function or work, in substantially the same way, to

11   obtain substantially the same overall result as the claimed

12   invention."  Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d

13   931, 934 (Fed. Cir. 1987) (citing Graver Tank & Mfg. Co. v. Linde

14   Air Prods. Co., 339 U.S. 605, 608 (1950), cert. denied, 485 U.S.

15   961 (1988).  This tripartite test is sometimes referred to as

16   "the function-way-results" test.  See, e.g., International Visual

17   Corp. v. Crown Metal Mfg. Co., Inc., 991 F.2d 768, 775 (Fed. Cir.

18   1993).

19          Dome contends that there is, at least, a genuine issue

20   of material facts as to infringement.  Dome's expert, Mr. Kim,

21   compares the two processes in his declaration.  First, he

22   describes Claim 1 of the Neefe Patent:

23               In Claim 1, the Neefe Patent sets forth a
                 method for making an oxygen permeable
24               material for the manufacture of contact
                 lenses by synthesizing [TRIS] by reacting
25               methacryloxypropyltrimethoxysilane and
                 trimethylchlorosilane in water.  The reaction
26               also produces a "Dimer" of TRIS . . .".
                 Thereafter, the TRIS is copolymerized with an
27               ester of acrylic or methacrylic acid, a
                 surface wetting agent, an oxygen permeable
28               crosslinking agent selected from the class of
                 multi-functional siloxanyl alkyl esters and a

Appendices - Page 15

1  free-radical or photo initiator.

2  (Kim Decl. ¶ 8.)

3  Next, he states in his declaration that he has

4  "reviewed the ingredients used to produce the various contact

5  lens materials sold by Pilkington" and that "[e]ach of the

6  foregoing contact lens material produced by Pilkington contained

7  TRIS, methacrylic acid, a surface wetting agent, an oxygen

8  permeable crosslinking agent selected from the class of multi

9  functional siloxanyl alkyl esters, i.e. Dimer, and a free-radical

10  initiator." (Id. at ¶ 9.)

11  Pilkington makes two arguments against Dome's doctrine

12  of equivalents argument:  first, a balancing of the equities

13  dictates that this court should not even apply the doctrine of

14  equivalents; and second, that even if the doctrine of equivalents

15  is applied, Dome has failed to satisfy the tripartite test.

16  (a)  Should the Doctrine of Equivalents be Applied?

17  Pilkington, in urging the Court to refrain from

18  applying the doctrine of equivalents, stresses that it is an

19  equitable doctrine.  The Federal Circuit has explained the role

20  of the doctrine of equivalents:

21  Th[e] equitable doctrine [of
   equivalents] evolved from a balancing of

22  competing policies . . .

23  On the one hand, claims must be
   'particular' and 'distinct,' as required by

24  35 U.S.C. § 112, so that the public has fair
   notice of what the patentee and the Patent

25  and Trademark Office have agreed constitute
   the metes and bounds of the claimed invention

26  . . . .

27  On the other hand, the patentee should
   not be deprived of the benefits of his patent

28  by competitors who appropriate the essence of
   an invention while barely avoiding the

1  literal language of the claims.

2      Application of the doctrine of
equivalents is the exception, however, not
3  the rule, for if the public comes to believe
(or fear) that the language of patent claims
4  can never be relied on, and that the doctrine
of equivalents is simply the second prong of
5  every infringement charge, regularly
available to extend protection beyond the
6  scope of the claims, then claims will cease
to serve their intended purpose.

7

London v. Carson Pirie Scott & Co., 946 F.2d 1534, 1538 (Fed.
8
Cir. 1991).
9
       Pilkington relies on Federal Circuit Judge Lourie's
10
concurrence in International Visual Corp., in which Judge Lourie
11
warned against an overextension of the doctrine of equivalents:
12
       In recent years, we have emphasized that
13  the doctrine of equivalents is equitable in
nature.  [Citations omitted.]  Unfortunately,
14  however, the tripartite test has become a
mechanical formula which can often be applied
15  to accused infringers who are not
unscrupulous copyists and who have made more
16  than insubstantial changes, under
circumstances in which it may not be
17  equitable to do so.

18   991 F.2d at 774-75 (Lourie, J., concurring).

19      Judge Lourie, in his concurrence, urges courts to go

20  beyond the mechanical application of the tripartite test, and

21  sets forth additional criteria for courts to use to determine

22  whether the doctrine of equivalents should apply.  These

23  additional criteria are (1) whether the accused infringer was "an

24  unscrupulous copyist," (2) whether the invention was pioneering,

25  and (3) the closeness of the accused product to the claim

26  language.  Id.

27      Pilkington argues that it cannot be an unscrupulous

28  copyist, because Petrarch (the predecessor to Huls) was selling

PSX198, a TRIS product containing Dimer, as early as 1981, (Decl.
of M. Scott Donahey, Ex. 2 (Huls Dep. 16:6-19:10)), and because
Petrarch had been making PSX224 with TMCS as a starting reactant
in 1979 or 1980, before Neefe claims to have disclosed his method
to Petrarch.   (Donahey Decl. at ¶ 2 (Peterson Dep., 32:7-33:18).

        Pilkington, relying on many of the arguments it makes
in its motion for summary judgment on invalidity grounds, also
argues that Neefe's patented process cannot be considered a
pioneering invention.  In addition, Pilkington argues that the
fact that the owners of the Neefe Patent "were universally
unsuccessful in licensing or otherwise exploiting the invention
claimed in Claim 1 of the Neefe patent," (Def.'s Supp. Mem. on
Noninfringement at 16), is strong evidence that the patent was
not pioneering.  Finally, Pilkington argues that Neefe "sat on
his rights for nearly a decade after he believed that infringe-
ment was occurring," (Def.'s Supp. Mem. on Noninfringement), and
this behavior operates like laches and argues against the
application of the equitable doctrine of equivalents.

        Dome, of course, argues that the Court should apply the
doctrine of equivalents.  Dome argues that Pilkington, through
its purchase of materials from Huls, is, indeed, an "unscrupulous
copyist."  Dome argues that Huls was notified of the existence of
the Neefe Patent five years ago, and both Huls and Pilkington
"proceeded full speed ahead to flood the market with infringing
products."  (Pl.'s Supp. Mem. in Opp'n on Noninfringement, at
13.)  Furthermore, Dome argues that, contrary to Pilkington's
assertions, the evidence shows that Dimer was not present in
Petrarch's contact lens materials until 1985.  This is a factual

1  dispute that must be resolved at trial.  Dome also argues that

2  Neefe's patent is a pioneering invention, relying, like

3  Pilkington, on arguments made in the invalidity portion of the

4  motion, many of which raise factual issues.

5          Despite Pilkington's arguments, the Court finds that

6  the equities in this case do not preclude the Court from applying

7  the doctrine of equivalents, particularly because there are

8  questions of fact as to the existence of these equitable factors

9  and they are entangled with the merits of infringement claim.

10          (b)  Has Pilkington Infringed Dome's Patent Under the
              Doctrine of Equivalents?

11

12          Dome claims that the eight Pilkington products that use

13  PSX198[5] infringe the Neefe Patent because Huls' method of

14  manufacturing PSX198 infringes the Neefe Patent.  Pilkington,

15  however, contends that a side-by-side comparison of the

16  manufacturing method described in Claim 1 of the Neefe Patent and

17  the methods Pilkington uses to manufacture its contact lens

18  materials show that there are enough differences to dispose of

19  Dome's doctrine of equivalents arguments as a matter of law.

20          Pilkington cites the following as three of the most

21  "salient" differences:

22          (1)  "Whereas Neefe begins with

23               trimethylchlorosilane [TMCS], Pilkington begins with

24               hexamthyldisiloxane [HMDO].  The undisputed evidence

25               shows that these chemicals are not chemical

26               equivalents."  (Def.'s Supp. Mem. on Noninfringement at

27  _____

28  [5]The Pilkington products are:  Paraperm O2, Paraperm EW,
    Fluoroperm 30, Fluoroperm 30UV, Fluoroperm 60, Fluoroperm 60UV,
    Fluoroperm 92, and Fluoroperm 92UV.

1    equivalents." (Def.'s Supp. Mem. on Noninfringement at

2    17 (citing Supp. Lyman Decl. at ¶ 3)).

3         (2)  "Whereas Neefe refers to 'hexamethyldisilane'

4    [sic; hexamethyldisiloxane] as an 'unwanted by-product'

5    of the reaction described to make TRIS, and removes the

6    hexamethyldisiloxane, Pilkington begins with

7    hexamethyldisiloxane as a necessary starting reactant

8    to form the TRIS, Dimer and silanol.  A necessary

9    reactant is far from an 'unwanted by-product.'  Indeed,

10   a 'by-product' is defined as 'a secondary and sometimes

11   unexpected or unintended result (unpleasant [by-

12   product]s of civilization)." Webster's Ninth New

13   Collegiate Dictionary (1985).  (Def.'s Supp. Mem. on

14   Noninfringement at 17) (internal citations omitted).

15        (3)  "Whereas, Pilkington requires that CPSX198

16   contain 73-76% TRIS, 6.5-8.5% Dimer, and 9.0-11.0%

17   silanol before it is polymerized with the other

18   components to manufacture its contact lens materials,

19   there is no reference to the manufacture or use of

20   silanol in the Neefe Patent or any evidence that the

21   method described in Claim 1 produces or uses any

22   silanol."  (Def.'s Supp. Mem. on Noninfringement at

23   17).

24        Dome disputes that the differences enumerated by

25   Pilkington suffice to place Pilkington's patents outside the

26   reach of the doctrine of equivalents.

27        In regard to Pilkington's first enumerated difference,

28   that Pilkington begins with HMDO as one reactant, rather than the

TMCS that Neefe begins with, Dome argues that HMDO and TMCS are, indeed, equivalent. HMDO is a by-product of a reaction of TMCS, and either TMCS or HMDO may be used as "a source of trimethylsiloxy groups to tack onto whatever molecule that we might want to." (Supp. Auyang Decl., Ex. 1, Peterson at 41.) Dome states that "[t]he goal is the same: to provide trimethylsiloxy groups on the polymerized material; and the means is essentially the same, with TMCS having an intermediate stop as an unwanted by-product that is recycled." (Pl.'s Supp. Mem. in Opp'n on Noninfringement at 6.) Thus, Dome argues that there is a material issue of fact as to whether these two chemicals are sufficiently similar to satisfy the requirements of the tripartite test.

In regard to Pilkington's second enumerated difference, that HMDO is an "unwanted by-product" in the Neefe Patent, and a necessary reactant in Huls' process, Dome reiterates that HMDO is equivalent to TMCS. Dome also makes the not particularly convincing argument that HMDO is a by-product in Huls' process, too. Dome relies on the statements of Dr. Peterson, who worked at Petrarch, the predecessor to Huls, and who stated that HMDO was a source of trimethylsiloxy groups in the polymerized material because it "was cheap because [it was] a big by-product that we didn't have a use for." Clearly, HMDO may have been a by-product of another reaction at Huls, but the focus in this action is on manufacture of TRIS, and HMDO was a starting material.

In regard to Pilkington's third enumerated difference, that there is a presence of a significant amount of silanol in

PSX198, and none in the Neefe process, Dome states that
Pilkington's contention is "astonishing."  Dome argues that
Pilkington is estopped from arguing that PSX198 contains silanol
because in the Syntex case, the court found there was an absence
of evidence that the silanol existed in PSX198.  Pilkington
responds that there is no factual dispute that Huls' PSX198
contains silanol, as evidenced by Dome's expert's statement that
"PSX198 contains, TRIS, Dimer and silanol . . . "  (Kim Decl. at
¶ 11).

Dome also argues that there are material issues of fact
as to the following issues:  (1) whether PSX198 has always been
formulated the same way and, specifically, whether it has always
had a high Dimer content; and (2) whether Huls ever changed
reactants in making its products.

3.  Conclusion

Given the conflicting testimony of the parties'
experts, the Court finds that there are sufficient issues of
material fact to preclude the grant of summary judgment on the
issue of infringement under the doctrine of equivalents.

*****

Ex. 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DOME PATENT L.P.,

                    Plaintiff,                          **ORDER**

        -vs-                                     Case No. 98 CV-6247L

PERMEABLE TECHNOLOGIES, INC., a
New Jersey Corporation, G.T. LABORATORIES,
INC., a Corporation, OPTICAL POLYMER
RESEARCH, INC., a Corporation, STELLAR
CONTACT LENS, INC., a Corporation, and
POLYMER TECHNOLOGY, a Corporation,

                    Defendants.

---

Defendant Optical Polymer Research, Inc. (Optical) having moved to stay this action

pending the outcome of a reexamination proceeding initiated by Optical in the United

States Patent and Trademark Office, and defendants Polymer Technology, Permeable

Technologies, Inc., GT Laboratories and Stellar Contact Lens, Inc. having joined in the

motion to stay filed by Optical.  Plaintiff Dome Patent, L.P. (Dome) having opposed

Optical's motion;

        Upon consideration of the parties' written submissions and oral arguments heard

on December 17, 1998 and September 23, 1999, and in accordance with the factors

articulated in Ethicon, Inc. v. Quigg, 849 F.2d 1422 (Fed. Cir. 1988),

        IT IS HEREBY ORDERED that:

        1.      The defendant's motion to stay this action pending resolution of the

reexamination proceedings is GRANTED.

#104

-2-

IT IS FURTHER ORDERED that:

1.    Any further proceedings in the case, whether discovery or otherwise, are stayed pending further order of the Court.

2.    The stay is indefinite and any party may, without prejudice, seek to modify or vacate the stay in the event a material change in circumstances occurs.

3.    Status reports from the plaintiff and collectively, the defendants, advising the Court as to the status of the reexamination proceeding and the continued need for staying this action are due on December 20, 1999.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
CHIEF JUDGE
UNITED STATES DISTRICT COURT

Dated: October 5, 1999
        Rochester, New York

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Dome Patent L.P.

                                    Plaintiff(s)

        v.                                      6:98-cv-06247

Permeable

                              Defendant(s)

---

PLEASE take notice of the entry of an ORDER filed on

10/5/99, of which the within is a copy, and entered 10/5/99

upon the official docket in this case.  (Document No. 104 .)

Dated:  Rochester, New York
        October 5, 1999

                              RODNEY C. EARLY, Clerk
                              U.S. District Court
                              Western District of New York
                              2120 U.S. Courthouse
                              100 State Street
                              Rochester, New York 14614

Enclosure
TO:
        Koorosh Afshari, Esq.
        Douglas Jones, Esq.
        James T. FitzGibbon, Esq.
        Brian B. Shaw, Esq.
        Harry C. Post, Esq.
        Michael Wolford, Esq.
        Priscilla F. Gallagher, Esq.
        James R. Vogler, Esq.
        John P. Sutton, Esq.
        Henry D. Coleman, Esq.
        Herbert W. Larson, Esq.
        H. William Larson, Esq.
        James Metzler, Esq.

# Ex. 4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
UNITED STATES COURTHOUSE
100 STATE STREET, ROOM 2500
ROCHESTER, NEW YORK 14614-1324

CHAMBERS OF
DAVID G. LARIMER
CHIEF JUDGE

(716) 263-5894
FAX (716) 263-6433

March 10, 2000

Douglas Jones, Esq.
Chamberlain, D'Amanda,
Oppenheimer & Greenfield
1600 Crossroads Building
2 State Street
Rochester, New York 14614

John P. Sutton, Esq.
2421 Pierce Street
San Francisco, California 94104

Henry D. Coleman, Esq.
708 Third Floor
14th Floor
New York, New York 10017-4101

James T. FitzGibbon, Esq.
Vedder, Price, Kaufman & Kammholz
222 North LaSalle Street
Chicago, Illinois 60601-1003

Brian B. Shaw, Esq.
Cumpson & Shaw
Two Street
Rochester, New York 14614

H. William Larson, Esq.
Larson and Larson, P.A.
7381 114th Avenue North #406
Largo, Florida 33773

Harry C. Post, Esq.
Griggs, Robinson, Post,
Henderson & Smith, LLP
1200 North Dallas Bank Tower
12900 Preston Road, LB-29
Dallas, Texas 75230

Michael Wolford, Esq.
Wolford & Leclair, LLP
600 Reynolds Arcade Building
16 East Main Street
Rochester, New York 14614

Edward W. Remus, Esq.
McAndrews, Held & Malloy, Ltd.
500 West Madison Street
34th Floor
Chicago, Illinois 60661

Priscilla F. Gallagher, Esq.
McAndrews, Held & Malloy, Ltd.
500 West Madison Street
34th Floor
Chicago, Illinois 60661

James Metzler, Esq.
Boylan, Brown, Code, Fowler,
Vigdor & Wilson
2400 Chase Square
Rochester, New York 14614

James R. Vogler, Esq.
Foley & Lardner
330 North Wabash Avenue, Suite 3300
Chicago, Illinois 60611

Douglas Jones, Esq., et al.
Page 2
March 10, 2000

RE: DOME PATENT L.P. V. PERMEABLE TECHNOLOGIES, INC., ET AL. - 98-CV-6247L

Dear Counsel:

The court has received your recent correspondence concerning plaintiff's request that the stay in this case be lifted. After reviewing your submissions, I am not convinced that the stay should be lifted at this time. It appears from the December 16, 1999 decision of the Patent and Trademark Office that there has been some activity there. I also note that the Court of Appeals for the Federal Circuit recently denied plaintiff's petition for a writ of mandamus challenging the Group Director's finding that there was a new issue of patentability, which also suggests that the reexamination proceeding should go forward.

Nevertheless, I am sensitive to plaintiff's concern about delays in this matter. I therefore deny plaintiff's request to lift the stay, but direct the parties to report to me again on September 1, 2000 on the status of the reexamination proceeding. If appropriate, plaintiff may renew its request to lift the stay at the time, and the court will revisit the matter.

Very truly yours,

David G. Larimer
Chief Judge
United States District Court

DGL/ea

# EXHIBIT 5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DOME PATENT L.P.,

                       Plaintiff (s),

    -vs-

                                           98-CV-6247

PERMEABLE TECHNOLOGIES,
INC., et al,

                       Defendant(s),

_____        ORDER TO SHOW CAUSE

DOME PATENT L.P.,

                       Plaintiff(s),

    -vs-                              99-CV-6377

CON-CISE CONTACT LENS, INC.,

                       Defendant(s).

_____

       The above cases have been pending for some time without any action.  The parties are, therefore, directed to advise the Court in writing concerning the status of these cases.  Counsel should submit a joint statement, if possible, setting forth the case status to include: Is the case still pending?  Has discovery been completed?  Would a conference with the Court be of assistance?  Is the case ready for trial?

Please send a written response to this order by **letter, facsimile or e-mail** at the address, fax number, or e-mail address listed below no later than **April 11, 2005**.  Your failure to respond could result in the case being dismissed for failure to prosecute pursuant to Rule 41.2 of the local rules.

**IT IS SO ORDERED**.

Hon. David G. Larimer
U.S. District Court
100 State Street, Room 2500
Rochester, New York 14614
Facsimile:  (585) 613-4045
E-Mail: larimer@nywd.uscourts.gov

David G. Larimer
United States District Judge

Dated:          March 28, 2005
                Rochester, New York

Ex. 6



UNITED STATES DEPARTMENT OF COMMERCE
**Patent and Trademark Office**
Address:    COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| CONTROL NUMBER | FILING DATE | PATENT UNDER REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 90/005,090 | 08/27/98 | 4306042 | |

IM22/0410

JAMES P. SUTTON
2421 PIERCE STREET
SAN FRANCISCO CA 94115

| EXAMINER |
|---|
| MCCLENDON, S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1711 | 22 |

DATE MAILED:
04/10/01

# OFFICE ACTION IN REEXAMINATION

[X] Responsive to the communication(s) filed on **19 January 2001**    [ ] This action is made FINAL.

A shortened statutory period for response to this action is set to expire **2** month(s) from the date of this letter. Failure to respond within the period for response will cause termination of the proceeding and issuance of a reexamination certificate in accordance with this action.  37 CFR 1.550(d).  **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

## PART I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. [ ] Notice of References Cited by Examiner, PTO-892.     3. [ ] Notice of Informal Patent Drawing, PTO-948.

2. [ ] Information Disclosure Citation, PTO-1449.      4. [ ] _____

## PART II    SUMMARY OF ACTION:

1a. [X] Claims **2-7** _____ are subject to reexamination.

1b. [ ] Claims _____ are not subject to reexamination.

2. [ ] Claims _____ have been cancelled.

3. [X] Claims **2-4 + 7** _____ are confirmed.

4. [ ] Claims _____ are patentable.

5. [X] Claims **5-6** _____ are rejected.

6. [ ] Claims _____ are objected to.

7. [ ] The formal drawings filed on _____ are acceptable.

8. [ ] The drawing correction request filed on _____ is [ ] approved, [ ] disapproved.

9. [ ] Acknowledgment is made of the claim for priority under 35 U.S.C. 119.  The certified copy has [ ] been received,
[ ] not been received, [ ] been filed in Serial No. _____ filed on _____.

10. [ ] Since the proceeding appears to be in condition for issuance of a reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11, 435 O.G. 213.

11. [ ] Other

cc: Requester

PTOL-466 (2-90)

04/10/2001

## DETAILED ACTION

### *Response to Amendment*

1.    In response to the Amendment received on January 19, 2001, the examiner has carefully considered the amendments. The amendment filed January 19, 2001 proposes amendments to the specification and claims that do not comply with 37 CFR 1.530(d), which sets forth the manner of makin g amendments in reexamination proceedings. A supplemental paper correctly proposing amendments in the reexamination proceeding is required.

Any amendment to the specification other than the claims should be presented to the office as follows:

(i)    Amendments must be made by submission of the entire text of a newly added or rewritten paragraph(s) with markings pursuant to paragraph (d)(1)(iii) of this section, except that an entire paragraph may be deleted by a statement deleting the paragraph without presentation of the text of the paragraph.

(ii)    The precise point in the specification must be indicated where the paragraph to be amended is located.

(iii)    Underlining below the subject matter added to the patent and brackets around the subject matter deleted from the patent are to be used to mark the amendments being made.

Amendments in reexamination proceedings: Any proposed amendment to the description and claims in patents involved in reexamination proceedings must be made in accordance with §1.530(d).

**The amendment although improper will be treated on the merits, as if claim 1 has been cancelled and claims 5-7 added.**

2.    Claims 5-7 are rejected under 35 U.S.C. 305(a) as enlarging the scope of the claim(s) of the patent being reexamined. In 35 U.S.C. 305(a), it is stated that "[n]o proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding...." A claim presented in a reexamination "enlarges the scope" of the patent claim(s) where the claim is broader than any claim of the patent. A claim is broader in scope

than the original claims if it contains within its scope any conceivable product or process which would not have infringed the original patent. A claim is broadened if it is broader in any one respect, although it may be narrower in other respects. The newly added claims are broader than the original method claims. Claim 5 is broader since it now recites copolymerization of any polysiloxanyl alkyl acrylic ester and an alkyl acrylic ester, wherein in claim 1 the polysiloxanyl ester was specifically limited to TRIS as the polysiloxanyl alkyl acrylic ester and the crosslinker · was not specified.

## Standing Rejection

1.      Claims 5-6 are rejected under 35 U.S.C. 103(a) as being unpatentable over Quaal (3,377,371) in view of Gaylord (4,120,570) and Tanaka et al (4,235,985).

Quaal teaches tris-siloxy acrylic silane. The disclosure of Quaal teaches a method of making tris (trimethylsiloxy)-$\alpha$-methacryloxypropylsilane (TRIS). The method, example 1, includes reacting methacrylatopropyltrimethoxysilane, trimethylacetoxysilane, and trimethylsilyl chloride in the presence of a water/solvent mixture. While in example 4, Quaal teaches reacting only methacrylatopropyltrimethoxysilane and trimethylsilyl chloride using the method of example 1 to get the TRIS product. Quaal teaches that the amount of water employed in the reaction is not critical except that enough should be used for the hydrolysis reaction to proceed. Additionally, it is taught that the solvent is not essential. However, it is used to help maintain a low reflux temperature, to improve the stability of the product, and to help separate the product from any hydrohalic acid that may be produced. Thus, it would have been obvious to added large amounts of water to produce TRIS. The motivation would have been to employ the hydrolysis reaction. Moreover, because water is a known to be used as a coolant, it would also help to keep the reflux temperature low. Quaal teaches that the monomers prepared by the patent are useful for modifying organic polymers having unsaturated organic monomers since they (tri-siloxy acrylic silanes) will readily copolymerize with other monomers—col. 1, lines 67-70. Quaal does not expressly teach using said TRIS in a composition to make oxygen permeable contact lens.

Gaylord discloses compositions and articles for correcting visual defects. Said, composition comprises a copolymer of a polysiloxanylalkyl acrylic ester and an alkyl acrylic ester. In addition, the composition comprises a free radical polymerization initiator from 0.05 to

2% by weight. Moreover, the composition can comprises from 0.1 to 10% of a wetting agent. Said, polysiloxanylalkyl acrylic ester can be chosen from the list in col. 2, wherein tris (trimethylsiloxy)-α-methacryloxypropylsilane (TRIS) is one. The alkyl acrylic esters can be chosen from the list in col. 3 and col. 4. Example 22 discloses a method of making TRIS using methacrylatopropyltrimethoxysilane and trimethylacetoxysilane in the presence of a catalyst solution of sulfuric acid, ethanol, and water. The contact lens is made in Example 23 using TRIS and methyl methacrylate in the presence of a free radical polymerization initiator.

Gaylord and Quaal are analogous art because they are from the same field of endeavor that is polyorganosiloxane compositions that are oxygen permeable.

Therefore, it would have been obvious to one of ordinary skill in the art to make a contact lens using the composition as taught by Gaylord, using the method for making the TRIS monomer, as taught by Quaal. The motivation to use the TRIS preparation of Quaal would have been to use a non-hazardous-type catalyst system—water/ether vs. ethylsulfuric acid. Wherein, the sulfuric acid is a corrosive acid.

Gaylord does not expressly teach the use of siloxanyl poly-functional ester crosslinking agents in the method of making contact lens.

Tanaka et al teaches polymers for contact lens and contact lens made thereof. Tanaka et al teaches that a polymerization product can be obtained from (a) an organosiloxane monomer having a formula I—see abstract and col. 1—and (b) a hydrophobic methacrylic acid alkyl ester monomer. The organosiloxane monomer is polymerized with the hydrophobic monomer to form a copolymer. Said copolymer is then crosslinked to improve solvent resistance. This can be done with a polyfunctional crosslinking agent. Said agent can be monomers such as those listed in col. 8, lines 3-34. These can be methacrylate, vinyl, allyl, and polyfunctional monomers having siloxane groups. Wherein, polysiloxanylbis (alkyl methacrylate) are preferred. Because the crosslinking agent can have siloxane bonds, it helps to maintain the hydrophilic property in the cured product. The polymerization of the copolymer and crosslinking agent is done in the presence of a free radical polymerization initiator. This composition is then cast into a mold with a contact lens shape and polymerized to obtain a contact lens.

Gaylord et al and Tanaka et al are analogous art because they are from the same fields of endeavor that is polyorganosiloxane compositions that are oxygen permeable.

Therefore, it would have been obvious to one of ordinary skill in the art to use polysiloxanyl esters of acrylates or methacrylates as crosslinking agents, as taught by Tanaka et al, instead of the crosslinking agents in the composition, as taught by Gaylord, to make contact lens. Because Tanaka et al teaches that either (meth) acrylates or siloxanyl alkyl esters as crosslinkers, they are deemed equivalent. The motivation would have been to obtain a contact lens with hydrophilic and superior oxygen permeability as taught by Tanaka et al—see col. 3, lines 20-22 and col. 8, lines 43-46.

Thus, the invention of claim 1̃ is obvious in the combination of the reference.

### Claim Rejections - 35 USC § 103

3.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

• Claims 5-6 are rejected under 35 U.S.C. 103(a) as being unpatentable over Gaylord (4,120,570) in view of Tanaka et al (4,235,985).

Gaylord discloses compositions and articles for correcting visual defects.   Said composition comprises a copolymer of a polysiloxanylalkyl acrylic ester and an alkyl acrylic ester.  In addition, the composition comprises a free radical polymerization initiator from 0.05 to 2% by weight.  Moreover, the composition can comprises a crosslinking agent to provide for rigidity in the contact lens and from 0.1 to 10% of a wetting agent.  Said crosslinking monomer can be chosen from the group in column 6, lines 3-12.  Said polysiloxanylalkyl acrylic ester can be chosen from the list in col. 2, wherein tris (trimethylsiloxy)-α-methacryloxypropylsilane (TRIS) is one.  The alkyl acrylic esters can be chosen from the list in col. 3 and col. 4.  Example 22 discloses a method of making TRIS using methacrylatopropyltrimethoxysilane and

trimethylacetoxysilane in the presence of a catalyst solution of sulfuric acid, ethanol, and water. The contact lens is made in Example 23 using TRIS and methyl methacrylate in the presence of a free radical polymerization initiator.

Gaylord does not expressly teach the use of siloxanyl poly-functional ester crosslinking agents in the method of making contact lens.

Tanaka et al teaches polymers for contact lens and contact lens made thereof. Tanaka et al teaches that a polymerization product can be obtained from (a) an organosiloxane monomer having a formula I—see abstract and col. 1—and (b) a hydrophobic methacrylic acid alkyl ester monomer. The organosiloxane monomer is polymerized with the hydrophobic monomer to form a copolymer. Said copolymer is then crosslinked to improve solvent resistance. This can be done with a polyfunctional crosslinking agent. Said agent can be monomers such as those listed in col. 8, lines 3-34. These can be methacrylate, vinyl, allyl, and polyfunctional monomers having siloxane groups, wherein polysiloxanylbis (alkyl methacrylate) are preferred. Because the crosslinking agent can have siloxane bonds, it helps to maintain the hydrophilic property in the cured product. The polymerization of the copolymer and crosslinking agent is done in the presence of a free radical polymerization initiator. This composition is then cast into a mold with a contact lens shape and polymerized to obtain a contact lens.

Gaylord et al and Tanaka et al are analogous art because they are from the same fields of endeavor that is polyorganosiloxane compositions that are oxygen permeable.

Therefore, it would have been obvious to one of ordinary skill in the art to use polysiloxanyl esters of acrylates or methacrylates as crosslinking agents, as taught by Tanaka et al, instead of the crosslinking agents in the composition, as taught by Gaylord, to make contact lens. Because Tanaka et al teaches that (meth) either acrylates or siloxanyl alkyl esters as crosslinkers, they are deemed equivalent in function. Tanaka et al also teaches that the siloxane bonds of the esters improve oxygen permeability of the compositions. One skilled in the art would have been motivated to employ siloxanyl alkyl esters in order to obtain a contact lens with superior oxygen permeability as taught by Tanaka et al—see col. 3, lines 20-22 and col. 8, lines 43-46.

Thus, the invention of claims 5-6 are obvious in the combination of the reference because the method steps in original claim 1 are encompassed in the method of claims 5-6.

Application/Control Number: 90/005,090

Art Unit: 1711

## Response to Arguments

### Declaration 1 from Neefe:

4.    The Declaration of Neefe under 37 CFR 1.132 filed January 19, 2001 is insufficient to overcome the rejection of the claims based upon the Gaylord 3,808,178 under 356 USC 103(a) as set forth in the last Office action because: 3,808,178 to Gaylord was not used in the obviousness rejection as set forth in the Office action dated 12/08/00.

In response to paragraph 9 of the Neefe Declaration the evidence of a obtaining a Dk of 151 when your invention was used is not commensurate in scope with the method set forth in claims 5-6.  In addition, there is not any data to tell what components, weight percents of said components were used, or which method was used to make the materials in the 1986 Paragon report.

In response to applicant's arguments against the references individually, one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references.  See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.*, 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986).  In response to applicant's argument that the original claim 1 of 4,306,042 was meant to be of a Jepson-type claim or an "improvement over" the prior art this argument has no merit because the claim does not recite an improvement.

The applicant has not provided any evidence that the method of making TRIS by Quaal is different than that of 4,306,042 to Neefe or that the TRIS product made by Quaal cannot be used in the synthesis of a contact lens.  Especially, in light of the fact that TRIS is a well-known monomer in the synthesis of contacts—see Gaylord (4,120,570).

### Declaration 2 from Sutton:

5.    The Declaration of Sutton under 37 CFR 1.132 filed January 19, 2001 is insufficient to overcome the rejection of the claims based upon a specific reference applied under 35 USC 103(a), namely Quaal as set forth in the last Office action because: Quaal is deemed to be analogous art because it teaches a method of making TRIS—in addition see below in paragraph 9. The examiner acknowledges the inaccuracy in the Office action sent 12/08/2000 states the

04/10/2001

Quaal and Gaylord are analogous art because they teach polyorganosiloxane compositions that are oxygen permeable. Notwithstanding, Gaylord and Quaal are still analogous art because each teach methods of preparing tris-siloxy acrylic silanes and that the compounds are polymerizable with ethylenically unsaturated monomers—see Quaal col. 1, lines 67-70. Quaal is relies upon only for the method of making TRIS monomers.

Applicant's arguments with respect to Gaylord application serial number, 461,882 are not persuasive. This application, serial number 461,882, does not correspond to the Gaylord patent used to reject instant claims. Therefore, any arguments to the prosecution of serial number 461,882 or any other patents not addressed in the 35 USC 103(a) in the Office action dated 12/08/2000 are moot and not considered.

Applicant's argument that the Quaal reference was dropped in continuing Gaylord applications is not persuasive. The rejection of method claims of 4,120,570 over Quaal is not relevant to Neefe method claims because '570 method step is fitting to patients eye-to-a lens fabricated from a solid copolymer.... Neefe method is method steps for making a copolymer from the monomers recited.

It is noted that an issue not within the scope of reexamination proceedings has been raised. The issue being consideration of Exhibits 1-6. The issue is not proper for consideration in a reexamination proceeding. See 37 CFR 1.552(c).

However, examiner refers applicant to exhibit 5, as found in the Amendment and Response filed January 19, 2001 that shows all elements were known in the prior art. Moreover, that it would have been obvious to combine them to obtain an oxygen permeable contact lens. For example, Gaylord teaches using TRIS in contact lens compositions in combination with a crosslinker, Quaal teaches an alternate method of making TRIS, and Tanaka et al teaches using TRIS-type polymers in combination with oxygen permeable crosslinkers to make oxygen permeable contact lens. Moreover, Gaylord teaches using TRIS to get higher oxygen permeability and Tanaka et al teaches siloxanyl ester crosslinkers to get higher oxygen permeability.

In response to applicant's argument that Quaal is not a bar to patentability of a method of making contact lens material: The examiner contends that one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.*, 800 F.2d 1091,

231 USPQ 375 (Fed. Cir. 1986). It is acknowledged that Quaal does not teach a method making contact lens, however Quaal does teach the synthesis of TRIS with is a concern of the applicant's invention. The examiner contends that methods of making organic compounds containing silicon might be relevant to claims for making contact lens from silicon compounds. Therefore, the combination of Quaal, Gaylord and Tanaka et al are deemed analogous art.

### *Response to Remarks (1-19-2001):*

6. Applicant's arguments filed January 19, 2001 have been fully considered, the arguments are moot with respect to cancelled claim 1. The examiner will respond to the arguments to help clarify the record and to establish a clear issue with regards to all arguments and the re-examination of US Patent 4,306,042.

7. The applicant states that Quaal does not teach using A-174 to get a TRIS product. The examiner disagrees. In example 1, Quaal teaches using 248 gm of CH2=C (CH3) COO (CH2) 3 Si (OCH3) 3 which is methacryloxypropyl trimethoxy silane or A-174, as taught by Neefe. In addition, the examiner refers the applicant to the Request for Reexamination, dated August 27, 1998, page three. In the paragraph describing claim 1, it states "Quaal teaches the synthesis of TRIS (see example 1, column 2,lines 3-30 and example 4, first two entries, column 3, lines 10-11) using methacryloxypropyltrimethoxysilane (herein referred to using its commercial name A174) and trimethylchlorosilane...." This paper is signed by applicant's representation, so the remarks regarding the methods of Quaal are not understood.

8. In response to applicant's argument that Quaal does not disclose any "oxygen permeable properties" of TRIS, Quaal is relied upon for teaching a method of making TRIS. In this case, Quaal is reasonably pertinent to the particular problem (synthesis of TRIS) with which applicant is concerned. Gaylord is relevant art because it is in the same field of endeavor, that is methods of making contact lenses. The examiner refers applicant to the Office Action dated 12/08/2000 that cites Gaylord (4,120,570).

9. Claims 5-6 are now rejected over Gaylord (4,120,570) in view of Tanaka et al (4,235,985). Therefore, arguments to Gaylord 3,808,178 are moot with regards to the rejection sent by the Office dated 12/08/2000. Regardless of the nature of the claims patented in 3,808,178 or the examination of other continuing applications of Gaylord, Gaylord (4,120,570)

Application/Control Number: 90/005,090                                    Page 10
Art Unit: 1711

discloses/teaches oxygen permeable contact lens compositions and articles made thereof. Therefore, Gaylord (4,120,570) is pertinent and relevant to applicant's endeavor and concerns.

10.     The examiner agrees that Gaylord does not teach oxygen-permeable crosslinkers. Gaylord teaches the use of methacrylate esters. Quaal on the other hand does not teach using crosslinkers in the disclosure, but teaches that the monomers made by the invention can be used as co-monomers in other compositions—see column 1, lines 67-70. Tanaka et al is relied upon for teaching siloxanyl crosslinkers.

11.     Applicant's argument that the enhancement of oxygen permeability is evidence of non-obviousness and unexpected results in the method as taught by applicant is not commensurate in scope with the method set forth in the instant claims. Additionally, evidence that these results are unexpected is not found especially because Tanaka et al teaches that siloxanyl alkyl esters provided higher oxygen permeability properties when used over other crosslinkers that do not provide silicone bonds in the final product-see Tanaka et al (4,235,958) column 8, lines 35-40 and column 10, lines 46-end to column 11, lines 1-46.

12.     With regards to applicant's argument that there is no suggestion to combine the references, the examiner recognizes that obviousness can only be established by combining or modifying the teachings of the prior art to produce the claimed invention where there is some teaching, suggestion, or motivation to do so found either in the references themselves or in the knowledge generally available to one of ordinary skill in the art.  See *In re Fine*, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988) and *In re Jones*, 958 F.2d 347, 21 USPQ2d 1941 (Fed. Cir. 1992).  In this case, Quaal teaches a method of making TRIS and it is well known in the art to use TRIS and other acrylic silanes in making contact lens—see Gaylord 4,120,570. Gaylord teaches using TRIS in contact lens compositions with crosslinkers, Quaal teaches an alternate method of making TRIS, and Tanaka et al teaches using siloxanyl alkyl ester crosslinkers to provide oxygen permeability in contact lens. Tanaka et al teaches that the use of siloxanyl alkyl esters provide siloxane bonds which provides oxygen permeability in the crosslinked polymers. One of ordinary skill in the art would have been motivated to use siloxanyl alkyl ester as crosslinkers to provide a crosslinked polymer composition with high oxygen permeability as suggest by Tanaka et al—see column 8, lines 35-40.

13.     In response to applicant's argument that the examiner's conclusion of obviousness is based upon improper hindsight reasoning, it must be recognized that any judgment on

0

Application/Control Number: 90/005,090                                    Page 11
Art Unit: 1711

obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning. But so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made, and does not include knowledge gleaned only from the applicant's disclosure, such a reconstruction is proper. See *In re McLaughlin*, 443 F.2d 1392, 170 USPQ 209 (CCPA 1971). Thus, Tanaka et al teaches that either (meth) acrylates or siloxanyl alkyl esters can be used as crosslinkers, wherein the siloxanyl alkyl esters are preferred because they provide oxygen permeable properties to the copolymer. Therefore, the examiner contends that it would have been obvious for one of ordinary skill in the art to use the crosslinkers preferred by Tanaka et al in the contact lens composition of Gaylord. The motivation would have been to obtain a contact lens with superior oxygen permeability as suggested by both Gaylord and Tanaka et al.

The examiner acknowledges that Tanaka teaches the use of a hydrophobic methacrylic acid ester monomer in the preparation of the siloxane copolymer. However, the hydrophobic methacrylic acid ester is not intended to be a crosslinker. It is intended to be a co-monomer in the synthesis of organosiloxane copolymer that is then crosslinked with a crosslinker. Tanaka et al teaches that said crosslinkers could be vinyl compounds, such as polyfunctional monomers with siloxane bonds. These are preferred because the oxygen permeability of the obtained crosslinked polymers is high, since they contain siloxane bonds in their molecules. It is not agreed that Tanaka teaches a huge catalog of potential crosslinkers. The two formulas set forth in column 6 makes selection of siloxanyl alkyl ester crosslinkers straightforward. Gaylord teaches that copolymers containing TRIS and TRIS-type co-monomers show improved oxygen permeability—see column 4, lines 57-59. Gaylord and Tanaka et al both teach the use of known crosslinkers, such as ethylene glycol dimethacrylate, whereas Tanaka et al also teaches those siloxanyl alkyl esters can be used to improve oxygen permeability. Therefore, it would have been obvious for one of ordinary results to use the crosslinkers of Tanaka et al in a composition for contact lens as suggested by Gaylord to improve the oxygen permeability in the absence of unexpected results.

14.     In response to applicant's argument that the references fail to show certain features of applicant's invention, it is noted that the features upon which applicant relies (i.e., DIMER) are not recited in the rejected claim(s). Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims. See *In re Van.*

1

15.    *Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993). Applicant's claim 1 does not recite the use of a DIMER product. It recites the use of a multi functional siloxanyl alkyl ester crosslinker, so the definitions of Tanaka's formula "V" and "VI" read on the multifunctional siloxanyl alkyl ester crosslinker of applicant's claim 1.

16.    In response to paragraph 7, the examiner did intend for the Response to Amendment section to respond to the Declarations by Dr. Mark and Dr. Berry.

17.    In response to applicant's discussion of the Chang reference. The examiner intended to show that it was known in the art that distillation under vacuum of crude TRIS is enough to remove impurities to provide a pure TRIS product.

**18.**    Applicant's arguments concerning the Ellis patent 4,424,328 and the prosecution of the Gaylord. Patent (4, 120,570) in relation to the prosecution of the re-examination of Neefe (4,306,042) has been considered. Ellis was not used in the re-exam rejection of claim 1; therefore, these arguments are irrelevant.

### Conclusion

19.    No substantial new question of patentability for claims 2-4 and 7 is raised by the request for reexamination and prior art cited therein for the reasons set forth below.

The prior art made of record fails to teach methods of making an oxygen permeable material for manufacture of contact lens, wherein the claim 2 method comprises first synthesizing crosslinker 1,5- bis (methacryloxypropyl)-1,1,5,5-tetrakis (trimethylsiloxy) dimethyltrisiloxane. Adding this crosslinker to a copolymer of a siloxy alkyl ester and an ester of acrylic and methylacrylic acid to prepare an oxygen permeable contact lens, wherein this contact lens also comprises a wetting agent and a free radical or photoinitiator. The claim 3 method comprises synthesizing crosslinker 1,5,9-tris (methacryloxypropyl)-1,1,5,9,9-pentakis (trimethylsiloxy) tetramethylpentasiloxane. Adding this crosslinker to a copolymer of a siloxy alkyl ester and an ester of acrylic and methylacrylic acid to prepare an oxygen permeable

contact lens, wherein this contact lens also comprises a wetting agent and a free radical or photoinitiator. The claim 4 method comprises synthesizing the crosslinker 1,5,9,13-tetrakis (methacryloxypropyl)-1,1,5,9,13,13-hexakis (trimethylsiloxy) hexamethylheptasiloxne. Adding this crosslinker to a copolymer of a siloxy alkyl ester and an ester of acrylic and methylacrylic acid to prepare an oxygen permeable contact lens, wherein this contact lens also comprises a wetting agent and a free radical or photoinitiator.

In addition, the prior art fails to teach using 1,1,3,3-tetrakis (trimethylsiloxy)-1,3-bis (methacryloxypropyl) disiloxane, as recited in new claim 7.

20.     **THIS ACTION IS MADE NON-FINAL.**

21.     Any inquiry concerning this communication or earlier communications from the examiner should be directed to Sanza L McClendon whose telephone number is (703) 305-0505. The examiner can normally be reached on Monday through Friday 8:00 to 4:30.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, James Seidleck can be reached on (703) 308-2462. The fax telephone numbers for the organization where this application or proceeding is assigned are (703) 872-9645 for regular communications and (703) 305-3599 for After Final communications.

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the receptionist whose telephone number is (703) 308-0657.

Sanza L McClendon
Examiner
Art Unit 1711

Smc
March 19, 2001
Conferees:
James Seidleck
Susan Berman

James J. Seidleck
Supervisory Patent Examiner
Technology Center 1700

SUSAN W. BERMAN
PRIMARY EXAMINER
GROUP 1500

3

04/10/2001

Ex. 7



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/005,090 | 08/27/1998 | | | 6919 |

7590     05/23/2002

Perkins Coie LLP
P.O. Box 2168
Menlo Park, CA  94026

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | 3 0 |

DATE MAILED: 05/23/2002

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 07-01)

01/19/2001



| | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/005,090 | 4306042 |
| **Office Action in Ex Parte Reexamination** | Examiner | Art Unit |
| | Sanza L McClendon | 1711 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a ☒ Responsive to the communication(s) filed on <u>12 September 2001</u> .        b ☒ This action is made FINAL.
c ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination
certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days
will be considered timely.

Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.        3. ☐ Interview Summary, PTO-474.

2. ☐ Information Disclosure Statement, PTO-1449.        4. ☐ _____.

Part II   SUMMARY OF ACTION

1a. ☒ Claims <u>1-4</u> are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☒ Claims <u>2-4</u> are patentable and/or confirmed.

4. ☒ Claims <u>1</u> are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All  b)☐ Some*  c)☐ None     of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____ .

   4☐ been filed in reexamination Control No. _____.

   5☐ been received by the International Bureau in PCT application No. _____.

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal
   matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D.
   11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)
US Patent and Trademark Office
PTO-466 (Rev. 04-01)        **Office Action in Ex Parte Reexamination**        Part of Paper No. 29

01/19/2001

# DETAILED REEXAMINATION ACTION

## *Response to Amendment*

1.   In response to the Amendment received on September 12,
2001, the examiner has carefully considered the amendments.
However, because patent 4,306,042 has expired, no amendments can
be entered into an expired patent per rule 37 CFR 1.530(j), which
states:

> § 1.530 Statement by patent owner in ex parte reexamination; amendment
> by patent owner in ex parte or inter
>
> partes reexamination; inventorship change in ex parte or inter partes
> reexamination.

> (j) No enlargement of claim scope. No amendment may enlarge the scope
> of the claims of the patent or introduce new matter. No amendment may be proposed for
> entry in an
>
> expired patent. Moreover, no amendment, other than the cancellation of
> claims, will be incorporated into the patent by a certificate issued after the
> expiration of the patent.

Therefore, all amendments sent in for consideration will not be
entered. these include paper number 21, received January 19,
2001; paper numbers 25-27, received June 1, 2001 and June 11,
2001 by John Sutton, respectfully; and paper 28, received
September 12, 2001.   Thus the case is now restored to the
original claims that were subjected to re-examination.   In
summary, claim 1 is rejected and claims 2-4 are not subject to
re-examination because there is no substantial question of
patentability.

01/19/2001

2.    The Declaration of Neefe under 37 CFR 1.132 filed May 29, 2001 is insufficient to overcome the rejection of claim 1 based upon Gaylord ('178) and Tanaka* as set forth in the last Office action because:  US patent 3,808,178 to Gaylord was not a part of the obviousness rejection as set forth in Office Action dated December 08, 2000 or March 19, 2001.  There is no evidence that the oxygen permeability of the Tanaka copolymers is "no better" than that of the Gaylord copolymers.   The Declaration is not persuasive because it does not apply to the combination of Gaylord (4,120,570),  Quaal (3,377,371) and  Tanaka et al (4,235,985). Additionally, the Declaration appear to be self-serving, that is not supported by factual evidence—see statements number 4-5, which includes evidence of unexpected results, commercial success, solution of a long-felt need, inoperability of the prior art, invention before the date of the reference, and allegations that the author(s) of the prior art derived the disclosed subject matter from the applicant.

1.    With respect to the Declaration of Neefe, dated January 9, 2001, it is not found persuasive for the same reasons specified in Office action dated March 16, 2001.

### Claim Rejections - 35 USC § 103

2.    The text of those sections of Title 35, U.S. Code not included in this action can be found in a prior Office action.

3.    Claim 1 is rejected under 35 U.S.C. 103(a) as being unpatentable over Quaal (3,377,371) in view of Gaylord and Tanaka* et al (4,235,985).

Quaal teaches tris-siloxy acrylic silane.  The disclosure of Quaal teaches a method of making tris (trimethylsiloxy)-□-methacryloxypropylsilane (TRIS).  The method, example 1, includes reacting                          methacrylatopropyltrimethoxysilane, trimethylacetoxysilane,  and  trimethylsilyl  chloride  in  the

---

* Examiner is assuming the applicant is referring to USP 4,235,985) to

01/19/2001

presence of a water/solvent mixture. Quaal teaches that the amount of water employed in the reaction is not critical except that enough should be used for the hydrolysis reaction to proceed. Additionally, it is taught that the solvent is not essential. However, it is used to help maintain a low reflux temperature, to improve the stability of the product, and to help separate the product from any hydrohalic acid that may be produced. Thus, it would have been obvious to added large amounts of water to produce TRIS. The motivation would have been to employ the hydrolysis reaction. Moreover, because water is known to be used as a coolant, it would be expected to keep the reflux temperature low in the absence of solvent. Quaal teaches that the monomers prepared by the patent are useful for modifying organic polymers having unsaturated organic monomers since they (tri-siloxy acrylic silanes) will readily copolymerize with other monomers—col. 1, lines 67-70. Quaal does not expressly teach using said TRIS in a composition to make oxygen permeable contact lens.

Gaylord discloses compositions and articles for correcting visual defects. Said composition comprises a copolymer of a polysiloxanylalkyl acrylic ester and an alkyl acrylic ester. In addition, the composition comprises a free radical polymerization initiator from 0.05 to 2% by weight. Moreover, the composition can comprises from 0.1 to 10% of a wetting agent. Said polysiloxanylalkyl acrylic ester can be chosen from the list in col. 2, wherein tris (trimethylsiloxy)-$\alpha$-methacryloxypropylsilane (TRIS) is one. The alkyl acrylic esters can be chosen from the list in col. 3 and col. 4. Example 22 discloses a method of making TRIS using methacrylatopropyltrimethoxysilane and trimethylacetoxysilane in the presence of a catalyst solution of sulfuric acid, ethanol, and water. The contact lens is made in Example 23 using TRIS and methyl methacrylate in the presence of a free radical polymerization initiator.

---

Tanaka et al found in the rejection under 35 USC 103(a).

4

Gaylord and Quaal are analogous art because they are from the same field of endeavor that is providing polyorganosiloxane compositions that are oxygen permeable.

Therefore, it would have been obvious to one of ordinary skill in the art to make a contact lens using the composition as taught by Gaylord and using the method for making the TRIS monomer as taught by Quaal. The motivation to use the TRIS preparation of Quaal would have been to use a non-hazardous-type catalyst system—water/ether vs. using ethyl sulfuric acid in water and ethanol, wherein, the sulfuric acid is a corrosive acid.

Gaylord does not expressly teach the use of siloxanyl poly-functional ester crosslinking agents in the method of making contact lens.

Tanaka et al teaches polymers for contact lens and contact lens made thereof. Tanaka et al teaches that a polymerization product can be obtained from (a) an organosiloxane monomer having a formula I—see abstract and col. 1—and (b) a hydrophobic methacrylic acid alkyl ester monomer. The organosiloxane monomer is polymerized with the hydrophobic monomer to form a copolymer. Said copolymer is then crosslinked to improve solvent resistance. This can be done with a polyfunctional crosslinking agent. Said agent can be monomers such as those listed in col. 8, lines 3-34. These can be methacrylate, vinyl, allyl, and polyfunctional monomers having siloxane groups; wherein, polysiloxanylbis (alkyl methacrylate) are preferred. Because the crosslinking agent can have siloxane bonds, it helps to maintain the hydrophilic property in the cured product. The polymerization of the copolymer and crosslinking agent is done in the presence of a free radical polymerization initiator. This composition is then cast into a mold with a contact lens shape and polymerized to obtain a contact lens.

Gaylord et al and Tanaka et al are analogous art because they are from the same fields of endeavor that is polyorganosiloxane compositions that are oxygen permeable.

5

Therefore, it would have been obvious to one of ordinary skill in the art to use polysiloxanyl esters of acrylates or methacrylates as crosslinking agents, as taught by Tanaka et al, instead of the crosslinking agents in the compositions as taught by Gaylord to make contact lens. The reason is that Tanaka et al teaches that either (meth) acrylates or siloxanyl alkyl esters are useful crosslinkers. The motivation would have been to obtain a contact lens with hydrophilic properties and superior oxygen permeability as taught by Tanaka et al—see col. 3, lines 20-22 and col. 8, lines 43-46.

Thus, the invention of claim 1 is obvious in the combination of the reference.

## Response to Arguments

4. Applicant's arguments filed September 12, 2001 have been fully considered but they are not persuasive.

5. In response to applicant's argument that there is no suggestion to combine the references, the examiner recognizes that obviousness can only be established by combining or modifying the teachings of the prior art to produce the claimed invention where there is some teaching, suggestion, or motivation to do so found either in the references themselves or in the knowledge generally available to one of ordinary skill in the art. See *In re Fine*, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988) and *In re Jones*, 958 F.2d 347, 21 USPQ2d 1941 (Fed. Cir. 1992). In this case, Gaylord and Quaal are considered analogous art because they both disclose methods for making TRIS. One of ordinary skill in the art would have been motivated to substitute the method of making TRIS taught by Quaal for the method of making TRIS taught by Gaylord because it provides the same TRIS monomer without using a catalyst containing corrosive acid, as taught by Quaal. Gaylord teaches methods for crosslinking the polymers disclosed with (meth) acrylate compounds. Gaylord and

6

Quaal are relevant to the instant claim 1 method of "synthesization" of TRIS and co-polymerizing TRIS.

Gaylord and Tanaka et al are analogous art because they both disclose methods of crosslinking the polysiloxane copolymers disclosed with (meth) acrylate compounds (alkyl (meth) acrylates in the case of Gaylord and alkyl methacrylates and/or siloxanes methacrylates in the case of Tanaka et al). Tanaka et al teaches that crosslinking with siloxyanyl alkyl (meth) acrylate crosslinking agents increase oxygen permeability of the disclosed copolymers. Thus providing motivation to use the siloxanyl acrylates as some or all of the crosslinking agents in Gaylord.

6. Additionally, it is not required that the prior art disclose or suggest the properties newly-discovered by an applicant in order for there to be a prima facie case of obviousness. See In re Dillon, 919 F.2d 688, 16 USPQ2d 1897, 1905 (Fed. Cir. 1990). Moreover, as long as some motivation or suggestion to combine the references is provided by the prior art taken as a whole, the law does not require that the references be combined for the reasons contemplated by the inventor. See In re Beattie, 974 F.2d 1309, 24 USPQ2d 1040 (Fed. Cir. 1992); In re Kronig, 539 F.2d 1300, 190 USPQ 425 (CCPA 1976) and In re Wilder, 429 F.2d 447, 166 USPQ 545 (CCPA 1970).

7. In response to applicant's argument that the references fail to show certain features of applicant's invention, it is noted that the features upon which applicant relies (i.e., improved oxygen permeability of contact lens material or DK values) are not recited in the rejected claim(s). Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims. See In re Van Geuns, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993). These arguments are not commensurate in scope with the method set forth in claim 1. There is no recitation in claim 1 that the method provides for improved oxygen permeability over the prior art, for improved oxygen permeability, nor for a degree of oxygen permeability (the DK value) in the contact lens material as a

7

whole or in the compounds used to make said oxygen permeable material. The claim recites a method of making an oxygen permeable material.

8. With respect to applicant's arguments that the prior art fails to suggest the possibility of achieving further improvement by combining the references along the lines of the instant invention, the examiner respectfully disagrees. Gaylord teaches making TRIS, making copolymers of TRIS, and crosslinking said copolymers with polyacrylates. And additionally, Gaylord teaches that copolymers of TRIS in contact lens have high oxygen permeability. Quaal teaches another materially different method of making TRIS and that it is copolymerizable with vinyl monomers to produce increased oxygen permeability in contact lens—see column 4, lines 57-59. Tanaka et al teaches that crosslinking agents that comprise siloxanyl moieties increases oxygen permeability when crosslinked with copolymers for making contact lens—see column 8, lines 35-39. Therefore, one of ordinary skill in the art would have expected at least a reasonable degree of success in increasing oxygen permeability in a contact lens copolymer provided by the method taught by Gaylord in combination with Quaal, that is crosslinked with a siloxanyl acrylate crosslinking agent, as taught by Tanaka et al.

## Conclusion

9. No substantial new question of patentability for claims 2-4 are raised by the request for reexamination and prior art cited therein for the reasons set forth in Office action dated March 19, 2001 (paper number 22).

10. THIS ACTION IS MADE FINAL.

A shortened statutory period for response to this action is set to expire two (2) months from the mailing date of this action.

Extensions of time under 37 CFR 1.136(a) do not apply in reexamination proceedings. The provisions of 37 CFR 1.136 apply

8

only to "an applicant" and not to parties in a reexamination proceeding. Further, in 35 U.S.C. 305 and in 37 CFR 1.550(a), it is required that reexamination proceedings "will be conducted with special dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37 CFR 1.550(c).** A request for extension of time must be filed on or before the day on which a response to this action is due. The mere filing of a request will not effect any extension of time. An extension of time will be granted only for sufficient cause, and for a reasonable time specified.

The filing of a timely first response to this final rejection will be construed as including a request to extend the shortened statutory period for an additional month, which will be granted even if previous extensions have been granted. In no event however, will the statutory period for response expire later than SIX MONTHS from the mailing date of the final action. See MPEP §2265.

11. Any inquiry concerning this communication or earlier communications from the examiner should be directed to Sanza L McClendon whose telephone number is (703) 305-0505. The examiner can normally be reached on Monday through Friday 8:00 to 4:30.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, James Seidleck can be reached on (703) 308-2462. The fax phone numbers for the organization where this application or proceeding is assigned are (703) 872-9645 for regular communications and (703) 305-3599 for After Final communications.

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the receptionist whose telephone number is (703) 308-0657.

Sanza L McClendon
Examiner
Art Unit 1711

9

Application/Control Number 90/005,090
Art Unit 1711

SMc

May 8, 2002

Conferees:

James J. Seidleck
Supervisory Patent Examiner
Technology Center 1700

10

Ex. 8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DOME PATENT L.P.,

        Plaintiff,

    v.                                   98-CV-6247

PERMEABLE TECHNOLOGIES,
INC., et al.,

        Defendants.

---

DOME PATENT L.P.,

        Plaintiff,

    v.                                   99-CV-6377

CON-CISE CONTACT LENS, INC.,

        Defendants.

---

## JOINT STATEMENT IN RESPONSE TO ORDER TO SHOW CAUSE

The parties in the above-entitled cases, with the exception of defendant, Stellar Contact lens, Inc., submit this joint statement in response to the Court's Order to Show Cause dated March 28, 2005. Mr. Edward Remus, counsel for defendants Polymer Technology and Con-Cise Contact Lens, Inc., communicated with Mr. Post's office and learned that Harry C. Post, III, Esq., counsel for Stellar Contact lens, Inc., has recently passed away and his former partner is recovering from a stroke and cannot communicate. As a result, Mr. Remus has been unable to ascertain Stellar's present counsel to obtain Stellar's agreement to this Statement but believes that Stellar, once contact is made with it, would join in this Statement.

Each of these cases were stayed by this Court's Order of October 5, 1999, pending resolution of the reexamination of claims 1-4 of the patent-in-suit, U.S. Patent No. 4,306,042 (the '042 patent). The reexamination proceeding for the '042 patent is still pending in the U.S. Patent and Trademark Office (PTO). The patent examiner confirmed claims 2-4 and issued a final rejection as to claim 1, which was appealed by the plaintiff, Dome Patent, to the PTO Board of Patent Appeals and Interferences. The appeal has been fully briefed and docketed. Dome has requested oral argument. No date for oral argument has been set by the Board of Patent Appeals and Interferences. A decision by the PTO Board will follow oral argument. A copy of the transaction history of the reexamination proceeding in the PTO which shows the current status of the proceeding is attached as Exhibit A.

The stays in each of these cases were entered five days after the Court denied certain defendants' Rule 12(e) Motion for More Definite Statement. Consequently, answers to the complaint have not yet been filed by some of the defendants and no discovery has been taken of any defendant. The '042 patent expired as a matter of law on September 8, 2000.

Each of the parties request that the stays be continued in view of the appeal now pending in the PTO. If there is any change in status of the appeal, the parties will promptly advise the Court.

Respectfully submitted,

_____          _____
James W. Dabney, Esq.                        Edward W. Remus, Esq.
Fried, Frank, Harris, Shriver                Priscilla F. Gallagher, Esq.
  & Jacobson LLP                             McAndrews, Held & Malloy, Ltd.
One New York Plaza                           500 West Madison Street, 34th Floor
New York, NY 10004                           Chicago, IL 60661
Counsel for Dome Patent L.P.                 Counsel for Polymer Technology and
                                             Con-Cise Contact Lens, Inc.

2

K. Wade Eaton, Esq.
Chamberlain D'Amanda
1600 Crossroads Building
Two State Street
Rochester, NY  14614-1397
Attorneys for Dome Patent L.P.

Michael R. Wolford, Esq.
Wolford & Leclair, LLP
16 East Main Street, Suite 600
Rochester, NY  14614
Counsel for Polymer Technology and Con-Cise
Contact Lens, Inc.

Henry D. Coleman, Esq.
Coleman Sudol Sapone, PC
714 Colorado Avenue
Bridgeport, Connecticut 06605-1601
Counsel for Permeable Technologies, Inc.

James T. FitzGibbon, Esq.
Vedder, Price, Kaufman & Kammholz
222 North LaSalle Street, Suite 2600
Chicago, IL  60601-1003
Counsel for G.T. Laboratories, Inc.

Edwin Mason
Foley & Lardner LLP
321 N. Clark St., Suite 2800
Chicago, IL  60610-4764
Counsel for G.T. Estate, Inc.

Date:  April 7, 2005

H. William Larson, Esq.
Larson & Larson, P.A.
11199 69th Street North
Largo, FL  33773-5504
Counsel for Optical Polymer Research, Inc.

3

# Ex. 9

Reexam



## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Reexamination of Neefe :
:
Control No.: 90/005,090 :    Examiner:    S. McClendon
:
Filed: August 27, 1998 :    Art Unit:    1711
:
U.S. Patent No. 4,306,042 :    Conf. No.    6919
:
For:  METHODS OF MAKING A :
CONTACT LENS MATERIAL :
WITH INCREASED OXYGEN :
PERMEABILITY :
:

### REPLY BRIEF IN RESPONSE TO
### SUPPLEMENTAL EXAMINER'S ANSWER

**Box PAI**
U.S. Patent and Trademark Office
Customer Service Window
Randolph Building
401 Dulaney Street
Alexandria, VA  22314

Pursuant to 37 C.F.R. § 1.193, appellant Dome Patent, L.P. ("Dome") respectfully submits this Reply Brief in Response to the Supplemental Examiner's Answer mailed July 12, 2005 (the "Supp. Answer").

This Reexamination proceeding is related to, and was requested by a named defendant in, a federal court action for patent infringement entitled *Dome Patent L.P. v. Permeable Technologies, Inc.,* No. 6:98-CV-06247 (W.D.N.Y., filed June 9, 1998), currently pending in the United States District Court for the Western District of New York. This Reexamination proceeding is also related to a federal court action for

patent infringement entitled *Dome Patent L.P. v. Con-Cise Contact Lens, Inc.*, No.
6:99-CV-06377 (W.D.N.Y., filed August 30, 1999), currently pending in the United
States District Court for the Western District of New York.  In view of these pending
federal court actions Dome respectfully requests expedited review by the Board of
Patent Appeals and Interferences (the "Board") pursuant to MPEP 1442.03.

## REAL PARTY IN INTEREST

Appellant's Brief on Appeal filed October 25, 2002 ("App. Br.") stated in part:
"The real party in interest is Dome Patent, L.P." (App. Br. at 1). The Examiner's
assertion that appellant's "brief does not contain a statement identifying the Real Party
in Interest" (Supp. Answer at 1) is erroneous.

## RELATED APPEALS AND INTERFERENCES

Appellant's Brief on Appeal filed October 25, 2002, stated in part: "Appellant is
not aware of other appeals or interferences that would directly affect or be directly
affected by or have a bearing on the Board's decision in the present appeal" (App. Br.
at 1).  The Examiner's assertion that appellant's "brief does not contain a statement
identifying the related appeals and interferences" (Supp. Answer at 2) is erroneous.

## RESPONSE TO EXAMINER'S ARGUMENTS

The Examiner acknowledges the correctness of Dome's "Summary of
Invention" (Supp. Answer at 5, "The summary of invention contained in the brief is
correct"). U.S. Patent No. 4,306,042 ("the '042 patent") is titled "Method of Making
a Contact Lens Material With Increased Oxygen Permeability." Claim 1 of the '042
patent is addressed to the problem of making contact lens polymer material that has
both high oxygen and high carbon dioxide permeability and a hydrophilic (wettable)
surface ('042 patent col. 1, lines 53-56). Unrebutted evidence of record shows that, at

the time of the invention, makers of rigid gas permeable ("RGP") contact lenses had long attempted to solve this problem, *See* U.S. Patent No. 3,808,178 to Gaylord, filed June 17, 1972, at col. 1, lines 18-20 (describing "methods for increasing the oxygen permeability of polymerized acrylates and methacrylates" used for contact lenses); U.S. Patent No. 4,120,570 to Gaylord, filed Sept. 6, 1977, at col. 4, lines 57-59 (continuation-in-part of the '178 patent describing "copolymers hav[ing] vastly increased oxygen permeability in comparison to conventional contact lens materials"), but only had limited success in doing so (Declaration of Russell A. Neefe, sworn to January 9, 2001, hereinafter, "Neefe Decl.", at ¶¶ 1-10).

Claim 1 of the '042 patent recites a novel method of making an oxygen permeable contact lens material (the "Claim 1 Method") that involves the steps of (1) preparing 1,1,1-tris (trimethylsiloxy) methacryloxypropylsilane ("TRIS") under conditions that minimize non-oxygen permeable by-products and (2) co-polymerizing TRIS thus prepared with (a) an ester of acrylic or methacrylic acid ("MMA"), (b) a surface wetting agent, and (c) an oxygen permeable crosslinking agent selected from the class of multifunctional siloxanyl alkyl esters in the presence of a free radical or a photo initiator. *See*, the '042 patent, col. 5, lines 38-64.

Unrebutted evidence of record shows that the Claim 1 Method is effective to produce contact lens material whose oxygen permeability is more than thirty (30) times higher than that of a TRIS co-polymer made according to the teachings of the Gaylord patents cited above (Neefe Decl. ¶ 9). Unrebutted evidence further shows that the Claim 1 Method has been widely adopted by RGP contact lens manufacturers and has enjoyed commercial success (*id*. at ¶¶ 8-10).

In the Examiner's Supplemental Answer, filed July 12, 2005, the Examiner does not mention the record evidence of commercial success, long-felt but unsolved

need, and failures of others to devise a method of making contact lens materials having the desirable and commercially valuable properties of the contact lens materials made according the Claim 1 Method.

Instead, the Examiner contends that, as of September 8, 1980 (the filing date of the '042 patent), the Claim 1 Method assertedly "would have been obvious to a person having ordinary skill in the art," 35 U.S.C. § 103(a), in view of U.S. Patent No. 3,377,371 to Quaal, filed Sept. 3, 1964 ("Quaal"); the above-cited U.S. Patent No. 4,120,570 to Gaylord, filed Sept. 6, 1977 ("Gaylord"); and U.S. Patent No. 4,235,985 to Tanaka *et al.*, filed Sept. 22, 1978 ("Tanaka").

In fact, the references cited by the Examiner do not make out even a *prima facie* case of "obviousness" (Part I, *infra*). And at all events, any such *prima facie* case has clearly been rebutted by objective evidence of patentability submitted by the named inventor (Part II, *infra*).

## I. THE CITED REFERENCES DO NOT MAKE OUT A PRIMA FACIE CASE OF "OBVIOUSNESS" UNDER 35 U.S.C. § 103(a).

Claim 1 of the '042 patent recites:

1. A method of making an oxygen permeable material for the manufacture of contact lens by the synthesization of the monomer 1,1,1-tris(methylsiloxy) methacryloxypropylsilane (a siloxanyl alkyl ester) by the following procedures:

(a) a mixture is prepared having the relationship of one mole of methacryloxypropyltrimethoxysilane with three to forty moles of trimethylchlorosilane;

(b) the mixture is then added to water whose volume is from 3 to 10 times that of the mixture;

(c) agitation is maintained for 30 minutes to 48 hours;

(d) then allow the mixture to separate into layers, remove and filter the upper

organic layer;

(e) the unwanted by-product (hexamethyldisilane) is then removed by vacuum distillation; and

(f) forming an oxygen permeable contact lens material by copolymerizing from 5% to 90% by weight of the 1,1,1-tris(trimethylsiloxy)methacryloxypropylsilane prepared above; 3% to 90% by weight of an ester of acrylic or methacrylic acid; from 0.05% to 90% by weight of a surface wetting agent, from 0.01% to 90% by weight of an oxygen permeable crosslinking agent selected from the class of multifunctional siloxanyl alkyl esters in the presence of a free radical or a photo initiator.

Under 35 U.S.C. § 103(a), "the examiner bears the initial burden, on review of the prior art or on any other ground, of presenting a *prima facie* case of unpatentability." *In re Oetiker*, 977 F.2d 1443, 1445, 24 U.S.P.Q.2d 1443, 1444 (Fed. Cir. 1992). The Examiner must show that the references disclose each and every feature of the claim (*See, e.g.*, MPEP, 1242) and that the combination of art suggests the invention and provides one of ordinary skill in the art with a reasonable expectation of success. *In re Vaeck,* 947 F.2d 488, 20 U.S.P.Q. 2d 1438 (Fed. *Dr.* 1991) and *In re O'Farrell*, 853 F.2d 894, 7 U.S.P.Q. 2d 1673 (Fed. Cir. 1988). The mere fact that references can be combined or modified does not render the resultant combination obvious unless the prior art suggests the desirability of the combination. *In re Mills*, 916 F.2d, 680, 16 U.S.P.Q. 2d 1430 (Fed. Cir. 1990). Where, as here, a rejection rests on a combination of references, "the examiner must show reasons that the skilled artisan, confronted with the same problems as the inventor and with no knowledge of the claimed invention, would select the elements from the cited prior art references for combination in the manner claimed." *In re Rouffet*, 149 F.3d 1350, 1357, 47 U.S.P.Q.2d 1453, 1458 (Fed. Cir. 1998). The required showing must include "a reasonable expectation of success" in solving the problem confronting the inventor. *In re O'Farrell*, 853 F.2d 894, 904, 7 U.S.P.Q.2d 1673, 1681 (Fed. Cir. 1988).

"This factual question of motivation is material to patentability, and could not

be resolved on subjective belief and unknown authority." *In re Lee*, 277 F.3d 1338, 1343-44, 61 U.S.P.Q.2d 1430, 1434 (Fed. Cir. 2002). Rather, "it is fundamental that rejections under 35 U.S.C. § 103(a) must be based on evidence comprehended by the language of that section." *Id.* at 1342, 61 U.S.P.Q.2d at 1433 (emphasis added; quoting *In re Grasselli*, 713 F.2d 731, 739, 218 U.S.P.Q. 769, 775 (Fed. Cir. 1983)). "Broad conclusory statements regarding the teaching of multiple references, standing alone, are not 'evidence.'" *In re Dembiczak*, 175 F.3d 994, 999, 50 U.S.P.Q.2d 1614, 1617 (Fed. Cir. 1999). There must be shown "the specific understanding or principle within the knowledge of a skilled artisan that would have motivated one with no knowledge of [the] invention to make the combination in the manner claimed." *In re Kotzab*, 217 F.3d 1365, 1371, 55 U.S.P.Q.2d 1313, 1317 (Fed. Cir. 2000).

As set forth below, the three references cited by the Examiner do not make out even a *prima facie* case that "the subject matter" of the Claim 1 Method "as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). In contending otherwise, the Examiner erroneously urges the Board to invalidate claim 1 of the '042 patent by combining the references in a way that the prior art does not suggest is desirable, and in fact, in a way that goes against the teaching of the prior art, and provides no reasonable expectation of success.

### A. The Examiner Has Failed to Show Legally Sufficient Motivation to Combine the Cited References

The primary reference cited by the Examiner, Quaal, is now admitted to contain no teaching whatsoever with regard to solving the problem of producing a contact lens polymer material, much less a contact lens polymer material having both high oxygen permeability and a hydrophilic surface (App. Br. at 3, 6, 7; Supp. Answer at 2; "Examiner agrees with appellant's analysis of Quaal"). Quaal merely discloses a

method of preparing TRIS that differs from the relevant steps of the Claim 1 Method.[1]
According to Quaal, TRIS is useful as a "water repellant for fibrous and masonary
substrates" (Quall, at col. 1, lines 62-65). The Examiner points to no teaching in Quaal
that would have been useful in solving the problem that confronted the inventor of the
Claim 1 Method (App. Br. at 7), because there is none.[2]

The second reference cited by the Examiner, Gaylord, does address the same
problem as confronted the inventor of the Claim 1 Method, however, the record shows
that the method of making contact lens polymer material disclosed in Gaylord results
in copolymers that have only "marginal" oxygen permeability ('042 patent at col. 1,
line 29; See, Neefe Decl. ¶ 9; App. Br. at 4-6, 7-9). Gaylord teaches that "vastly
increased oxygen permeability" (as compared with then-existing contact lens
materials) is achievable through the use of copolymers comprising a
polysiloxanylalkyl ester of acrylic or methacrylic acid with an alkanol ester of acrylic
or methacrylic acid (Gaylord at col. 1, lines 52-58; id. at col. 4, lines 57-59). Gaylord
further teaches that "[t]he rigidity of a contact lens prepared from the material useful
in the practice of this invention may be increased, if desired, by the incorporation into
the copolymer composition of" certain "crosslinking" monomers (id. at col. 6, lines 4-

---

[1] As described more fully in Part I.C, infra, Quall teaches a method of preparing TRIS that utilizes three
reactants, namely, methacryloxypropyltrimethoxysilane ($CH_2=C(CH_3)COO$ ($CH_2)_3Si(OCH_3)_3$),
trimethylchlorosilane (($CH_3)_3SiCl$), and trimethylmethoxysilane (($CH_3)_3SiOCH_3$). The Claim 1 Method,
in contrast, recites a simpler method of preparing TRIS that utilizes only two reactants, i.e.,
methacryloxypropyltrimethoxysilane and trimethylchlorosilane. Quaal thus clearly does not disclose
even the first two steps 1(a) and 1(b) of the Claim 1 Method. Dome wishes to make clear, however, that
in the context of a claim of unauthorized use of the Claim 1 Method as a whole, the claim language in col.
5, lines 43-54 is intended to encompass all legal equivalents of the procedures there set forth. The
method of preparing TRIS disclosed in Quaal may or may not be such a legal equivalent. In the case of
Dome Patent L.P. v. Pilkington Visioncare Inc., No. 95-CV-3031 (N.D. Cal., filed Dec. 8, 1992), Dome
took the position that, under the doctrine of equivalents, claim 1 of the '042 Patent encompassed the
activities of a defendant that synthesized the TRIS component of an oxygen permeable contact lens
material (utilizing a variant of the TRIS-preparation method disclosed in Gaylord).

[2] As described more fully in Part I.B, infra, the Examiner proposes a modification of Quaal for reasons
having nothing to do with the problem that confronted the inventor of the Claim 1 Method.

12).

Gaylord in no way teaches or suggests, however, that increased oxygen permeability in a contact lens material having a hydrophilic surface, over and above the oxygen permeability levels of the materials disclosed in the Gaylord reference, can be achieved by any method, much less by the Claim 1 Method that involves using a multifunctional siloxanyl alkyl ester as the cross-linking agent (App. Br. at 4). The Examiner does not offer proof of the level of skill in the art of the '042 patent at the time of the invention, nor does she identify "the specific understanding or principle within the knowledge of a skilled artisan that would have motivated one with no knowledge of [the] invention," *Kotzab*, 217 F.3d at 1371, 55 U.S.P.Q. 2d at 1317, to conclude that the oxygen permeability of the contact lens materials disclosed in Gaylord could be dramatically improved, with no adverse side effects on hydrophilicity or clarity, by adoption of the Claim 1 Method in lieu of the methods of contact lens polymer production disclosed in Gaylord.

If anything, the Gaylord reference constitutes secondary evidence of non-obviousness: a roughly contemporaneous effort by others who were working on the same problem that confronted the inventor of the Claim 1 Method, but who nevertheless failed to see the commercially valuable and supposedly "obvious" solution provided by the Claim 1 Method that was effective to produce contact lens polymer material up to 30 times more oxygen permeable than was the contact lens material disclosed in Gaylord (Neefe Decl. ¶ 9).

The third reference cited by the Examiner, Tanaka, also tends to support a conclusion that the Claim 1 Method was not an "obvious" solution to the problem of producing a contact lens polymer material having both high oxygen permeability and a hydrophilic surface. Tanaka, like Gaylord, addresses the same problem as is the

Claim 1 Method, however, Tanaka specifically teaches away from the Claim 1 Method and discloses a solution to the problem of low oxygen permeability in a hydrophilic contact lens material that is substantially different from the Claim 1 Method.

In particular, Tanaka discloses producing a contact lens polymer material by copolymerizing novel <u>non-TRIS</u> monomers with a hydrophobic methacrylic acid alkyl ester monomer (Tanaka, col. 2, lines 8-30). Tanaka further states that by utilizing the disclosed particular organosiloxane monomers disclosed therein, "it is possible to obtain polymers having a high oxygen permeability without copolymerization with a hydrophilic monomer" (*id*. at col. 3, lines 53-56).[3]

Tanaka contrasts the advantage of the disclosed organosiloxane monomers, having hydrophilic groups, with the prior art approach (taken in Gaylord) of copolymerizing a polysiloxanylalkyl ester of acrylic or methacrylic acid having no hydrophilic groups (such as TRIS) with an alkyl acrylic ester to provide the obtained copolymer with a proper hydrophilic property and high oxygen permeability. Tanaka states that, according to the invention disclosed therein, the improved oxygen permeability

> lies in the use of particular methacrylic acid ester derivatives having not only alkyl siloxy groups, but also hydrophilic groups, in their molecules. That is to say each of the organosiloxane monomers shown by the general formula [I] has a hydroxyl group, which is a hydrophilic group, and some of them also have a polyether group which is a hydrophilic group *(See,*

---

[3] Dome wishes to clarify a statement made in the Declaration of Neefe, dated May 24, 2001 (the "Second Neefe Decl."). Mr. Neefe stated in paragraph 4 of his declaration, "The oxygen permeability of Tanaka copolymers is no better that [sic] that of Gaylord." This statement was based on a published description of certain commercial products that Mr. Neefe believed were manufactured according to the Tanaka patent and the Gaylord patent. For purposes of determining the patentability of the Claim 1 Method, however, the Board should take the teaching of the Tanaka reference at face value and should disregard paragraph 4 of the Second Neefe Decl. Dome currently has no information concerning whether any "Tanaka copolymers" were ever marketed or received FDA approval in the United States.

Tanaka, column 2, line 64 to column 3, line 5).

Tanaka attributes "excellent hydrophilic property" and "a high oxygen permeability" to the use of "compounds of the general formula [I] employed in the present invention [which] have a hydrophilic hydroxyl group" (*id.* at col. 3, lines 54-58). Tanaka further states "[t]his has a very significant meaning in the adaptation of the obtained copolymers as contact lens material" (*See*, Tanaka, column 3, lines 4-5) and that "the feature of the present invention lies in the particular use of particular methacrylic acid derivatives having not only alkylsiloxy groups, but also hydrophilic groups" (*See*, Tanaka, column 2, lines 64-67). Thus, Tanaka clearly states that it is the organosiloxane monomer having hydrophilic groups that increases oxygen permeability, *not* the cross-linker.

On the subject of cross-linking agents, Tanaka simply states: "[f]or the purpose of improving the solvent resistance and shape stability of contact lenses prepared from the copolymers of the invention, the copolymers may be cross-linked in a conventional manner" (id. at col. 7, lines 59-62). It is in the context of improving solvent resistance and shape stability that Tanaka suggests use of "polyfunctional monomers having siloxane bonds" and states, "[s]ince these cross-linking agents of the general formulas [V] and [VI] have siloxane bonds in their molecules, the oxygen permeability of the obtained cross-linked copolymers is high" (*id.* at col. 8, lines 35-38; emphasis added). Contrary to the Examiner's suggestion (Supp. Answer at 4), the above-quoted statement in no way teaches or suggests that the referenced "polyfunctional monomers having siloxane bonds" function to increase oxygen permeability, over and above the already "high" oxygen permeability provided by the disclosed organosiloxane monomer (Tanaka col. 3, lines 54-55). Still less does Tanaka teach or suggest that use of the referenced "polyfunctional monomers having siloxane bonds" would be likely to increase or improve the oxygen permeability of a TRIS-based copolymer -- a material

that Tanaka specifically discourages using.

The Examiner cites to no reason, and there is no conceivable reason, why a person having ordinary skill in the art would read Tanaka as suggesting the desirability of doing exactly what Tanaka teaches not to do, namely, prepare TRIS (a polysiloxanylalkyl ester of acrylic or methacrylic acid having no hydrophilic group) and then copolymerize the TRIS with a methacrylic acid alkyl ester monomer, as recited in the Claim 1 Method.

Rather, Tanaka teaches that the principal of his invention that results in improved oxygen permeability is the use of a particular monomer (i.e., a monomer other than TRIS) and is not due to the cross-linker (See, Tanaka, column 2, line 64 to column 3, line 5). Thus, one of ordinary skill in the art would not be motivated to combine Tanaka and Gaylord as suggested by the Examiner, i.e., to replace the conventional cross-linkers used in Gaylord with the multifunctional siloxanyl cross-linkers disclosed in Tanaka. To use the multifunctional siloxanyl cross-linkers disclosed in Tanaka, or for that matter any cross-linker, with TRIS, as disclosed in Gaylord, would completely change the principle of operation of the invention disclosed in Tanaka (i.e., that improved oxygen permeability is due to the use of a particular monomer (i.e., a monomer other than TRIS) and is not due to the cross-linker). "If the proposed [ ] combination of the prior art would change the principle of operation of the prior art invention being modified, then the teaching of the references are not sufficient to render the claims *prima facie* obvious" (See, MPEP ¶ 2143.02, citing *In re Ratti*, 270 F.2d at 810, 123 U.S.P.Q. at 349 (CCPA 1959).

Said another way, if a person of ordinary skill in the art were to combine Tanaka with Gaylord, they would first replace the polysiloxanylalkyl ester of Gaylord with the organosilane monomer having hydrophilic groups to provide a polymer that then could

optionally be cross-linked with a conventional cross-linker or a multifunctional siloxanyl cross-linker. This, however, would not result in the invention claimed in claim 1 of Neefe because TRIS does not have hydrophilic groups. All that Tanaka teaches one to do is to replace the TRIS with an organosilane monomer having hydrophilic groups and then to optionally cross-link the organosilane monomer having hydrophilic groups with a conventional cross-linker or a multifunctional siloxanyl cross-linker.

To the contrary, as Dome previously demonstrated (App. Br. at 5-6), Tanaka actually teaches that using a multifunctional siloxanyl alkyl ester cross linking agent can actually result in <u>lower</u>, not <u>increased</u>, oxygen permeability in a contact lens material comprising the organosiloxane monomer disclosed in Tanaka cross-linked with a multi-functional siloxanyl cross-linker, as compared with the same contact lens material cross-linked with EDMA, a conventional cross-linker (compare Tanaka col. 23, Example 29 with *id*. col. 25, Example 42). Despite the teaching in the Examples of Tanaka, the Examiner asserts that this "is not enough to discount the reference" as purportedly containing a suggestion to modify the TRIS-based polymers of Gaylord with multi-functional siloxanyl cross-linking agent of a type disclosed in Tanaka (Supp. Answer at 4), on the following basis (*id*. at 4-5):

> The argument is not whether one of ordinary skill in the art would have found better or enhanced oxygen permeability using the cross linkers of Tanaka over the cross linkers of Gaylord. Since there is no recitation in claim 1 that provides a method of improving oxygen permeability, the claim merely recites a method of making an oxygen permeable material. Therefore the argument is would it have been <u>reasonable</u> for one of ordinary skill in the art at the time of the invention to use the crosslinkers of Tanka [sic] et al over the crosslinkers of Gaylord.

The above-quoted analysis is simply erroneous as a matter of law. The Examiner's burden here was to "show reasons that the skilled artisan, confronted with

the same problems as the inventor and with no knowledge of the claimed invention, would select the elements from the cited prior art references for combination in the manner claimed." *In re Rouffet*, 149 F.3d at 1357, 47 U.S.P.Q.2d at 1458 (Fed. Cir. 1998). Lacking any basis for arguing that Tanaka and Gaylord should be combined in the manner suggested by the Examiner and despite the fact that the Examples of Tanaka teach that the Examiner's combination would likely result in lower oxygen permeability of a contact lens polymer material, the Examiner simply argues that it purportedly would have been "reasonable" for a skilled artisan "to use the crosslinkers of Tanka [sic] over the crosslinkers of Gaylord" (Supp. Answer at 5). Characterizing a substitution of method steps as "reasonable" (in some undefined subjective sense) is clearly not the same thing as providing "reasons that the skilled artisan, confronted with the same problems as the inventor and with no knowledge of the claimed invention, would select the elements from the cited prior art references for combination in the manner claimed." *Rouffet*, 149 F.3d at 1357, 47 U.S.P.Q.2d at 1458 (emphasis added).

Furthermore, "[a] prior art reference must be considered in its entirety, *i.e.*, as a whole, including portions that would lead away from the claimed invention." MPEP ¶ 2141.02, citing *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 220 U.S.P.Q. 303 (Fed. Cir. 1983), *cert denied*, 449 U.S. 851 (1984). As discussed above, when Tanaka is considered in its entirety the reference clearly teaches that replacing a conventional cross-linker with a multi-functional siloxanyl cross-linker does not result in increased oxygen permeability in a polymer. The Examiner's dismissal of this teaching (*See*, Supp. Answer at 4, stating: "the comparison is not enough to discount the reference."), however, is improper. The teaching of these examples is extremely important in what one of ordinary skill in the art would understand and a reference must be considered in its entirety. The Examples in Tanaka clearly teach one of ordinary skill in the art that replacing a conventional cross-linker with a more expensive and

more difficult to prepare multi-functional siloxanyl cross-linker, such as disclosed in Tanaka, would not be expected to have any advantage, much less result in an increase in oxygen permeability, if used in a polymer, much less a TRIS containing polymer, for a contact lens.

The Examiner's argument amounts, at best, to a contention that it purportedly would have been "obvious to try" combining a TRIS-based copolymer of Gaylord with a crosslinking agent disclosed in Tanaka. That, however, is an insufficient basis to negate patentability under 35 U.S.C. § 103(a) under any circumstances. See, *In re Geiger*, 815 F.2d 686, 688 2 U.S.P.Q. 2d 1276, 1278 (Fed. Cir. 1987) ("one skilled in the art might find it obvious to try various combinations of these known scale and corrosion prevention agents. However, this is not the standard of 35 U.S.C. § 103"). It is particularly insufficient where, as here, the Examiner points to no teaching or suggestion or pre-existing knowledge that the proposed combination would result in improved or increased oxygen permeability, or any other benefit, in a contact lens polymer material over that disclosed in either of the references to be combined, and that the proposed combination actually goes against the teachings of the references.

### B. The Examiner Has Failed to Show Legally Sufficient Motivation to Modify and Combine the Quaal Reference.

The Claim 1 Method recites preparing TRIS from proportional amounts of two reactants, *i.e.*, methacryloxypropyltrimethoxysilane and trimethylchlorosilane ('042 patent at col. 5, lines 43-46; step 1(a)). In contrast, the method disclosed in Quaal for making TRIS utilizes proportional amounts of three reactants, namely, methacryl-oxypropyltrimethoxysilane ($CH_2=C(CH_3)\ COO(CH_2)_3Si(OCH_3)_3$), trimethylchloro-silane ($(CH_3)_3SiCl$), and trimethylmethoxysilane ($(CH_3)_3SiOCH_3$). A synthesis that uses two reactants clearly is not the same as a synthesis that uses three reactants. On its face, Quaal does not disclose steps 1(a)-1(e) of the Claim 1 Method, such that its proposed

combination with Gaylord and Tanaka would yield every element of the claim.

The Examiner asserts that for purposes of determining the patentability of the Claim 1 Method, the Board should find that a person of ordinary skill in the art would not have simply followed the TRIS-synthesis method disclosed in Quaal, but purportedly would have undertaken to modify that method in a way that happens to correspond exactly with step 1(a) of the Claim 1 Method. Specifically, the Examiner contends that claim 1 of the '042 patent "does not positively exclude other components being added,"[4] and further contends that "one of ordinary skill would have found it obvious to replace trimethylmethoxy silane with the same amount of trimethylchlorosilane, *i.e.*, using 6 moles of trimethylchlorosilane (such as found in Example 4) instead of 3 moles of trimethylchlorosilane and 3 moles trimethylmethoxysilane" (Supp. Answer at 3-4).

But the Examiner here once again offers no "reasons that the skilled artisan, confronted with the same problems as the inventor," *Rouffet*, 149 F.3d at 1357, would reject a known way of preparing TRIS and attempt to develop a different way of preparing that monomer. The only method of synthesizing TRIS disclosed in Quaal, Example 1,[5] utilizes proportional amounts of both trimethylchlorosilane and trimethylmethoxysilane (Quaal at col. 2, lines 5-33). The Examiner provides no evidentiary basis for her assertion that a person having ordinary skill in the art would see that Quaal (purportedly) disclosed a needlessly complex method of making TRIS, and that the Quaal method involving use of three (3) reactants including trimethylmeth-

---

[4] As noted above, Dome contends that the Claim 1 Method includes all legal equivalents of its recited elements. Dome thus does not here traverse the broad construction of the claim that the Examiner's analysis implies. But even under the Examiner's construction of claim 1, Quaal simply does not provide step 1(a) of the Claim 1 Method but would require modification to do so.
[5] The Examiner has withdrawn her original, erroneous suggestion that Example 4 of Quaal discloses a method of preparing TRIS (Supp. Answer at 4).

oxysilane should be discarded in favor of the simpler TRIS preparation method recited in the Claim 1 Method.

The Examiner has also provided no legally sufficient basis for her contention that, as part of a solution to the problem of producing a contact lens polymer material having both high oxygen permeability and a hydrophilic surface, a person having ordinary skill in the art would have been motivated to replace the method of synthesizing TRIS disclosed in Gaylord (Gaylord at col. 11, lines 35-5, Example 22) with a method that is different from what Quaal discloses, but is allegedly similar to the Quaal method for synthesizing TRIS (Supp. Answer at 3). Passing over that Quaal does not even disclose the method that the Examiner would have the Board combine with Gaylord, the Examiner has cited no legally sufficient basis for the proposed combination.

The Examiner asserts that the method of synthesizing TRIS disclosed in Gaylord (a contact lens material reference) purportedly suffers from two disadvantages that purportedly are not present in the (hypothetically modified) Quaal method for synthesizing TRIS, namely, the use of a "caustic catalyst" and a longer reaction time (Supp. Answer at 3). Avoiding these alleged disadvantages is said to provide "motivation" for synthesizing TRIS by the Claim 1 Method in lieu of the method disclosed in Gaylord. The contention is neither supported nor persuasive.

With regard to use or non-use of a "caustic catalyst," the chemistry involved in the method disclosed in Quaal for making TRIS (which, to reiterate, is different from the method recited in claim 1 of the '042 patent; *see* note 1 *supra*) produces gaseous hydrochloric acid that is extremely corrosive, indeed, as corrosive if not more corrosive than the ethyl sulfuric acid used in the method of Gaylord. This reaction mixture must be extracted in the Quaal method of making TRIS. Moreover, gaseous corrosive

DC01 582021 v4                    -16-

reagents, such as those produced in the method for making TRIS disclosed in Quaal, are much more difficult to handle and much more dangerous than liquid reagents that are corrosive.

The method disclosed in Gaylord for making TRIS does not produce corrosive gases and therefore, as one of ordinary skill in the art would readily recognize, is safer than a method that produces corrosive gases such as the method disclosed in Quaal. Accordingly, the Examiner's suggested motivation for replacing the method for making TRIS used in Gaylord with the method for making TRIS disclosed in Quaal, *i.e.*, "to avoid exposure and/or handling corrosive materials" (Supp. Answer at 3) is simply unfounded.[6]

The Examiner's assertion that the method for making TRIS disclosed in Gaylord requires more time than the (hypothetically modified ) Quaal method is also unsupported and unfounded. The Examiner bases her contention on an example described in Gaylord and an example described in Quaal, the former having involved a 48 hour preparation period and the latter 24 hours (Supp. Answer at 3). From these two examples the Examiner leaps to the unsupported conclusion that (hypothetically modified) Quaal method necessarily produce TRIS much faster than would the method disclosed in Gaylord. There is simply no evidentiary or scientific basis for the Examiner's argument.[7]

---

[6] Appellant further notes that the Examiner's original motivation for combining Quall with Gaylord was that Gaylord used corrosive ethyl sulfuric acid that could "poison" the system. When it was noted by Appellant that this motivation was unfounded because the method disclosed in Quaal produced gaseous hydrochloric acid that is more corrosive than ethyl sulfuric acid, the Examiner changed her motivation for combining Quaal with Gaylord. The Examiner's proposed motivation for combining Quaal and Gaylord now is to avoid exposure to and/or handling corrosive materials. This motivation, however, is also unfounded for the reasons discussed above.

[7] It is our understanding that in both the Gaylord and the Quaal methods of synthesizing TRIS, the reaction is complete after a short period of time and that the length of time that each method reports is

C. The Cited References Do Not
   Disclose All Elements of the Claim 1 Method

The Examiner's rejection of the Claim 1 Method is improper for the further reason that the cited references do not disclose each and every element of the claim. MPEP 1242. For example, the Claim 1 Method recites the step of adding a mixture of methacryloxypropyltrimethoxysilane and trimethylchlorosilane to water whose volume is from 3 to 10 times that of the mixture ('042 patent at col. 5, lines 48-49, step 1(b)). If the method disclosed in Quaal was modified, as suggested by the Examiner, to use 6 moles of trimethylchlorosilane, instead of 3 moles of trimethylchlorosilane and 3 moles trimethylmethoxysilane, and 1 mole of methacryloxypropyltrimethoxysilane, the volume of the mixture of trimethylchlorosilane and methacryloxypropyltrimeth-oxysilane would be about 996 mL.[8] The process disclosed in Quaal adds only 512 mL of water to this mixture. Accordingly, the method disclosed in Quaal adds a volume of water that is only about 1/2 times that of the mixture, not 3 to 10 times that of the mixture as recited in the Claim 1 Method.[9] Accordingly, even if Quaal and Gaylord

---

most likely the simple result of what was convenient at the time (for example, the reaction mixture described in Example 1 of Quaal may have been set up at the end of the day and then allowed to stir overnight or the reaction mixture in Example 22 of Gaylord may have been set up at the end of the week and allowed to stir over the weekend).

[8] The statement in the text is based on the density of trimethylchlorosilane being 0.856 g/mol and the density of methacryloxypropyltrimethoxysilane being 1.045 g/mole.

[9] We note that in addition to the 512 mL of water added to the mixture, the method disclosed in Quall also adds 500 mL of ether to the mixture. Although there is no suggestion in Quall to replace the ether with water, even if the ether was replaced with water the volume of water would only be about 1012 mL. Even adding 1012 mL of water of water to the mixture, however, is only adding a volume of water that is about equal to the volume of the mixture; significantly different from the requirement of claim 1 of Neefe that water is added in an amount whose volume is from 3 to 10 times that of the mixture. Although Quaal discloses at column 1, lines 52-54 that the amount of water is not critical, there is no suggestion that using a large volume of water, as recited in the Claim 1 Method, would be advantageous, i.e., that it would provide a polymer with "higher oxygen permeability due to the absence of non-oxygen permeable by products" ('042 patent at col. 3, lines 15-18). Moreover, Quaal teaches that the use of a solvent is desirable to maintain a low reflux temperature (Quaal at col. 1, lines 55-57). Ether boils at a much lower temperature than water (35° C compared to 100° C). Accordingly, replacing the water with ether would not result in maintaining a low reflux temperature. Similarly, Quaal discloses that a solvent, i.e., ether, improves the solubility of the product and helps separate the product from any hydrochloric acid

were combined and modified as suggested by the Examiner, the combination would still not result in the Claim 1 Method (although alternative methods of forming TRIS could, in the context of an infringement claim, be legal equivalents of elements 1(a) through 1(e) of the Claim 1 Method).

Dome respectfully submits that the Examiner's rejection is a classic case of the impermissible use of hindsight to reconstruct an invention by selecting among several prior art references the separate components of the claimed invention using Appellant's invention as a blueprint when there is no motivation in the prior art to select and combine the separate components of Appellant's invention. It is well settled that hindsight cannot be used to reject a claim as obvious. *In re Sernaker,* 702 F.2d 989, 994 217 U.S.P.Q. 1, 5 (Fed. Cir. 1983); *In re Rinehart,* 531 F.2d 1048 189 U.S.P.Q. 143 (CCPA 1976); *In re Imperato,* 486 F.2d 585 179 U.S.P.Q. 730 (CCPA 1973); *In re Adams,* 356 F.2d 998 148 U.S.P.Q. 742 (CCPA 1966); *In re Dembiczak,* 75 F.3d 994, 999 50 U.S.P.Q. 2d 1614, 1617 (Fed. Cir. 1999); *C.R. Bard Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1352 48 U.S.P.Q. 2d 1225, 1232 (Fed. Cir. 1998) citing *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1556 222 U.S.P.Q. 26, 31-32 (Fed. Cir. 1985) (holding the prior art must suggest to one of ordinary skill in the art the desirability of the claimed combination).

Quaal, Gaylord, and Tanaka, individually or in combination provide no motivation to prepare an oxygen permeable material for the manufacture of a contact lens by the Claim 1 Method. Moreover, even if Quaal, Gaylord, and Tanaka were combined, such a combination would not result in the invention claimed in claim 1 because, as discussed above, none of the references disclose the method for making TRIS that is recited in the Claim 1 Method.

---

produced (Quaal at col. 1, lines 55-59). The Examiner has cited no evidence of motivation to replace the ether with water.

Accordingly, these three references do not establish even a *prima facie* case of unpatentability under 35 U.S.C. § 103(a).

## II. DOME HAS REBUTTED ANY *PRIMA FACIE* CASE OF OBVIOUSNESS

Even assuming, for purposes of argument, that the cited Quaal, Gaylord, and Tanaka references established a *prima facie* case of obviousness, the record fully rebuts any such case. The previously submitted Neefe declaration establishes that the Claim 1 Method solved a long-felt need, it has had substantial commercial success, and it has been copied by most manufacturers of RGP contact lenses in the United States.

Furthermore, the Neefe declaration establishes that the Claim 1 Method provided contact lens polymer materials that were as much as 30 times more oxygen permeable than were commercial products manufactured according to the teachings of Gaylord. "A greater than expected result is an evidentiary factor pertinent to the legal conclusion of obviousness . . . of the claims at issue" (*See* MPEP 716.02(a) (citing *In re Corkhill*, 711 F.2d 1496, 226 U.S.P.Q. 1005 (Fed. Cir. 1985)). Indeed, when a combination (in this case, TRIS and a multi-functional siloxanyl cross-linker) shows an additive result when a diminished result is expected (in this case a diminished result being expected based on the Examples in Tanaka), it is persuasive of non-obviousness (*See* MPEP 716.02(a) (citing *In re Corkhill*, 711 F.2d 1496, 226 U.S.P.Q. 1005)).

In these circumstances, the Examiner's theory that the Claim 1 Method discloses an "obvious" solution to the problem of producing contact lens materials with increased oxygen permeability if fully rebutted by the record.

## CONCLUSION

In view of the foregoing and the arguments presented in Appellant's Brief on Appeal, Appellant respectfully submits that neither Quaal, Gaylord, nor Tanaka,

individually or in combination, renders claim 1 obvious, and respectfully requests the withdrawal of the rejection. Accordingly, Applicant respectfully submits that the final rejection of claim 1 under 35 U.S.C. § 103 is in error and warrants reversal by the Board.

                                         Respectfully submitted,

Date:   September 9, 2005

                                         Paul E. Dietze, Ph.D. (Reg. No.  45,627)
                                         Attorney for Appellant

# Ex. 10

**ORIGINAL**



UNITED STATES DEPARTMENT OF COMMERCE

PATENT AND TRADEMARK OFFICE

In re

Reexamination of Neefe

Control No. 90/005,090
Filed: 08/27/98

U. S. Patent No. 4,306,042

/

## DECLARATION OF NEEFE UNDER 37 CFR §1.132

Russell Neefe, under penalty of perjury, declares:

1.      I am the inventor of the patent in issue in this proceeding.  I make this declaration of my own personal knowledge.  I wrote the patent application myself and prosecuted it through the PTO without an attorney or agent.

2.      My invention is an improvement on the Gaylord method of making contact lens materials.  I cited the Gaylord '178 patent at column 1, line 45 of the patent and in Example 1.  Example 1 is related to the synthesis of 1, 1, 1 tris (trimethylsiloxy) methacryloxypropylsilane, commonly called TRIS in the literature.

3.      My improvement over Gaylord related to making "a material with excellent oxygen and carbon dioxide permeability" (column 1, lines 46-47).  This was accomplished by using an oxygen-permeable crosslinker in place of the oxygen-impermeable crosslinker used by Gaylord.  Gaylord '178 teaches, at column 5, lines 6-14, the use of "polyol dimethacrylate or diacrylate or a polyol acrylic ester of higher functionality, for example, ethylene glycol dimethacrylate" (EGDMA).  Examples 12-14 of Gaylord '178 (column 7) show the use of EGDMA.

1.

4.     EGDMA is not permeable to oxygen because it does not contain any trimethylsiloxy groups. Exhibit 1 attached is a diagram of EGDMA prepared by Professor James McGrath of Virginia Polytechnic University. I attended a course on polymer chemistry taught by Professor McGrath, and he served as our expert witness in *Dome v. Pilkington.* The length of a molecule of EGDMA, according to Exhibit 1, is 12 Angstroms. This means that when two chains of TRIS are crosslinked with EGDMA, the chains are no more than 12 Angstroms apart.

5.     My invention was to substitute an oxygen-permeable crosslinker for the impermeable EGDMA used in the prior art. I examined the difunctional structure of EGDMA, and realized that a difunctional crosslinker having oxygen permeability would separate the chains of TRIS to a much greater extent, and would allow the plural trimethylsiloxy groups to enhance oxygen permeability.

6.     My preferred oxygen-permeable crosslinker is a dimer of TRIS, 1, 1, 3, 3, tetrakis (trimethylsiloxy) 1, 3 bis (methacryloxypropyl) disiloxane, called DIMER in the trade. Example 2 of my patent shows how this "crosslinking dimer" is made (column 3, line 34). Example 3 of the patent shows the polymerization of TRIS "and the oxygen permeable crosslinking agent" in Example II. DIMER has the difunctionality of EGDMA, but because it is a dimer of TRIS, it has the same oxygen-permeable properties as do the chains of TRIS. It was an elegant solution to the problem of increasing oxygen permeability.

7.     DIMER is a much larger molecule than EGDMA. Exhibit 2 attached is another diagram prepared by Dr. McGrath. It shows that DIMER is 20 Angstroms in length, nearly double that of EGDMA (Exhibit 1). If one imagines a cage through which air can pass freely, a cage having horizontal members separated, both vertically and horizontally by 20 inches instead of 12 inches, it would be much more open and permeable. Separating chains by 20 Angstroms instead of 12 would theoretically give a much more permeable structure.

8.     My theoretical assumption of improved permeability proved to be correct. Nearly every maker of rigid gas permeable (RGP) contact lenses,

2.

01/19/2001

including those defendants in the case of *Dome v. Permeable* in which Petitioner is a defendant, use my invention.

9. · Pilkington, the defendant in the prior Dome Patent Case, owned Paragon Optical, Inc. Paragon adopted and used my invention of DIMER as a crosslinker for TRIS. In 1986, Paragon published a report on "Oxygen Performance" in which it compared the Dk (a measure of oxygen permeability) for various contact lens materials. The material that was made by the Gaylord patents was called "POLYCON." The materials made by Paragon were called "PARAPERM." Exhibit 3 attached shows that the original Gaylord material, Polycon I, had a Dk of 4.5. In comparison, one of the Paragon products "EW" had a Dk of 57, according to data "that was submitted to the FDA by each company." Paraperm EW was made from TRIS crosslinked with DIMER, according to the jury's finding. A Dk of 57 is more than twelve times superior to that of the original Gaylord product. Other products using my invention have shown improvements up to Dk 151, which is over 33 times the permeability of Polycon I. These extraordinary results are solely attributable to the use of an oxygen-permeable crosslinker, since the TRIS, methylmethacrylate and wetting agent were similar in all of the products.

10. My invention filled a long-felt need for higher oxygen-permeability. The invention is commercially successful, since virtually the entire RGP industry uses my invention.

11. Claim 1 of the patent defines the improvement of "an oxygen permeable crosslinking agent" (column 5, lines 61-62), but my inexperience in drafting patent claims caused me to include details that are not essential to the improvement. By the present amendment, I have attempted to pinpoint the improvement I invented and distinguish it over the prior art. At the time I drafted my patent application, I was unaware of the case of *Ex Parte Jepson* 1917 C.D. 62 (Comm'r 917) that permits claims of the type now submitted.

12. · As now drafted, my patent clearly distinguishes over the prior art. The patent to Quaal has no concept or teaching of oxygen permeability at all.

3.

01/19/2001

Gaylord has modest oxygen-permeability because of TRIS, but the crosslinkers he used were oxygen-impermeable. Tanaka shows no recognition of oxygen permeable crosslinkers for TRIS copolymers. The catalog of crosslinkers at column 8, lines 2-46 of Tanaka makes no suggestion of my invention of an oxygen-permeable crosslinker of TRIS-MMA copolymers. On the contrary, at column 8, line 6, that "ethylene glycol dimethacrylate" (EGDMA) is a suitable crosslinker, exactly as Gaylord taught.

I declare under penalty of perjury that the foregoing is true and correct. Executed on _____/ – 9 – 0 / _____, at Big Spring, Texas.

RUSSELL NEEFE

Submitted by:

John P. Sutton (Reg. No. 22,430)
Attorney at Law
2421 Pierce Street
San Francisco, CA 94115-1131
Telephone: (415) 922-6426
Facsimile: (415) 922-2885

Attorney for Inventor and Owner

4.

01/19/2001

JAN 1 9 2001
PATENT & TRADEMARK OFFICE

## CERTIFICATE OF SERVICE BY MAIL

I, the undersigned, state:

I am employed in the City and County of San Francisco, California. I am over the age of 18 years and not a party to the within action. I am an employee of JOHN P. SUTTON, Attorney at Law, and my business address is 2421 Pierce Street, San Francisco, California 94115-1131. On January 15, 2001, I caused the within document, described as follows: **DECLARATION OF NEEFE UNDER 37 CFR §1.132** to be served on the parties named below, by placing a true and correct copy in a sealed envelope for collection and mailing on this date, at San Francisco, California, addressed as follows:

**H. William Larson, Esq.**
**Larson & Larson, P.A.**
**11199 69th Street N.**
**Largo, Florida 33773**

I am readily familiar with this office's practice for collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 15, 2001, at San Francisco, California.

Jeff Smith

---

**CERTIFICATE OF MAILING [37 CFR §1.8(a)(1)(i)(A)]**
I hereby certify that this paper (along with any referred to as being attached or enclosed) is being deposited with the U.S. Postal Service on the date shown below with sufficient postage as first class mail in an envelope addressed to the Assistant Commissioner for Patents, Washington, D.C. 20231.

JOHN P. SUTTON
Attorney at Law

Dated: 1/15/01      By:

---

5.

JAN 1 9 2004

## EGDMA
End–End = 12.15 Ang.



EXHIBIT /

01/19/2001

# "DIMER"

## End−End = 20.02 Ang.



# EXHIBIT 2

# Ex. 11

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

NORTHERN _____ DISTRICT OF _____ CALIFORNIA

Dome Patent L.P.

V.

JON W. DUDAS, Under Secretary of Commerce
for Intellectual Property and Director of the United
States Patent and Trademark Office

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 07-CV-01695 (PLF)
Case pending in the U.S. District
Court for the District of Columbia

TO:
ABB/Con-Cise Optical Group LLC
1750 North Loop Road, Suite 150
Alameda, CA 94502

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attached Definitions and Schedule A

| PLACE  Farella Braun & Martel LLP, c/o Brandon Wisoff, 235 Montgomery Street, Russ Bldg., San Francisco, CA 94104 (415) 954-4449 | DATE AND TIME  1/21/2008 4:00 pm |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)      Attorney(s) for Plaintiff | DATE  1/4/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
James W. Dabney
Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (212)859-8000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|

SERVED

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on

| DATE | SIGNATURE OF SERVER |
|---|---|

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a deponent to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

# DEFINITIONS

1. As used in this subpoena, the term "ABB" refers to ABB/Con-Cise Optical Group LLC, its corporate predecessors and any corporation, company, or entity that controlled, was controlled by, or was under common control with ABB or its predecessors at any time, or from time to time, during the Neefe Patent Period or the Pre-Neefe Patent Period, and includes any subsidiary of ABB and any entity acquired by or merged into ABB, including but not limited to any entity known as or doing business as Con-Cise Contact Lens Co.

2. As used in this subpoena, the term "control" means ownership or control over at least 50% of the voting capital stock of a corporation, company, or other entity.

3. As used in this subpoena, the term "Neefe patent" refers to U.S. Patent No. 4,306,042 issued December 15, 1981, to Russell A. Neefe.

4. As used in this subpoena, the term "Neefe Patent Period" means the period of time commencing December 15, 1981, and ending September 8, 2000.

5. As used in this subpoena, the term "Pre-Neefe Patent Period" means the 5-year period commencing December 15, 1976, and ending December 15, 1981.

6. As used in this subpoena, the term "TRIS" refers to the chemical compound known in the art of the Neefe patent as 1,1,1,-tris(methylsiloxy)methacryloxy-propylsilane.

7. As used in this subpoena, the term "TRIS Product" refers to any contact lens material whose preparation includes the polymerization or co-polymerization of TRIS.

8. As used in this subpoena, the term "RGP Product" refers to any rigid gas permeable contact lens product.

1

9. As used in this subpoena, the term "TRIS RGP Product" refers to any rigid gas permeable contact lens product whose preparation includes the polymerization or co-polymerization of TRIS.

10. As used in this subpoena, the term "TRIS Process" refers to any method or process by which a TRIS Product has been made for use in a TRIS RGP Product.

11. As used in this subpoena, the term "identify," when used in reference to a TRIS Process, means identify, list, and set forth each step of each TRIS Process, including (a) the exact quantities of each element, ingredient, or compound used in a method or process for making a TRIS Product, (b) the full details of any mixing of elements, ingredients, or compounds in a process or method for making a TRIS Product, (c) the full details of any filtration of products, by-products, compounds, or materials made or generated in any method or process for making a TRIS Product, (d) the full details of any removal of unwanted by-products, including hexamethyldisiloxane, made or generated in any method or process for making a TRIS Product, (e) the full details of any copolymerizing of TRIS with an ester of acrylic or methacrylic acid, (f) the full details of any copolymerizing of TRIS with a surface wetting agent, and (g) the full details of any copolymerizing of TRIS with an oxygen permeable cross-linking agent.

12. As used in this subpoena, the term "identify," when used in reference to a person, means state the person's full name, last known business address, and last known business telephone number.

13. As used in this subpoena, the term "identify," when used in reference to an RGP Product (including a TRIS RGP Product), means identify, list, and set forth the

2

product brand name and whatever numbers or codes were used by ABB to record or track sales or shipments of the product.

14. As used in this subpoena, the term "FDA" refers to the U.S. Food and Drug Administration.

15. As used in this subpoena, the term "degree of oxygen permeability" means the rate of diffusion of oxygen through the TRIS Product, the RGP Product, and/or the TRIS RGP Product, as determined by the diffusion coefficient (Dk) or any other measurements.

16. As used in this subpoena, the term "degree of wettability" means the ability of aqueous solutions to spread over the surface of the TRIS Product, the RGP Product, and/or the TRIS RGP Product, as determined by the advancing contact angle, the receding contact angle, or any other measurements.

17. As used in this subpoena, the term "degree of hardness" means the hardness of the TRIS Product, the RGP Product, and/or the TRIS RGP Product, as determined in accordance with the Shore A or D scales or any other measurements.

561655.1

## SCHEDULE A

1.     Such documents as will identify each TRIS Process that ABB used at any time during the Pre-Neefe Patent Period.

2.     Such documents as will identify each person that made any TRIS Product for ABB during the Pre-Neefe Patent Period.

3.     Such documents as will identify each TRIS Process that was used in the manufacture of any TRIS RGP Product that ABB made, had made or sold at any time during the pre-Neefe Patent Period.

4.     Such documents as will identify the physical location(s) where any TRIS Product was made for ABB during the pre-Neefe Patent Period.

5.     Such documents as will identify each RGP Product, including any TRIS RGP Product, that ABB made, had made, or sold during the pre-Neefe Patent Period.

6.     All documents that were provided to the FDA, at any time, in connection with any application for FDA approval of any RGP Product, including any TRIS RGP Product, that ABB made, had made or sold at any time during the Pre-Neefe Patent Period.

7.     Samples of each and any brochure, advertisement, or product description that (a) ABB approved or distributed to any physician, ophthalmologist, optometrist, or optician, directly or indirectly, during the Pre-Neefe Patent Period, and (b) refers to any RGP Product, including any TRIS RGP Product.

8.     Such documents as will identify the degree of oxygen permeability of each RGP Product, including any TRIS RGP Product, that ABB made, had made or sold at any time during the pre-Neefe Period.

1

9.     Such documents as will identify the degree of wettability of each RGP Product, including any TRIS RGP Product, that ABB made, had made or sold at any time during the pre-Neefe Period.

10.     Such documents as will identify the degree of hardness of each RGP Product, including any TRIS RGP Product, that ABB made, had made or sold at any time during the pre-Neefe Period.

11.     Such documents as will show the unit volume of RGP Product sales by ABB in each month of the Pre-Neefe Patent Period.

12.     Such documents as will show the unit volume of TRIS RGP Product sales by ABB in each month of the Pre-Neefe Patent Period.

13.     Such documents as will show the unit cost to ABB of any TRIS Product that was incorporated in any TRIS RGP Product that ABB made, had made or sold during the pre-Neefe Patent Period.

14.     Such documents as will show the dollar volume of RGP Product sales by ABB in each month of the Pre-Neefe Patent Period.

15.     Such documents as will show the dollar volume of TRIS RGP Product sales by ABB in each month of the Pre-Neefe Patent Period.

16.     Each document that constitutes, refers to, or relates to any patent application that (a) was filed by or on behalf of ABB at any time, and (b) refers to any TRIS Process, any TRIS Product, or any TRIS RGP Product.

17.     Each document that refers to the Neefe patent.

18.     Such documents as will identify each TRIS Process that ABB used at any time during the Neefe Patent Period.

2

19.  Such documents as will identify each person that made any TRIS Product for ABB during the Neefe Patent Period.

20.  Such documents as will identify each TRIS Process that was used in the manufacture of any TRIS RGP Product that ABB made, had made or sold at any time during the Neefe Patent Period.

21.  Such documents as will identify the physical location(s) where any TRIS Product was made for ABB during the Neefe Patent Period.

22.  Such documents as will identify each RGP Product, including any TRIS RGP Product, that ABB made, had made, or sold during the Neefe Patent Period.

23.  All documents that were provided to the FDA, at any time, in connection with any application for FDA approval of any RGP Product, including any TRIS RGP Product, that ABB made, had made or sold at any time during the Neefe Patent Period.

24.  Samples of each and any brochure, advertisement, or product description that (a) ABB approved or distributed to any physician, ophthalmologist, optometrist, or optician, directly or indirectly, during the Neefe Patent Period, and (b) refers to any RGP Product, including any TRIS RGP Product.

25.  Such documents as will identify the degree of oxygen permeability of each RGP Product, including any TRIS RGP Product, that ABB made, had made or sold at any time during the Neefe Period.

26.  Such documents as will identify the degree of wettability of each RGP Product, including any TRIS RGP Product, that ABB made, had made or sold at any time during the Neefe Period.

3

27.    Such documents as will identify the degree of hardness of each RGP Product, including any TRIS RGP Product, that ABB made, had made or sold at any time during the Neefe Period.

28.    Such documents as will show the unit volume of RGP Product sales by ABB in each month of the Neefe Patent Period.

29.    Such documents as will show the unit volume of TRIS RGP Product sales by ABB in each month of the Neefe Patent Period.

30.    Such documents as will show the unit cost to ABB of any TRIS Product that was incorporated in any TRIS RGP Product that ABB made, had made or sold during the Neefe Patent Period.

31.    Such documents as will show the dollar volume of RGP Product sales by ABB in each month of the Neefe Patent Period.

32.    Such documents as will show the dollar volume of TRIS RGP Product sales by ABB in each month of the Neefe Patent Period.

4

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

**WESTERN** _____ DISTRICT OF _____ **NEW YORK**

Dome Patent L.P.

V.

JON W. DUDAS, Under Secretary of Commerce
for Intellectual Property and Director of the United
States Patent and Trademark Office

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]
07-CV-01695 (PLF)
Case pending in the U.S. District
Court for the District of Columbia

TO:
Bausch & Lomb Incorporated
1400 North Goodman Street
Rochester, NY 14609

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below
to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See attached Definitions and Schedule A

| PLACE   Chamberlain D'Amanda Oppenheimer Greenfield LLP, c/o K. Wade Eaton, 1600 Crossroads Bldg., Two State Street, Rochester, NY 14614(585) 295 4008 | DATE AND TIME   1/25/2008 4:00 pm |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney(s) for Plaintiff | 1/8/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Stephen S. Rabinowitz
Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (212)859-8000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
   (1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
   (2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
   (B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
   (3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
       (i) fails to allow reasonable time for compliance;
       (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
       (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
       (iv) subjects a person to undue burden.
   (B) If a subpoena
       (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
       (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
       (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
   (1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
   (B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
   (C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
   (D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
   (2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
   (B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (c)(3)(A)(ii) of subparagraph (c)(3)(A).

**DEFINITIONS**

1.  As used in this subpoena, the term "B & L" refers to Bausch & Lomb Incorporated, its corporate predecessors and any corporation, company, or entity that controlled, was controlled by, or was under common control with B & L or its predecessors at any time, or from time to time, during the Neefe Patent Period or the Pre-Neefe Patent Period, and includes any subsidiary of B & L and any entity acquired by or merged into B & L, including but not limited to any entity known as or doing business as Polymer Technology Corporation.

2.  As used in this subpoena, the term "control" means ownership or control over at least 50% of the voting capital stock of a corporation, company, or other entity.

3.  As used in this subpoena, the term "Neefe patent" refers to U.S. Patent No. 4,306,042 issued December 15, 1981, to Russell A. Neefe.

4.  As used in this subpoena, the term "Neefe Patent Period" means the period of time commencing December 15, 1981, and ending September 8, 2000.

5.  As used in this subpoena, the term "Pre-Neefe Patent Period" means the 5-year period commencing December 15, 1976, and ending December 15, 1981.

6.  As used in this subpoena, the term "TRIS" refers to the chemical compound known in the art of the Neefe patent as 1,1,1,-tris(methylsiloxy)methacryloxy-propylsilane.

7.  As used in this subpoena, the term "TRIS Product" refers to any contact lens material whose preparation includes the polymerization or co-polymerization of TRIS.

8.  As used in this subpoena, the term "RGP Product" refers to any rigid gas permeable contact lens product.

1

9. As used in this subpoena, the term "TRIS RGP Product" refers to any rigid gas permeable contact lens product whose preparation includes the polymerization or co-polymerization of TRIS.

10. As used in this subpoena, the term "TRIS Process" refers to any method or process by which a TRIS Product has been made for use in a TRIS RGP Product.

11. As used in this subpoena, the term "identify," when used in reference to a TRIS Process, means identify, list, and set forth each step of each TRIS Process, including (a) the exact quantities of each element, ingredient, or compound used in a method or process for making a TRIS Product, (b) the full details of any mixing of elements, ingredients, or compounds in a process or method for making a TRIS Product, (c) the full details of any filtration of products, by-products, compounds, or materials made or generated in any method or process for making a TRIS Product, (d) the full details of any removal of unwanted by-products, including hexamethyldisiloxane, made or generated in any method or process for making a TRIS Product, (e) the full details of any copolymerizing of TRIS with an ester of acrylic or methacrylic acid, (f) the full details of any copolymerizing of TRIS with a surface wetting agent, and (g) the full details of any copolymerizing of TRIS with an oxygen permeable cross-linking agent.

12. As used in this subpoena, the term "identify," when used in reference to a person, means state the person's full name, last known business address, and last known business telephone number.

13. As used in this subpoena, the term "identify," when used in reference to an RGP Product (including a TRIS RGP Product), means identify, list, and set forth the

2

product brand name and whatever numbers or codes were used by Bausch & Lomb Inc. to record or track sales or shipments of the product.

14. As used in this subpoena, the term "FDA" refers to the U.S. Food and Drug Administration.

15. As used in this subpoena, the term "degree of oxygen permeability" means the rate of diffusion of oxygen through the TRIS Product, the RGP Product, and/or the TRIS RGP Product, as determined by the diffusion coefficient (Dk) or any other measurements.

16. As used in this subpoena, the term "degree of wettability" means the ability of aqueous solutions to spread over the surface of the TRIS Product, the RGP Product, and/or the TRIS RGP Product, as determined by the advancing contact angle, the receding contact angle, or any other measurements.

17. As used in this subpoena, the term "degree of hardness" means the hardness of the TRIS Product, the RGP Product, and/or the TRIS RGP Product, as determined in accordance with the Shore A or D scales or any other measurements.

3

## SCHEDULE A

1.      Such documents as will identify each TRIS Process that B & L used at any time during the Pre-Neefe Patent Period.

2.      Such documents as will identify each person that made any TRIS Product for B & L during the Pre-Neefe Patent Period.

3.      Such documents as will identify each TRIS Process that was used in the manufacture of any TRIS RGP Product that B & L made, had made or sold at any time during the pre-Neefe Patent Period.

4.      Such documents as will identify the physical location(s) where any TRIS Product was made for B & L during the pre-Neefe Patent Period.

5.      Such documents as will identify each RGP Product, including any TRIS RGP Product, that B & L made, had made, or sold during the pre-Neefe Patent Period.

6.      All documents that were provided to the FDA, at any time, in connection with any application for FDA approval of any RGP Product, including any TRIS RGP Product, that B & L made, had made or sold at any time during the Pre-Neefe Patent Period.

7.      Samples of each and any brochure, advertisement, or product description that (a) B & L approved or distributed to any physician, ophthalmologist, optometrist, or optician, directly or indirectly, during the Pre-Neefe Patent Period, and (b) refers to any RGP Product, including any TRIS RGP Product.

8.      Such documents as will identify the degree of oxygen permeability of each RGP Product, including any TRIS RGP Product, that B & L made, had made or sold at any time during the pre-Neefe Period.

1

9.    Such documents as will identify the degree of wettability of each RGP Product, including any TRIS RGP Product, that B & L made, had made or sold at any time during the pre-Neefe Period.

10.    Such documents as will identify the degree of hardness of each RGP Product, including any TRIS RGP Product, that B & L made, had made or sold at any time during the pre-Neefe Period.

11.    Such documents as will show the unit volume of RGP Product sales by B & L in each month of the Pre-Neefe Patent Period.

12.    Such documents as will show the unit volume of TRIS RGP Product sales by B & L in each month of the Pre-Neefe Patent Period.

13.    Such documents as will show the unit cost to B & L of any TRIS Product that was incorporated in any TRIS RGP Product that B & L made, had made or sold during the pre-Neefe Patent Period.

14.    Such documents as will show the dollar volume of RGP Product sales by B & L in each month of the Pre-Neefe Patent Period.

15.    Such documents as will show the dollar volume of TRIS RGP Product sales by B & L in each month of the Pre-Neefe Patent Period.

16.    Each document that constitutes, refers to, or relates to any patent application that (a) was filed by or on behalf of B & L at any time, and (b) refers to any TRIS Process, any TRIS Product, or any TRIS RGP Product.

17.    Each document that refers to the Neefe patent.

18.    Such documents as will identify each TRIS Process that B & L used at any time during the Neefe Patent Period.

2

19.    Such documents as will identify each person that made any TRIS Product for B & L during the Neefe Patent Period.

20.    Such documents as will identify each TRIS Process that was used in the manufacture of any TRIS RGP Product that B & L made, had made or sold at any time during the Neefe Patent Period.

21.    Such documents as will identify the physical location(s) where any TRIS Product was made for B & L during the Neefe Patent Period.

22.    Such documents as will identify each RGP Product, including any TRIS RGP Product, that B & L made, had made, or sold during the Neefe Patent Period.

23.    All documents that were provided to the FDA, at any time, in connection with any application for FDA approval of any RGP Product, including any TRIS RGP Product, that B & L made, had made or sold at any time during the Neefe Patent Period.

24.    Samples of each and any brochure, advertisement, or product description that (a) B & L approved or distributed to any physician, ophthalmologist, optometrist, or optician, directly or indirectly, during the Neefe Patent Period, and (b) refers to any RGP Product, including any TRIS RGP Product.

25.    Such documents as will identify the degree of oxygen permeability of each RGP Product, including any TRIS RGP Product, that B & L made, had made or sold at any time during the Neefe Period.

26.    Such documents as will identify the degree of wettability of each RGP Product, including any TRIS RGP Product, that B & L made, had made or sold at any time during the Neefe Period.

3

27.     Such documents as will identify the degree of hardness of each RGP Product, including any TRIS RGP Product, that B & L made, had made or sold at any time during the Neefe Period.

28.     Such documents as will show the unit volume of RGP Product sales by B & L in each month of the Neefe Patent Period.

29.     Such documents as will show the unit volume of TRIS RGP Product sales by B & L in each month of the Neefe Patent Period.

30.     Such documents as will show the unit cost to B & L of any TRIS Product that was incorporated in any TRIS RGP Product that B & L made, had made or sold during the Neefe Patent Period.

31.     Such documents as will show the dollar volume of RGP Product sales by B & L in each month of the Neefe Patent Period.

32.     Such documents as will show the dollar volume of TRIS RGP Product sales by B & L in each month of the Neefe Patent Period.

4

Ex. 12

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOME PATENT L.P., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case Number: 07-CV-01695 (PLF) |
| | ) |
| JON W. DUDAS, | ) Case pending in the U.S. District Court for |
| Under Secretary of Commerce for Intellectual | ) the District of Columbia |
| Property and Director of the United States | ) |
| Patent and Trademark Office, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## RELATED TO

| | |
|---|---|
| DOME PATENT L.P., | ) |
| | ) |
| | ) Case Number: 6.98 CV-06247-DGL |
| Plaintiff, | ) |
| v. | ) Judge Larimer |
| | ) |
| PERMEABLE TECHNOLOGIES, et al. | ) Case pending in the District Court for the |
| | ) Western District of New York |
| Defendants. | ) |
| | ) |

## OBJECTIONS OF BAUSCH & LOMB INCORPORATED TO DOME PATENT L.P.'s DOCUMENT SUBPOENA OF BAUSCH & LOMB, INC.

### GENERAL OBJECTIONS

The following general objections apply to each and every specific request of Dome Patent L.P. ("Dome").

1.     The subpoena served on Bausch & Lomb Incorporated ("B&L") fails to comply with Rule 45(a)(2)(C) of the Federal Rules of Civil Procedure which requires a subpoena to issue from the court for the district where the production of documents is to be made.  The subpoena was issued from the Northern District of New York, but commands production in New York City, in the Southern District of New York.

2.     Dome's subpoena fails to comply with Rule 45(c)(1) of the Federal Rules of Civil Procedure which requires a party or attorney to take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.  Dome Patent's original subpoena of Bausch & Lomb Vision Care issued from the court for the Western District of New York and commanded the production of documents in Rochester, New York, where B&L has an established place of business.  The new subpoena served on B&L, however, commands production in New York City, more than 100 miles away from B&L's place of business.  By issuing the new subpoena out of the Northern District of New York and requiring production in New York City, Dome has taken steps to increase the burden on B&L rather than taking steps to avoid undue burden, as required by Rule 45.

3.     B&L objects to Dome's subpoena because it requires B&L to produce documents in New York City, more than 100 miles away from B&L's regular and established place of business in Rochester, New York.

4.     B&L objects to Dome's subpoena because it evidences forum-shopping on the part of Dome.  B&L has a regular and established place of business in the Western District of New York  and the related case, <u>Dome Patent L.P. v. Permeable Technologies, Inc. et al.</u>, Case No. 6:98CV-06247-DGL is pending in the U.S. District Court, Western District of New York ("Dome litigation").  Thus, the appropriate district for the issuance of Dome's subpoena of B&L

2

is the Western District of New York, the same judicial district which issued Dome's original subpoena of Bausch & Lomb Vision Care, Inc. Instead, Dome's subpoena of B&L issued from the Northern District of New York and requires compliance in the Southern District of New York, judicial districts with which B&L has no connection and which are unfamiliar with the Dome litigation pending in the Western District of New York.

5.      B&L objects to Dome's subpoena to the extent that it requests documents that are relevant to the issues in the Dome litigation pending in the Western District of New York. All proceedings, including discovery, have been stayed in that case by the Court's Order dated October 5, 1999 while the Neefe Patent was reexamined in the U.S. Patent & Trademark Office ("PTO"). No discovery has been taken in the Dome litigation; B&L's subsidiary, Polymer Technology Corporation, has not filed an answer to the Complaint; and now, seven years after the Neefe Patent expired, the PTO has affirmed the reexamination examiner's rejection of the Neefe Patent. Dome's request for documents via Third Party Subpoena in another action is a flagrant violation of the October 5, 1999 Stay Order in the Dome litigation. Dome has gone through an entire eight-year re-examination proceeding for the Neefe Patent, including an appeal to the Board of Patent Appeals and Interferences ("Board of Appeals") without indicating any need for the documents now requested. Dome acquiesced in the stay of the Dome litigation, even though Judge Larimer indicated by letter dated March 10, 2000, that Dome could renew its request to lift the stay at the next status report on September 1, 2000. No request to lift the stay was ever filed and Dome continued to acquiesce, and even agreed that the stay should continue in view of the re-examination appeal. *See* Joint Statement in Response to Order to Show Cause filed April 7, 2005 in the Dome litigation. Accordingly, for nearly 8 years, Dome essentially did nothing and acquiesced in the Court ordered stay. Now that the U.S. Patent and Trademark

Office has rejected the Neefe patent claim and the Board of Appeals has affirmed the rejection of that claim, Dome seeks all the discovery it could have fought for years ago but did not. The law of the case in the Dome litigation does not permit the discovery sought by Dome.

6.    B&L objects to Dome's subpoena to the extent it requests in excess of twenty-five categories of documents. Local Rule 34 of the Western District of New York limits the number of categories of document requests to twenty-five. Dome is attempting to circumvent this Rule by issuing its subpoena out of the Northern District of New York. Dome is further attempting to circumvent this Rule by directing document demands to B&L outside the context of the Dome litigation pending in the Western District of New York.

7.    B&L objects to Dome's subpoena to the extent that it requests confidential information of B&L.

8.    B&L further objects to Dome's subpoena to the extent that it seeks the disclosure or identification of information that is protected by a recognized privilege or other immunity from disclosure, including, but not limited to, the attorney-client privilege and work product immunity, and/or as material prepared in anticipation of litigation. Nothing in these objections is intended to be, or in any way shall be deemed a waiver of any available privilege or immunity.

9.    B&L objects to the noticed time and date of the document production as unreasonable given that the production sought spans a period of over thirty years and further given the extremely broad scope of the production sought.

10.    B&L objects to Dome's subpoena because it subjects B&L to undue burden. Many of the requests contained in Schedule A attached to the subpoena ("Schedule A") request the production of documents that cover a time span of several decades and have been archived for years in multiple locations. Locating any such documents will require considerable time,

4

effort and expense. B&L anticipates that it will require months of searching and hundreds of thousands of dollars to locate, segregate and/or redact privileged from non privileged information; separate and/or redact irrelevant from relevant information, and produce the documents requested.

11.    B&L further objects to Dome's subpoena because it requires B&L, who is not a party or an officer of a party, to incur substantial expense without the offer of reasonable compensation.

12.    B&L further objects to Dome's subpoena because the 32 categories of document requests contained in Schedule A are overly broad, encompass information that is not relevant to Dome's claims in the District Court for the District of Columbia action ("D.C. action"), and seek information not reasonably calculated to lead to the discovery of admissible evidence. Dome's requests are based on the pure speculation and conjecture that claims of the Neefe Patent have been "widely adopted by United States contact lens manufacturers." Dome is attempting to obtain several decades-worth of documents pertaining to virtually every aspect of B&L's RGP business with absolutely no evidence that B&L ever "adopted" the method of the Neefe patent. See, e.g., American Standard, Inc. v. Pfizer, Inc., 828 F.2d 734, 742 (Fed. Cir. 1987).

13.    B&L objects to any document request in Schedule A to the extent that it requires the production of "each" or "all" documents or items of information, or any similar unrestricted request, on the grounds that it is cumulative, vague, overly broad, and unduly burdensome.

14.    B&L further objects to any document request in Schedule A as vague and ambiguous to the extent it fails to designate with reasonable particularity the documents sought.

15.    B&L further objects to any document requests in Schedule A to the extent that it seeks information that is a matter of public record or otherwise publicly available and is

therefore already available to Dome or can be obtained in a less burdensome manner through other avenues of discovery.

16.    B&L further objects to Dome's subpoena because it subjects B&L to undue prejudice.  The subpoena requests trade secret and confidential information that Dome will attempt to use to resurrect the Neefe Patent in the D.C. action.  Dome has already asserted the Neefe Patent against B&L's subsidiary, Polymer Technology Corporation, and Dome's subpoena puts B&L in the position of producing its confidential documents to assist Dome in resurrecting its patent and tailor its arguments so that Dome can continue the Dome litigation against B&L's subsidiary.

## SPECIFIC OBJECTIONS TO DOCUMENT REQUESTS

To the extent applicable, B&L incorporates each of the foregoing General Objections into each and every response below, and subject to and without waiving the applicable General Objections, B&L responds as follows:

Request No. 1:  Such documents as will identify each TRIS Process that B&L used at any time during the Pre-Neefe Patent Period.

## RESPONSE TO REQUEST NO. 1:

B&L objects to this request as requiring an unduly burdensome search.  To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense.  B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

6

Request No. 2: Such documents as will identify each person that made any TRIS Product for B&L during the Pre-Neefe Patent Period.

**RESPONSE TO REQUEST NO. 2:**

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 3: Such documents as will identify each TRIS Process that was used in the manufacture of any TRIS RGP Product that B&L made, had made or sold at any time during the pre-Neefe Patent Period.

**RESPONSE TO REQUEST NO. 3:**

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 4: Such documents as will identify the physical location(s) where any TRIS Product was made for B&L during the pre-Neefe Patent Period.

**RESPONSE TO REQUEST NO. 4:**

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense. B&L further objects to this

7

request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

**Request No. 5:** Such documents as will identify each RGP Product, including any TRIS RGP Product, that B&L made, had made, or sold during the pre-Neefe Patent Period.

**RESPONSE TO REQUEST NO. 5:**

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

**Request No. 6:** All documents that were provided to the FDA, at any time, in connection with any application for FDA approval of any RGP Product, including any TRIS RGP Product, that B&L made, had made or sold at any time during the Pre-Neefe Patent Period.

**RESPONSE TO REQUEST NO. 6:**

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

**Request No. 7:** Samples of each and any brochure, advertisement, or product description that (a) B&L approved or distributed to any physician, ophthalmologist, optometrist, or optician, directly or indirectly, during the Pre-Neefe Patent Period, and (b) refers to any RGP Product, including any TRIS RGP Product.

8

**RESPONSE TO REQUEST NO. 7**:

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 8: Such documents as will identify the degree of oxygen permeability of each RGP Product, including any TRIS RGP Product, that B&L made, had made or sold at any time during the pre-Neefe Period.

**RESPONSE TO REQUEST NO. 8**:

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense.

B&L further objects to this request because it encompasses information that is not relevant to any claim at issue in the D.C. case, and it seeks information not reasonably calculated to lead to the discovery of admissible evidence. The Neefe Patent does not disclose any oxygen permeability measurements for the Neefe materials, does not disclose how oxygen permeability is to be measured and does not claim oxygen permeability as a lens property.

Request No. 9: Such documents as will identify the degree of wettability of each RGP Product, including any TRIS RGP Product, that B&L made, had made or sold at any time during the pre-Neefe Period.

**RESPONSE TO REQUEST NO. 9**:

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense.

B&L further objects to this request because it encompasses information that is not relevant to any claim at issue in the D.C. case, and it seeks information not reasonably calculated to lead to the discovery of admissible evidence. The Neefe Patent does not disclose any wettability measurements for the Neefe materials, does not disclose how wettability is to be measured, and does not claim wettability as a lens property.

Request No. 10: Such documents as will identify the degree of hardness of each RGP Product, including any TRIS RGP Product, that B&L made, had made or sold at any time during the pre-Neefe Period.

**RESPONSE TO REQUEST NO. 10**:

B&L further objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense.

B&L further objects to this request because it encompasses information that is not relevant to any claim at issue in the D.C. case, and it seeks information not reasonably calculated to lead to the discovery of admissible evidence. The Neefe Patent does not disclose any hardness measurements for the Neefe materials, does not disclose how hardness is to be measured, and does not claim hardness as a lens property.

Request No. 11:  Such documents as will show the unit volume of RGP Product sales by B&L in each month of the Pre-Neefe Patent Period.

**RESPONSE TO REQUEST NO. 11:**

B&L objects to this request as requiring an unduly burdensome search.  To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense.  B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 12:  Such documents as will show the unit volume of TRIS RGP Product sales by B&L in each month of the Pre-Neefe Patent Period.

**RESPONSE TO REQUEST NO. 12:**

B&L objects to this request as requiring an unduly burdensome search.  To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense.  B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 13:  Such documents as will show the unit cost to B&L of any TRIS Product that was incorporated in any TRIS RGP Product that B&L made, had made or sold during the pre-Neefe Patent Period.

**RESPONSE TO REQUEST NO. 13:**

B&L objects to this request as requiring an unduly burdensome search.  To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense.  B&L further objects to this

11

request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 14: Such documents as will show the dollar volume of RGP Product sales by B&L in each month of the Pre-Neefe Patent Period.

**RESPONSE TO REQUEST NO. 14:**

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 15: Such documents as will show the dollar volume of TRIS RGP Product sales by B&L in each month of the Pre-Neefe Patent Period.

**RESPONSE TO REQUEST NO. 15:**

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 16: Each document that constitutes, refers to, or relates to any patent application that (a) was filed by or on behalf of B&L at any time, and (b) refers to any TRIS Process, any TRIS Product, or any TRIS RGP Product.

12

**RESPONSE TO REQUEST NO. 16**:

B&L objects to this request as requiring an unduly burdensome search. To the extent that any requested documents exist, they were generated decades ago and locating any such documents will require considerable time, effort and expense.

B&L further objects to this request to the extent it seeks documents protected by the attorney-client privilege or work product immunity; B&L will not produce privileged or immune documents. B&L also objects to this request as unduly burdensome to the extent that searching for "each" document that "refers to" or "relates to" any TRIS patent application is, on its face, unduly burdensome or may require an unduly burdensome search.

Request No. 17: Each document that refers to the Neefe patent.

**RESPONSE TO REQUEST NO. 17**:

B&L objects to this request as overly broad and encompassing information that is not relevant to any issue in the D.C. action or calculated to lead to the discovery of admissible evidence. B&L objects to this request as unduly burdensome to the extent that searching for "each" document on its face is unduly burdensome or may require an unduly burdensome search. B&L further objects to this request to the extent it seeks documents protected by the attorney-client privilege and/or work product immunity; B&L will not produce privileged or immune documents.

Request No. 18: Such documents as will identify each TRIS Process that B&L used at any time during the Neefe Patent Period.

**RESPONSE TO REQUEST NO. 18**:

B&L objects to this request as requiring an unduly burdensome search. Many of the documents requested were generated years ago and, to the extent that the requested documents

13

exist, locating such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 19: Such documents as will identify each person that made any TRIS Product for B&L during the Neefe Patent Period.

**RESPONSE TO REQUEST NO. 19:**

B&L objects to this request as requiring an unduly burdensome search. Many of the documents requested were generated years ago and, to the extent that the requested documents exist, locating such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 20: Such documents as will identify each TRIS Process that was used in the manufacture of any TRIS RGP Product that B&L made, had made or sold at any time during the Neefe Patent Period.

**RESPONSE TO REQUEST NO. 20:**

B&L objects to this request as requiring an unduly burdensome search. Many of the documents requested were generated years ago and, to the extent that the requested documents exist, locating such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

14

Request No. 21:  Such documents as will identify the physical location(s) where any TRIS Product was made for B&L during the Neefe Patent Period.

**RESPONSE TO REQUEST NO. 21:**

B&L objects to this request as requiring an unduly burdensome search.  Many of the documents requested were generated years ago and, to the extent that the requested documents exist, locating such documents will require considerable time, effort and expense.  B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 22:  Such documents as will identify each RGP Product, including any TRIS RGP Product, that B&L made, had made, or sold during the Neefe Patent Period.

**RESPONSE TO REQUEST NO. 22:**

B&L objects to this request as requiring an unduly burdensome search.  Many of the documents requested were generated years ago and, to the extent that the requested documents exist, locating such documents will require considerable time, effort and expense.  B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 23:  All documents that were provided to the FDA, at any time, in connection with any application for FDA approval of any RGP Product, including any TRIS RGP Product, that B&L made, had made or sold at any time during the Neefe Patent Period.

**RESPONSE TO REQUEST NO. 23:**

B&L objects to this request as requiring an unduly burdensome search.  Many of the documents requested were generated years ago and, to the extent that the requested documents

exist, locating such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 24:  Samples of each and any brochure, advertisement, or product description that (a) B&L approved or distributed to any physician, ophthalmologist, optometrist, or optician, directly or indirectly, during the Neefe Patent Period, and (b) refers to any RGP Product, including any TRIS RGP Product.

**RESPONSE TO REQUEST NO. 24**:

B&L objects to this request as requiring an unduly burdensome search.  Many of the documents requested were generated years ago and, to the extent that the requested documents exist, locating such documents will require considerable time, effort and expense.  B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 25:  Such documents as will identify the degree of oxygen permeability of each RGP Product, including any TRIS RGP Product, that B&L made, had made or sold at any time during the Neefe Period.

**RESPONSE TO REQUEST NO. 25**:

B&L objects to this request as requiring an unduly burdensome search.  Many of the documents were generated years ago and, to the extent that any requested documents exist, locating such documents will require considerable time, effort and expense.

B&L further objects to this request because it encompasses information that is not relevant to any claim at issue in the D.C. case, and it seeks information not reasonably calculated to lead to the discovery of admissible evidence.  The Neefe Patent does not disclose any oxygen

16

permeability measurements for the Neefe materials, does not disclose how oxygen permeability is to be measured and does not claim oxygen permeability as a lens property.

Request No. 26: Such documents as will identify the degree of wettability of each RGP Product, including any TRIS RGP Product, that B&L made, had made or sold at any time during the Neefe Period.

**RESPONSE TO REQUEST NO. 26:**

B&L objects to this request as requiring an unduly burdensome search. Many of the documents were generated years ago and, to the extent that any requested documents exist, locating such documents will require considerable time, effort and expense.

B&L further objects to this request because it encompasses information that is not relevant to any claim at issue in the D.C. case, and it seeks information not reasonably calculated to lead to the discovery of admissible evidence. The Neefe Patent does not disclose any wettability measurements for the Neefe materials, does not disclose how wettability is to be measured, and does not claim wettability as a lens property.

Request No. 27: Such documents as will identify the degree of hardness of each RGP Product, including any TRIS RGP Product, that B&L made, had made or sold at any time during the Neefe Period.

**RESPONSE TO REQUEST NO. 27:**

B&L objects to this request as requiring an unduly burdensome search. Many of the documents were generated years ago and, to the extent that any requested documents exist, locating such documents will require considerable time, effort and expense.

B&L further objects to this request because it encompasses information that is not relevant to any claim at issue in the D.C. case, and it seeks information not reasonably calculated to lead to the discovery of admissible evidence. The Neefe Patent does not disclose any hardness

17

measurements for the Neefe materials, does not disclose how hardness is to be measured, and does not claim hardness as a lens property.

Request No. 28: Such documents as will show the unit volume of RGP Product sales by B&L in each month of the Neefe Patent Period.

**RESPONSE TO REQUEST NO. 28:**

B&L objects to this request as requiring an unduly burdensome search. Many of the documents requested were generated years ago and, to the extent that the requested documents exist, locating such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 29: Such documents as will show the unit volume of TRIS RGP Product sales by B&L in each month of the Neefe Patent Period.

**RESPONSE TO REQUEST NO. 29:**

B&L objects to this request as requiring an unduly burdensome search. Many of the documents requested were generated years ago and, to the extent that the requested documents exist, locating such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 30: Such documents as will show the unit cost to B&L of any TRIS Product that was incorporated in any TRIS RGP Product that B&L made, had made or sold during the Neefe Patent Period.

18

**RESPONSE TO REQUEST NO. 30**:

B&L objects to this request as requiring an unduly burdensome search. Many of the documents requested were generated years ago and, to the extent that the requested documents exist, locating such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 31: Such documents as will show the dollar volume of RGP Product sales by B&L in each month of the Neefe Patent Period.

**RESPONSE TO REQUEST NO. 31**:

B&L objects to this request as requiring an unduly burdensome search. Many of the documents requested were generated years ago and, to the extent that the requested documents exist, locating such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Request No. 32: Such documents as will show the dollar volume of TRIS RGP Product sales by B&L in each month of the Neefe Patent Period.

**RESPONSE TO REQUEST NO. 32**:

B&L objects to this request as requiring an unduly burdensome search. Many of the documents requested were generated years ago and, to the extent that the requested documents exist, locating such documents will require considerable time, effort and expense. B&L further objects to this request as overly broad, encompassing information that is not relevant to any

claim asserted by Dome in the D.C. action or calculated to lead to the discovery of admissible evidence.

Subject to these objections and the General Objections, and without waiving same, unless and until Dome significantly narrows the scope of the requests, B&L will not produce documents pursuant to these requests.

Dated: January 8, 2008

Michael R. Wolford (Bar Roll No. 502001)
The Wolford Law Firm LLP
600 Reynolds Arcade Building
16 East Main Street
Rochester, NY 14614
Telephone: (585) 325-8000
mwolford@wolfordfirm.com

Edward W. Remus
Priscilla F. Gallagher
McAndrews, Held & Malloy, Ltd.
500 West Madison Street
34th Floor
Chicago, IL 60661

*Attorneys for Bausch & Lomb Incorporated*

20

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DOME PATENT L.P., )<br><br>          Plaintiff, )<br><br>     v. )<br><br>JON W. DUDAS, )<br>Under Secretary of Commerce for Intellectual )<br>Property and Director of the United States )<br>Patent and Trademark Office, )<br><br>          Defendant. )<br>) | Case Number: 07-CV-01695 (PLF)<br><br>Case pending in the U.S. District Court for<br>the District of Columbia |

**RELATED TO**

| | |
|---|---|
| DOME PATENT L.P., )<br><br>          Plaintiff, )<br>     v. )<br><br>PERMEABLE TECHNOLOGIES, et al. )<br><br>          Defendants. )<br>) | Case Number: 6.98 CV-06247-DGL<br><br>Judge Larimer<br><br>Case pending in the District Court for the<br>Western District of New York |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 8, 2008, a true and correct copy of the foregoing **OBJECTIONS OF BAUSCH & LOMB INCORPORATED TO DOME PATENT L.P.'s DOCUMENT SUBPOENA OF BAUSCH & LOMB, INC.**, was served electronically and via United States First Class Mail upon:

*Attorneys for Plaintiff Dome Patent L.P.:*

JAMES W. DABNEY, ESQ.
Fried Frank Harris Shriver & Jacobson LLP
One New York Plaza
New York, NY  10004-1980
james.dabney@friedfrank.com

*Attorneys for Defendant John W. Dudas:*

DIANE M. SULLIVAN, ESQ.
United States Attorney's Office
555 4th Street, NW
Civil Division
Washington, D.C.  20530
diane.sullivan@usdoj.gov

Dated:  January 8, 2008

Michael R. Wolford (Bar Roll No. 502001)