# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
-------------------------------------------------------------------- x
                                          :
DOME PATENT L.P.,                         :   Civil Action No. 07-1695 (PLF)
                                          :
                     Plaintiff,           :   ECF
                                          :
           - v. -                         :
                                          :
TERESA STANEK REA, Acting Under Secretary of  :
Commerce for Intellectual Property and Acting Director  :
of the United States Patent and Trademark Office,  :
                                          :
                                          :
                     Defendant.           :
-------------------------------------------------------------------- x
```

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
801 17th Street, NW
Washington, DC 20006
(202) 639-7000

Attorneys for Plaintiff
Dome Patent L.P.

James W. Dabney
Stephen S. Rabinowitz
Randy C. Eisensmith
Kristin M. Whidby

*Of Counsel*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

I.  PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF
    FACT ................................................................................................................................1

    Procedural History ............................................................................................................1

    Technical Background of the Neefe Invention ..................................................................2

    Claim 1 of the Neefe Patent ..............................................................................................4

    Level of Ordinary Skill in the Art.....................................................................................8

    The Gaylord Patent ...........................................................................................................9

    The Tanaka Patent............................................................................................................15

    There Was No Motivation to Use Tanaka's Formula VI Cross-Linking Agent with
    Gaylord's Tris Comonomer .............................................................................................22

    Bausch & Lomb Secondary Considerations Evidence ....................................................27

    Claim Construction Issue – Filtration is Not Required Before Distillation.....................35

    Claim Construction Issue – Polymerization Requires Adding in Tris Dimer or
    Trimer ..............................................................................................................................38

II. **PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED CONCLUSIONS
    OF LAW** ........................................................................................................................40

    Burden of Proof................................................................................................................40

    Standard of Review..........................................................................................................42

    Legal Background of Obviousness Under 35 U.S.C. § 103(a)..........................................44

    Combining Quaal, Gaylord, and Tanaka Does Not Render the Neefe Patent
    Obvious............................................................................................................................46

    Nexus Between Secondary Considerations Evidence and the Neefe Patent ....................49

    Nexus – Order of the Steps ..............................................................................................53

    Nexus - Polymerization....................................................................................................57

    Nexus – Commercial Success of Boston IV Due to New Polymerization Process ...........60

    Nexus – Dr. Melamed's Testimony was Reliable .............................................................61

    Secondary Considerations Overcome Prima Facie Case of Obviousness .........................64

III. CONCLUSION................................................................................................................65

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Alberts v. Kappos,*
    No. 10-1727 (JEB), 2013 WL 204694 (D.D.C. Jan. 18, 2013) ...............................................41

*Altiris, Inc. v. Symantec Corp.,*
    318 F.3d 1363 (Fed Cir. 2003)...........................................................................................54, 56, 57

*Ambrosini v. Labarraque,*
    101 F.3d 129 (D.C. Cir. 1996) ............................................................................................61

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.,*
    229 F.3d 1120 (Fed. Cir. 2000)...........................................................................................53, 60

*Demaco Corp. v. F. Von Langdorff Licensing Ltd.,*
    851 F.2d 1387 (Fed. Cir. 1988)...........................................................................................60, 65

*Fromson v. Advance Offset Plate, Inc.,*
    755 F.2d 1549 (Fed. Cir. 1985)...........................................................................................42

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966) .................................................................................................................43

*In re Cyclobenzaprine Hydrochloride Extended Capsule Patent Litigation,*
    676 F.3d 1063, 1075 (Fed. Cir. 2012)...........................................................................45

*In re Gartside,*
    203 F.3d 1305 (Fed. Cir. 2000)...........................................................................................41

*In re Rosuvastatin Calcium Patent Litigation,*
    703 F.3d 511 (Fed. Cir. 2012)......................................................................................44, 45

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.,*
    106 F.3d 1563 (Fed. Cir. 1997)...........................................................................................60

*Kappos v. Hyatt,*
    132 S. Ct. 1690 (2012).........................................................................................................40, 41

*KSR Int'l Co. v. Teleflex Inc.,*
    550 U.S. 398 (2007).............................................................................................................46

*Kumho Tire Co., Ltd. v. Cormichael,*
    526 U.S. 137 (1999).............................................................................................................61

*Mantech Environmental Corp. v. Hudson Services, Inc.,*
    152 F.3d 1368 (Fed. Cir. 1998)...........................................................................................54

*Microsoft Corp. v. i4i Ltd. P'Ship*,
   131 S. Ct. 2238 (2011) ...................................................................................43

*Minerals Separation, Ltd. v. Hyde*,
   242 U.S. 261 (1916) .........................................................................................5

*OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*,
   701 F.3d 698 (Fed. Cir. 2012) ..................................................................5, 22, 45

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
   678 F.3d 1280 (Fed. Cir. 2012) ...................................................................44

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...............................................37, 56

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
   699 F.3d 1340 (Fed. Cir. 2012) ...................................................................44

*Waterman v. Mackenzie*,
   138 U.S. 252 (1891) .........................................................................................1

## STATUTES

35 U.S.C. § 103 ...................................................................................................1

35 U.S.C. § 103(a) (2006) ......................................................................... passim

35 U.S.C. § 145 .......................................................................................40, 41, 49

35 U.S.C. § 282 .......................................................................................40, 41, 42

35 U.S.C. § 282(a) ..................................................................................1, 40, 42

35 U.S.C. § 306 .............................................................................................40, 49

35 U.S.C. § 307 .............................................................................................40, 65

## OTHER AUTHORITIES

Fed. R. Evid. 703 ...............................................................................................62

Fed. R. Evid. 801(c) ..........................................................................................43

Fed. R. Evid. 802 .........................................................................................43, 49

Fed. R. Evid. 803(4) .....................................................................................61, 62

Dome Patent, L.P. ("Dome") respectfully submits this response to the acting Director's proposed findings of fact and conclusions of law filed March 29, 2013. The numbered paragraphs below correspond to the numbered paragraphs in the Director's submission.

## I. PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT[1]

### *Procedural History*

1.      Contrary to the Director's suggestion, this civil action involves the <u>validity</u> of claim 1 of U.S. Patent No. 4,306,042 (the "Neefe Patent"). As a litigant in this Court, the Director contends that claim 1 of the Neefe patent is <u>invalid</u> because the process it describes purportedly "would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (2006). The Director uses the term "unpatentable," rather than "invalid," to characterize what she now contends should be the legal status of claim 1 of the Neefe patent, but in the context of this case, it is a distinction without a difference. However much the Director may try and talk around the fact, alleged non-compliance with 35 U.S.C. § 103 is a basis for holding a patent claim invalid, and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a). To assert that a claim in an issued patent is "unpatentable" is but another way of asserting that a claim is invalid.

2.      Contrary to the Director's suggestion, Mr. Neefe did not testify that he held an <u>ownership</u> interest in the Neefe patent. Holding a contractual right to receive royalties does not render a person an "owner" of a patent. *See, e.g., Waterman v. Mackenzie*, 138 U.S. 252, 25 (1891).

---

1   Several paragraphs in the Director's filing, although styled as "proposed conclusions of law," are really proposed findings of fact or are legal conclusions resting on proposed findings of fact for which de novo findings are appropriate. *See* Defendant's Proposed Findings of Fact and Conclusions of Law) (D.I. 100), at paragraphs 176-187, 191-198, and 203-245. To the extent that these paragraphs make factual assertions, Dome will address them as Proposed Findings of Fact.

3.      Dome does not dispute this proposed finding of fact.

4.      Dome does not dispute this proposed finding of fact.

5.      Dome does not dispute this proposed finding of fact.

6.      Dome does not dispute this proposed finding of fact.

7.      As Dome has previously set forth (*see* Dome's proposed findings of fact 6-9), the "reexamination request" that the Director refers to was filed by counsel for one of the defendants in *Dome Patent L.P. v. Permeable Technologies Inc.* (the "Infringement Action").   In subsequently ordering reexamination and concluding that claim 1 of the Neefe patent should be cancelled as directed to subject matter that supposedly "would have been obvious at the time the invention was made," 35 U.S.C. § 103(a) (2006), the Director embraced an invalidity contention that was initially raised in the context of the Infringement Action.

8.      Despite the Director's preference for the word "unpatentable," what actually occurred was that an Examiner in the USPTO concluded that claim 1 of the Neefe patent was invalid because the process it describes purportedly "would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).  The Director in this case seeks legal authority to cancel claim 1 of the Neefe patent, which authority the Director does not currently have and will never have unless this court or an appellate court concludes that the record of this case supports a conclusion that claim 1 of the Neefe patent is invalid.

9.      Dome does not dispute this proposed finding of fact.

10.      Dome does not dispute this proposed finding of fact.

## ***Technical Background of the Neefe Invention***

11.      Dome does not dispute this proposed finding of fact.

12.      Dome does not dispute this proposed finding of fact.

2

13.     Dome does not dispute this proposed finding of fact.

14.     Dome does not dispute this proposed finding of fact.

15.     Dome does not dispute this proposed finding of fact.

16.     Dome does not dispute this proposed finding of fact.

17.     Dome does not dispute this proposed finding of fact.

18.     Dome does not dispute this proposed finding of fact.

19.     Contrary to the Director's suggestion, the Neefe Patent does not state that "only the surface of the [contact lens] material must be wettable and compatible with the fluids of the eye."  Director's F.F. 19 (emphasis added) (quotation marks and citation omitted).  Dr. Timothy Long, Dome's expert in polymer chemistry, including the chemistry of polymers suitable for use in the manufacture of rigid gas permeable ("RGP") contact lenses (1/28 am session, Long Testimony, 47:13-16), explicitly disagreed with such an assertion at trial.  1/28 pm session, Long Testimony, 74:25-75:4.  The wetting agent is one of four components that are copolymerized to form the final polymer.  JTX-1 at col. 5, ll. 54-64; 1/28 pm session, Long Testimony, 55:1-10. The wetting agent is not limited to the surface of the polymer; rather, the wetting agent is incorporated throughout the structure of the polymer, homogeneously improving the overall wettability of the material.  1/28 pm session, Long Testimony, 76:25-77:1; *see also* PTX-4 at Tab 16.

20.     Dome does not dispute this proposed finding of fact.

21.     Dome does not dispute this proposed finding of fact.

22.     Dome does not dispute this proposed finding of fact.

23.     Dome does not dispute this proposed finding of fact.

24.     Dome does not dispute this proposed finding of fact.

3

25.     Dome does not dispute this proposed finding of fact.

26.     Dome does not dispute this proposed finding of fact.

27.     Dome does not dispute this proposed finding of fact.

28.     Dome does not dispute this proposed finding of fact.

29.     Dome does not dispute this proposed finding of fact.

30.     Dome does not dispute this proposed finding of fact.

### *Claim 1 of the Neefe Patent*

31.     Dome does not dispute this proposed finding of fact; however, Dome notes that the Board misstated claim 1 of the Neefe Patent in its Findings of Fact 3 and 7.  There, the Board stated that claim 1 of the Neefe Patent provided for "0.05%-90% of a surface wetting agent." JTX-16 at 2-3.  In fact, claim 1 of the Neefe Patent specifies 0.5% to 90% of this component of the polymer.  JTX-1 at col. 5, ll. 38-64 and Certificate of Correction.

32.     Dome does not dispute this proposed finding of fact.

33.     Dome does not dispute this proposed finding of fact.

34.     Contrary to the Director's suggestion, Dr. Long neither agreed with nor contested the Director's assertion that U.S. Patent No. 3,377,371 (the "Quaal Patent") discloses the process for manufacturing Tris described in steps (a)-(e) of claim 1 of the Neefe Patent.  Rather, Dr. Long merely stated he "did not use Quaal to construct my expert report."  1/28 pm session, Long Testimony, 62:17.  Dome acknowledges that Tris (as distinct from a particular process for manufacturing Tris) was known in the prior art.  *See, e.g.,* 1/28 am session, Long Testimony, 65:23-66:6.

35.     The Director's proposed finding of fact is incomplete.  Claim 1, step (f) of the Neefe Patent specifies that the "[Tris] prepared above" *i.e.,* made by performing steps (a)-(e) or

their equivalent, must be copolymerized with the other materials enumerated in step (f).  *See* JTX-1 at col. 5, lines 56-57.

36.     Dome does not dispute this proposed finding of fact, except that the Tris specified in step (f) is the Tris "prepared above," i.e., by performing steps (a)-(e) or their equivalent.

37.     Although Tris dimer and Tris trimer are in the class of multifunctional siloxanyl alkyl esters, they are not, contrary to the Director's assertion, polymers with two and three Tris monomers respectively.  No witness so testified at trial.

38.     Contrary to the Director's suggestion, there is not a shred of evidence that the ranges identified in claim 1 of the Neefe patent constitute grounds for invalidating that claim under 35 U.S.C. § 103(a).  The Board did not attempt to justify its invalidity determination on any such basis.  The government presented no evidence at trial concerning these proposed facts. There is no evidence that a person skilled in the art "would have been motivated" to make contact lens material utilizing the process described in claim 1 of the Neefe patent and "would have had a reasonable expectation of success" if he or she had tried to do so.  *OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc*., 701 F.3d 698, 706 (Fed. Cir. 2012).  All competent evidence of record is to the contrary.[2]

---

2   Further, while irrelevant to any issue in this case, identifying ranges like those identified in claim 1 of the Neefe Patent is a well-established way of claiming a process where, as here, multiple different process variables exist. In *Minerals Separation, Ltd. v. Hyde*, 242 U.S. 261, 270-71 (1916), the Court upheld the validity of a similar claim, saying:

> Equally untenable is the claim that the patent is invalid for the reason that the evidence shows that when different ores are treated preliminary tests must be made to determine the amount of oil and the extent of agitation necessary in order to obtain the best results.  Such variation of treatment must be within the scope of the claim, and the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject matter.  The composition of ores varies infinitely, each one presenting its special problem, and it is obviously impossible to specify in a patent the precise treatment which would be most successful and economical in each case.  The process is one for dealing with a large class of substances and the range of treatment within the terms of the claims, while leaving something to the skill of persons applying the

39.     Contrary to the Director's suggestion, as stated in paragraph 38, above, there is no evidence in the record that the ranges identified in claim 1 of the Neefe patent constitute grounds for invalidating that claim under 35 U.S.C. § 103(a).

40.     Contrary to the Director's suggestion, for the reasons set forth in paragraph 19 above, the surface wetting agent used in the Neefe Patent is not limited to improving the wettability of the surface of the Neefe contact lens polymer.   Because the wetting agent is copolymerized with the other components, the wetting agent is incorporated throughout the structure of the Neefe polymer, homogeneously improving the overall wettability of the material. 1/28 pm session, Long Testimony, 76:25-77:1; *see also* PTX-4 at Tab 16.   Moreover, as stated in paragraph 38, above, there is no evidence in the record that the ranges identified in claim 1 of the Neefe patent constitute grounds for invalidating that claim under 35 U.S.C. § 103(a).

41.     Contrary to the Director's suggestion, as stated in paragraph 38, above, there is no evidence in the record that the ranges identified in claim 1 of the Neefe patent constitute grounds for invalidating that claim under 35 U.S.C. § 103(a).

42.     Contrary to the Director's assertion, in the testimony cited, Dr. Long merely refused to speculate as to the exact physical properties that would be observed.   1/28 pm session, Long Testimony, 85:20-86:2.   Dr. Long had testified earlier that the physical properties of polymers "are very challenging to predict" individually and "it's impossible to predict all of these physical properties" – clarity, hardness, oxygen permeability, and wettability – when taken together.   1/28 am session, Long Testimony, 50:14-23; *see also id.* at 54:1-5, 62:19-20.   Thus, Dr. Long's refusal to speculate on a polymer's physical properties without gathering experimental data simply demonstrates that Dr. Long is a cautious and meticulous scientist.   *Cf.*

invention, is clearly sufficiently definite to guide those skilled in the art to its successful application, as the evidence abundantly shows.  This satisfies the law.

1/29 pm session, 89:25-90:1 ("[Dr. Long]'s not just a chemist, he's a very distinguished chemist.").

43.     Contrary to the Director's suggestion, Dr. Long only testified that he did not know offhand what quantitative number was required by contact lens manufacturers for a polymer to be considered sufficiently wettable to be made into a contact lens product.  1/28 pm session, Long Testimony, 85:2-10.  This is understandable given that the contact angle of commercially marketed contact lens materials has varied from 12° to 54°.  *See* JTX-4 at 66-67. However, Dr. Long testified that wettability is a "very critical physical property" of a polymer that is to be used as a contact lens material.  1/28 am session, Long Testimony, 50:7-13; *see also* 1/29 am session, Melamed Testimony, 15:12-16:7, 17:7-9, 100:12-15.  Furthermore, Dr. Long was offered by Dome "as an expert in the field of polymer chemistry generally, including the chemistry of polymer[s] suitable for use in the manufacture of rigid gas permeable contact lenses."  1/28 am session, Long Testimony, 47:14-16.  Dr. Long was not offered as an expert in the criteria for commercial decisions by manufacturers in selecting which contact lens polymers to market.

44.     Contrary to the Director's suggestion, Dr. Long merely refused to speculate, in the absence of data, as to the exact value of a physical property – in this case oxygen permeability – that would be possessed by the hypothetical polymer proposed by the government.  1/28 pm session, Long Testimony, 86:7-18.  The Director's attempt to discredit Dr. Long's testimony by emphasizing his refusal to speculate about the physical properties of a hypothetical polymer composition again fails.  As discussed in paragraph 42 above, Dr. Long was merely refusing to speculate on the exact oxygen permeability of an untested composition.

45.     Contrary to the Director's assertion, Dr. Long only testified that he did not know offhand the quantitative number for oxygen permeability required by contact lens manufacturers to commercially market a polymer material.   1/28 pm session, Long Testimony, 85:11-15. Nonetheless, he testified as to his knowledge that contact lens manufacturers are always seeking to increase the oxygen permeability of contact lens materials.  *Id.*  Dr. Long's refusal to speculate as to the required quantitative measurement for oxygen permeability is understandable given that the Dk value of commercial contact lens materials has ranged from 0.1 (PMMA) to 450 (Silicone rubber).  JTX-4 at 66-67.  It is even more understandable given the tension that exists between the "CHOW" properties.  1/28 am session, Long Testimony, 53:4-7, 72:20-73:8; PTX-5; JTX-4 at 65; JTX-9 at col. 1 ll. 30-34; JTX-23; JTX-26 at 11.8; JTX-27 at 273.   Since improving oxygen permeability was known to have a negative impact on the other "CHOW" properties, particularly wettability, it is entirely understandable that Dr. Long declined to testify as to the degree of oxygen permeability required to justify the business decision to commercially market a contact lens polymer relative to the other physical properties.

**_Level of Ordinary Skill in the Art_**

46.     The Director's Proposed Finding of Fact 46 is incomplete in focusing only on oxygen permeability, and overlooking the importance of the other "CHOW" properties.  That is, the Director fails to acknowledge that in addition to being oxygen permeable, a contact lens material must be optically clear, sufficiently hard and rigid so as to be machineable into a precise enough shape, and sufficiently wettable to be comfortable on the eye of the wearer.  *See* 1/28 am session, Long Testimony, 49:1-2, 49:8-10, 49:16-50:13, 53:21-24; *see also* Dome F.F. 17-18. Thus, one skilled in the art would not only be "aware of the reasons for and desirability of high oxygen permeability in contact lens materials," Director's F.F. 46, but would also be aware of the reasons for and desirability of sufficient clarity, hardness, and wettability in contact lens

materials.  Furthermore, it was known in the field of polymer chemistry at the time of the Neefe invention that changing one physical property of a contact lens material may have a negative impact on the other physical properties.  1/28 am session, Long Testimony, 53:4-7; PTX-5; *see also* JTX-4 at 65; JTX-9 at col. 1 ll. 30-34.  Thus, beyond understanding the desirability of the "CHOW" properties, one skilled in the art would have recognized the difficulty of achieving these design goals simultaneously.  1/28 pm session, Long Testimony, 61:5-10.

47.     Dome does not dispute this proposed finding of fact.

48.     Dome does not dispute this proposed finding of fact.

49.     Dome does not dispute this proposed finding of fact.

50.     Dome does not dispute this proposed finding of fact.

### *The Gaylord Patent*

51.     Dome does not dispute this proposed finding of fact.

52.     The Director misstates the nature and significance of Gaylord's invention.  The importance of U.S. Patent No. 4,120,570 (the "Gaylord Patent") was not merely that the material was oxygen permeable.  Pure silicone contact lenses with excellent oxygen permeability were commercially available since at least 1958.[3]  JTX-5 at 272.  Problems with the other "CHOW" properties, however, made these silicone contact lenses impractical for all but a few patients.  *Id.*; 1/30 am session, Benjamin Testimony, 13:22-25.  The Gaylord Patent described a contact lens material that had sufficient oxygen permeability for underline limited daily wear while also having sufficient clarity, hardness, and wettability to be wearable by a larger range of patients.  1/28 am session, Long Testimony, 53:16-24; 1/29 am session, Melamed Testimony, 19:1-3; 1/29 pm session, Neefe Testimony, 9:6-12; 1/29 pm session, Benjamin Testimony, 35:8-9; 1/30 am

---

3   The Director states in Proposed Finding of Fact 52 that Gaylord "creat[ed] a world of lenses with oxygen permeability," implying that no other oxygen permeable lens had ever been created.  As discussed above, this is incorrect.

session, Benjamin Testimony, 17:6-10, 40:2-7; JTX-4 at 17, 64; JTX-9 at col. 1, ll. 37-41; JTX-10 at col. 2, ll. 29-32; JTX-12 at 238; PTX-4 at Tab 1; PTX-5.

53.     This proposed finding of fact is incomplete, for the reasons stated in paragraph 52, above.

54.     While the Philips and Speedwell reference contains the quote cited in the Director's Proposed Finding of Fact 54, *see* JTX-4 at 65, Dome's experts explained at trial that it does not mean what the Director implies, for the following reasons:

         a.     Gaylord was the first to suggest a silicone/acrylate RGP contact lens material.  1/29 am session, Melamed Testimony, 22:24-25, 53:8-11; JTX-4 at 17, 63.  It is well-accepted in the contact lens industry that the Gaylord polymer ushered in the era of RGP materials, and that the patents for oxygen permeable contact lens polymer materials which followed have been built on the foundation established by the Gaylord polymer.  1/28 pm session, Long Testimony, 5:3-21; 1/29 am session, Melamed Testimony, 51:6-52:8.  But just because they have been a "refinement and improvement" on the basic idea of a RGP material (JTX-4 at 65) does not mean that the ideas in these patents have not been "truly new."  1/29 am session, Melamed Testimony, 23:5-11, 67:23-68:3.  "Truly new" is a subjective phrase.  1/29 am session, Melamed Testimony, 23:8.  According to the testimony of Dr. Mark Melamed, Dome's expert in the use and prescription of RGP contact lenses and the medical benefits achieved by contact lenses with improved oxygen permeability (1/29 am session, Melamed Testimony, 13:3-6), the subsequent development of "lenses that were dramatically better [than the Gaylord lenses] . . . was truly new."  *Id.* at 23:9-11.

         b.     The Gaylord Patent led to the development of the so-called "first generation contact lenses," which patients could wear for a portion of their working day.  1/29

am session, Melamed Testimony, 19:1-4, 53:12-17.   However, patients still often complained that contact lenses made from the Gaylord polymer, as well as the other first generation contact lenses that followed, were unsuitable for a prolonged wearing day (*i.e.,* from first thing in the morning until bedtime without removing the lenses for a period of time during the day).   1/29 am session, Melamed Testimony, 19:20-20:3, 20:10-25.   Hence, the next big breakthrough in RGP contact lens materials after the Gaylord Patent was the creation of a polymer that allowed contact lenses to be worn for a prolonged wearing day.   1/29 am session, Melamed Testimony, 29:7-23, 67:13-14.   This was exactly the "dramatic improvement" achieved by the Neefe polymer.   1/28 pm session, Long Testimony, 22:11-14; 1/29 am session, Melamed Testimony, 24:9-25:1.

55.     Dome does not dispute this proposed finding of fact; however, the Director's proposed finding of fact is incomplete in that it fails to acknowledge that the range given in the Gaylord Patent for the wetting agent (0.1 % to 10% by weight) falls partially outside of the range of the wetting agent specified in claim 1 of the Neefe Patent (0.5% to 90%).   *Compare* JTX-8 at col. 5, ll. 42-46 *with* JTX-1 at col. 5, ll. 60-61 and Certificate of Correction.

56.     Dome does not dispute this proposed finding of fact.

57.     Contrary to the Director's suggestion, the Gaylord Patent does not allow between 0.01% and 10% by weight of a wetting agent.   The stated range is incorrect.   The Gaylord Patent actually states that 0.1% to 10% by weight of a wetting agent may be added.   JTX-8 at col. 5, ll. 42-46.   The Board made the same factual error.   JTX-16 at 3-4 (F. 10).   Dome does not dispute that the sole claim of the Gaylord Patent is directed to a polymer "consisting essentially of" a polysiloxanylalkyl ester monomer (*i.e.,* Tris) (comprising 10 to 70 parts by weight) and an ester of a $C_1$-$C_{20}$ monohydric alkanol and an acid selected from the class of consisting of acrylic or methacrylic acids (*i.e.,* methyl methacrylate ("MMA")) (comprising 30 to 90 parts by weight)

(JTX-8 at col. 12 l. 43 – col. 14 l. 5), or that the specification discloses that between 0.05% and 2% by weight of a free radical initiator (JTX-8 at col. 4 ll. 33-38), from 0.1% to 10% by weight of a hydrophilic wetting agent (JTX-8 at col. 5, ll. 42-46), and 0.01% to 2% by weight of a cross-linking monomer such as ethylene glycol dimethacrylate (JTX-8 at col. 6, ll. 3-10) may be added to the copolymer.[4]

58.     Contrary to the Director's suggestion, percent by weight and parts by weight are not roughly equivalent.  1/28 pm session, Long Testimony, 66:11-12, 67:7-13.  Nor is there any testimony in the record (or anything in the Gaylord Patent) that supports the Director's assertion.

a.     Given the maximum percentages by weight allowed by the Gaylord Patent for the free radical initiator (2%), wetting agent (10%), and cross-linking monomer (2%), treating the parts by weight of the two components listed in claim 1 of the patent as percent by weight (totaling 100 parts by weight) would result in a compound with a total weight of 114%. This is a physical impossibility.  As Dr. Long testified, one cannot exceed 100%.  1/28 pm session, Long Testimony, 67:20-21.  As another example, Example 2 of the Gaylord Patent discloses the copolymerization of 55 parts of the polysiloxane monomer, 45 parts of methyl methacrylate, 1 part of ethylene glycol dimethacraylate (a cross-linking agent), 5 parts of hydroxymethyl methacrylate (a wetting agent), and 0.12 weight-% of tert-butyl peroxypivalate (a free radical initiator).  If the parts by weight are treated as percentages by weight, the material of Example 2 would have a total weight of 106.12%.  Again, as Dr. Long testified, this is a physical impossibility.

---

4   The two components described in the specification but not in claim 1 of the Gaylord Patent – free radical initiators and cross-linking agents – are treated by Gaylord as elements of his polymer.  For example, Gaylord includes the addition of a cross-linking agent as part of the polymer preparation claimed by his patent.  *See* JTX-8 at col. 6, ll. 29-30 (stating after disclosure of the possible use of cross-linking agents that the polymer is fabricated into contact lenses "[a]fter preparation . . . as described above").  In addition, Examples 2 to 6 and 10 to 21 describe the preparation of polymers containing a cross-linking agent.  JTX-8 at col. 7, l. 20 – col. 11, l. 25.

b.      Since percent by weight and parts by weight are not roughly equivalent, the Board made another factual error with respect to the composition of the Gaylord polymer when it refers to the amount of the siloxanyl alkyl ester and acrylic or methacrylic acid ester components as "% by weight."  JTX-16 at 3-4 (F. 10).

59.     Contrary to the Director's suggestion, claim 1, step (f) of the Neefe Patent differs from the Gaylord patent in that the Neefe process requires Tris as "prepared above," i.e., by steps (a)-(e) of Neefe claim 1.  JTX-1 at col. 5 ll. 57-58.  Dr. Long's testimony that "[t]he range is there but the crosslinking agents are completely different," 1/28 am session, Long Testimony at 70:15-20, does not support the Director's suggestion that the crosslinking agent was the "only" difference between the Gaylord Patent disclosure and claim 1 of the Neefe Patent.

60.     Dome does not dispute this proposed finding of fact.

61.     Dome does not dispute this proposed finding of fact.

62.     Dome does not dispute this proposed finding of fact.

63.     Dome does not dispute this proposed finding of fact.

64.     Contrary to the Director's suggestion, the Gaylord Patent actually discloses four alternative methods by which the wettability of a copolymer could be improved.  First, wetting agents can be included in the copolymerization mixture.  JTX-8 at col. 5, ll. 42-51.  In this case, the improved wettability would exist homogeneously throughout the compound, not just at the surface of the polymer, as the Director suggests.  *See* paragraph 40, above; 1/28 pm session, Long Testimony, 74:25-75:4; PTX-4 at Tab 9.  The last three methods of improving wettability are only applied to the surface of the polymer.  A wetting agent could be applied just to the surface of the contact lens material (JTX-8 at col. 5, ll. 51-55), the surface of the contact lens can be exposed to a corona discharge (JTX-8 at col. 5, ll. 55-56), or the surface of the contact lens

can be chemically treated with a strong oxidizing agent, such as nitric acid (JTX-8 at col. 5, ll. 56-58).

65.     Contrary to the Director's suggestion, the record <u>does</u> contain evidence regarding the limitations of surface treatment.  For example, Dr. Long testified that a surface treatment may not be applied homogeneously.  1/28 pm session, Long Testimony, 76:9-14.  Treated surfaces were also known to be prone to breaking down and to suffer badly from surface deposits.  JTX-4 at 17, 62; JTX-26 at 11.7.  Hence, those in the contact lens industry generally desired to avoid the use of surface treatments as a means of improving wettability.  JTX-10 at col. 1, l. 55 – col. 2, l. 6 ("Accordingly, it would be highly advantageous to provide a hard oxygen-permeable contact lens composition . . . which can be used to manufacture contact lenses . . . and which do not require special surface pre-treatments or periodic surface treatments to attain and maintain the desired surface properties.").

66.     Contrary to the Director's suggestion, it is incorrect to say that the contact lens material described in Example 5 of the Gaylord Patent "uses a different crosslinker" than the one recited in claim 1 of the Neefe Patent.  Director's F.F. 66.  In fact, the polymer of Gaylord's Example 5 does not use any cross-linking agent whatsoever.  *See* JTX-8 at col. 8, ll. 5-8; 1/28 pm session, Long Testimony, 75:10-22.  The government's counsel made the same mistake at trial, only to be corrected by Dr. Long.  1/28 pm session, Long Testimony, 75:19-22.

67.     The Director's Proposed Findings of Fact 67 refers back to "FF. 65," which identifies a lens made from silicone and subjected to surface treatment.  Such a silicone lens would not be "hard."  *See* 1/28 am session, Long Testimony, 52:10-14.  Nor is there any evidence that would be "readily wetted with a wetting agent solution," as the Director contends.

14

68.     The Director's Proposed Findings of Fact 68 refers back to "FF. 65," which in turn refers to a lens made from silicone and subjected to surface treatment.  There is no evidence in the record that such a silicone lens would be "readily wetted with a wetting agent solution," as the Director asserts.  Moreover, the Director ignores evidence that is of record regarding the limitations of surface treatments.  *See* paragraph 65 above.

69.     Contrary to the Director's suggestion, Dr. Long did not change his testimony regarding the issue of homogeneity with the use of corona discharge surface treatment.  On the contrary, Dr. Long consistently testified that Gaylord was silent about the issue of homogeneity: *Compare* 1/28 pm session, Long Testimony, 76:9-14 ("I don't think he's necessarily saying a homogeneous liability (sic, wettability). . . . But it doesn't imply anything about the homogeneity of the surface coverage of the lens.") *with id*. at 77:1-8 ("[C]orona discharge could be nonhomogeneous.  So, depending on where that contact angle is measured, it could be lower or it could be different. . . . He's saying wherever he tested it on the lens it is 10 degrees.").  Dr. Long's expert testimony about the issue of nonhomogeneous surfaces with the use of corona discharge was in no way undermined by his testimony that the Gaylord Patent is silent about this important issue.  *See id*. at 77:11 ("There's no word "portion," yeah.").  The lack of the word "portion" in Example 5 of the Gaylord Patent does not affect Dr. Long's testimony – based on his professional experience – that a corona discharge may be applied nonhomogenously or his refusal to assume homogeneity in the absence of data to support such an assertion.

**_The Tanaka Patent_**

70.     The Director's proposed finding of fact is incomplete and inaccurate, for the following reasons:

        a.      It is undisputed that the primary novel feature of the invention described in U.S. Patent No. 4,235,985 (the "Tanaka Patent") is a novel non-Tris comonomer that contains

both hydrophilic and hydrophobic groups and thus is amphiphilic, unlike Tris, which is hydrophobic. 1/28 pm session, Long Testimony, 6:10-7:3; 10:5-10; JTX-13 at col. 2, ll. 64-68 (describing this novel non-Tris mononer as "the feature of the present invention.") The Director entirely ignores the novel Tanaka monomer in her Proposed Findings of Fact.

   b.  Another novel aspect of the Tanaka Patent is the preferred use of hydrophilic siloxanyl <u>alkanol</u> ester cross-linking agents denoted by Formula V. JTX-13 at col. 8, ll. 35-49; *see also* 1/28 pm session, Long Testimony, 11:21-12:2, 12:16-23, 14:10-12, 78:2-18; JTX at 5:20-23. The Director's Proposed Findings of Fact also ignore this important aspect of the Tanaka Patent, except for a single reference to siloxanyl <u>alkanol</u> esters in a proposed Finding of fact that misquotes an erroneous factual finding by the Board. *See* Director's F.F. 79 and discussion below.

   c.  The Tanaka Patent discloses three types of cross-linking agents to be used with the disclosed novel non-Tris comonomer: (1) conventional hydrophilic cross-linkers of the type employed by Gaylord; (2) hydrophilic siloxanyl <u>alkanol</u> ester cross-linking agents denoted by Formula V; and (3) hydrophobic siloxanyl <u>alkyl</u> ester cross-linking agents denoted by Formula VI. It is true that Tanaka taught that the Formula V and Formula VI cross-linking agents were both preferred over the Gaylord-type conventional cross-linking agents for use with Tanaka's novel amphiphilic non-Tris monomer, because the presence of siloxane bonds in these cross-linkers increases a polymer's oxygen permeability. JTX-13 at col. 8, ll. 35-39; *see also* JTX-16 F.26; 1/28 pm session, Long Testimony, 78:2-18. However, the Director ignores that Tanaka preferred the novel Formula V cross-linking agents over the siloxanyl alkyl esters of Formula VI because the Formula V compounds contain hydrophilic hydroxyl groups in addition to the siloxane bond. JTX-13 at col. 8, ll. 39-43 (explaining why this advantageous feature of the

Formula V cross-linking agents made them "particularly useful"); *see also* 1/28 pm session, Long Testimony, 13:8-19; JTX-4 at 64; JTX-13 at col. 8, ll. 43-46.  That is, the Formula V cross-linkers not only improve oxygen permeability of the polymer containing Tanaka's non-Tris monomer but they also contribute to the wettability that the contact lens made of such a polymer such that it could be worn comfortably.  JTX-13 at col. 8, ll. 39-46.  Tanaka's preference for the Formula V cross-linkers is emphasized by the fact that none of the 53 examples in the Tanaka Patent uses a cross-linking agent of Formula VI.  1/28 pm session, Long Testimony, 13:22-14:6; *see also* PTX-13 at col. 18, l. 37 – col. 26, l. 29.

      d.     The most highly preferred cross-linking agents of Tanaka are thus those of Formula V.  Contrary to the Director's suggestion, the cross-linking agents of Formula V are <u>not</u> of the type recited in claim 1 of the Neefe Patent.  1/28 pm session, Long Testimony, 14:19-15:14.  To the extent that the Tanaka Patent teaches that the siloxanyl alkyl ester cross-linking agents denoted by Formula VI as "preferably employed," that teaching relates only to the use of Formula VI cross-linking agents with the novel amphiphilic non-Tris monomer of Tanaka.  JTX-13 at col. 8, ll. 38-39 (describing the cross-linking agents of Formula V and Formula VI as "preferably employed <u>in the present invention</u>.") (emphasis added).

71.     Dome does not dispute this proposed finding of fact.

72.     Dome does not dispute this proposed finding of fact.

73.     Contrary to the Director's suggestion, the Tanaka Patent does not teach the use of comonomers like Tris.  The Director completely ignores Tanaka's teaching away from the use of Tris monomer in contact lenses.  Tanaka states that the use of compounds such as Tris creates a polymer that "shows undesirable water repelling property with increase of the number of the alkylsiloxy groups in the polymer" (JTX-13 at col. 3, ll. 6-10; 1/28 pm session, Long Testimony,

8:2-12), and that Tris is "not suitable" for use in a contact lens material.  JTX-13 at col. 2, l. 64 –

col. 3, l. 63; *see also* 1/28 pm session, Long Testimony, 5:5-8, 5:13-14, 6:11-7:3, 8:2-9:21, 10:5-

10, 82:1-5; PTX-4 at Tab 13.   Likewise, the Director fails to acknowledge that of the 53

examples in the Tanaka Patent, none used the Tris monomer.  1/28 pm session, Long Testimony,

13:22-14:2; *see also* PTX-13 at col. 18, l. 37-col. 26, l. 29.   Instead of Tris, Tanaka teaches the

use of novel organosiloxane comonomers that have hydrophilic groups in addition to alkylsiloxy

groups.  JTX-13 at col. 2, l. 64 – col. 3, l. 5.   Specifically, the novel comonomers have at least a

hydrophilic hydroxyl group and some also have a hydrophilic polyether group.  *Id.*

74.     Dome does not dispute this proposed finding of fact.

75.     Dome does not dispute this proposed finding of fact.

76.     Dome does not dispute this proposed finding of fact.

77.     The Director's proposed finding of fact is incomplete and misleading.

Multifunctional siloxanyl alkyl ester[5] cross-linking agents, corresponding to Tanaka's Formula

VI, are hydrophobic, *see* 1/28 pm session, Long Testimony, 13:3-7, 13:20-21, and had been

known in the prior art since the 1950s, *id*. at 14:14-18; 78:19-79:12; 107:3-23; PTX-1.   The

Tanaka Patent teaches that these hydrophobic Formula VI cross-linkers can be substituted for

hydrophilic cross-linking agents (such as those used by Gaylord, PTX-4 at Tab 13) in order to

crosslink polymers comprised of Tanaka's novel non-Tris monomer. *See* JTX-13 at col. 8, ll. 38-

39.  However, as discussed in paragraph 70 above, the Director ignores the fact that the Formula

V cross-linking agents were preferred over either of these two crosslinkers.   More importantly,

the Director ignores the fact that none of the cross-linking agents disclosed in the Tanaka Patent

were taught for use with Tris monomers.

---

5    The Director misspells "siloxanyl" throughout her Proposed Findings of Fact and Conclusions of Law.  *See, e.g.,* Director's F.F. 77 (referring to "multifunctional siloxanyl alkyl ester cross-linking agents").   Dome notes that the Board made a similar error.  *See* JTX-16 at 5 (F.26).

78.     The Director's proposed finding of fact is incomplete and misleading, for the reasons stated in paragraph 70(b)-(d), above.

79.     The Director's Proposed Finding of Fact 79 mischaracterizes the Board's decision in an attempt to obfuscate a serious error of fact made by the Board.  Contrary to the Directors' suggestion, the Board's Finding of Fact 26 did <u>not</u> state:

> The preferred multifunctional monomers disclosed are multifunctional <u>siloxanyl alkyl esters</u> having a siloxane bond corresponding to specified formulas referred to as <u>Formula [VI]</u> and multifunctional <u>siloxanyl alkanol esters</u> having a siloxane bond corresponding to specified formulas referred to as <u>Formula [V]</u>.

Director's Proposed Finding of Fact 79 (purporting to characterize the Board's Finding of Fact 26).  In actuality, the Board's decision states:

> The preferred multifunctional monomers disclosed are multifunctional <u>siloxanyl alkyl esters</u> having a siloxane bond corresponding to specified formulas referred to as <u>Formulas [V] and [VI]</u>.

JTX-16 at 5 (F. 26).  It is undisputed that the above-quoted finding is factually erroneous, and that the Board made a serious error in describing the cross-linkers of Formula V as siloxanyl <u>alkyl</u> esters (which are <u>hydrophobic</u>), when in fact they are siloxanyl <u>alkanol</u> esters (which are <u>hydrophilic</u>).  *See* 1/28 pm session, Long Testimony, 19:11-20:18, 12:3-6, 12:16-23, 13:6-7, 13:20-21.  The Board's factually erroneous analysis of Tanaka led to the following factual error in the Board's reasoning:

> Lastly, the polyfunctional <u>siloxanyl ester</u> cross-linking agents are said to provide hydrophilic groups which are beneficial for the hydrophilic property of contact lens materials.

PTX-16 at 16:6-8.  This statement fails to distinguish between <u>siloxanyl alkyl esters</u> and <u>siloxanyl alkanol esters</u>.  The statement is only true of the siloxanyl alkanol ester cross-linking

agents of Formula V, but the siloxanyl alkyl esters of Formula VI are hydrophobic and do not provide hydrophilic groups.  The Director's attempt to obfuscate this error is a tacit admission of its critical significance for this case.  The Director's own witness, Dr. Benjamin, testified that a person of ordinary skill in the art, in order to offset the hydrophobicity of the standard Tris monomer, would <u>necessarily</u> have used a <u>hydrophilic</u> cross-linking agent, whether it bears siloxane units (like Tanaka's hydrophilic Formula VI cross-linkers) or not (like Gaylord's hydrophilic cross-linkers).  1/30 pm session, Benjamin Testimony, 74:15-75:6.  The Board, and Dr. Benjamin, confused and conflated the <u>alkan**ol**</u> ester cross-linking agents, which are <u>hydrophilic</u>, with <u>alkan**yl**</u> ester cross-linking agents, which are <u>hydrophobic</u>.  For precisely the reason stated by the Director's own expert, Dr. Benjamin, a person skilled in the art would <u>not</u> have used a hydrophobic cross-linker, such as the multifunctional siloxanyl alkyl ester cross-linking agent of Tanaka Formula V.  Yet that is precisely what step (f) of the Neefe Patent recites and requires.  PTX-1 at col. 5, ll. 62-63.  Properly understood, the Tanaka Patent thus teaches away from the invention claimed in the Neefe Patent.

80.     The Director's proposed finding of fact is incomplete and misleading, for the reasons stated in paragraph 70(b)-(d), above.

81.     The Director's proposed finding of fact is incomplete and misleading, for the reasons stated in paragraph 70(b)-(d), above.

82.     Dome does not dispute this proposed finding of fact.

83.     The Director's discussion of terminal unsaturated carbon bonds is a red herring. There is no dispute that it would be physically possible to chemically cross-link hydrophobic Tris monomers with the hydrophobic siloxanyl alkyl esters of Formula VI as cross-linking agents.  Rather, the issue is whether one skilled in the art would have had a reason to do so to

obtain a material suitable for use as a contact lens (*i.e.,* a material that is wettable and has sufficient oxygen permeability).  As the evidence at trial makes clear, there was no apparent reason to combine a <u>hydrophobic</u> Tris monomer with a <u>hydrophobic</u> siloxanyl alkyl ester cross-linking agent to make a contact lens polymer and no reasonable expectation that such a polymer would have sufficient clarity, hardness, and wettability to be useful as a contact lens material. Instead, in order to offset the hydrophobicity of Tris, the Tanaka Patent taught that the use of "a hydrophilic monomer to provide the obtained copolymer with a proper hydrophilic property." JTX-13 at col. 3, ll. 23-33.  Tanaka taught that using a hydrophobic Tris monomer was fraught with problems, because polymerizing it with hydrophilic cross-linkers would lead to a polymer that "is liable to become opaque."  *Id.* at col. 3, l. 35.  This is "a fatal defect" in polymers to be used as contact lens materials.  *Id.* at col. 3, l. 36.

84.     Dome disagrees with the Board's proposed finding of fact for the reasons given above in paragraph 83.

85.     Dome disagrees with the Board's proposed finding of fact for the reasons given above in paragraphs 79 and 83.

86.     Dome disagrees with this proposed finding of fact for the reasons given above in paragraphs 79 and 83.  As Dr. Benjamin testified, "[t]o offset the hydrophobicity of the standard Tris monomer, as in Gaylord and Tanaka, the crosslinking monomer would necessarily be hydrophilic, whether bearing siloxane units or not."  1/30 am session, Benjamin Testimony, 74:24-75:6.  Neither the multifunctional siloxanyl alkyl ester cross-linking agent recited in step (f) of claim 1 of the Neefe Patent nor the siloxanyl alkyl ester cross-linking agents denoted by Formula VI in the Tanaka Patent are hydrophilic.  Rather, they are both hydrophobic.  *See* 1/28 pm Long testimony, 13:20-21, 17:5-6, 62:18-19, 72:20-21.  According to the testimony of the

Director's sole witness at trial, one of ordinary skill in the art would <u>not</u> have been led by Tanaka to use a hydrophobic cross-linker with the hydrophobic Tris monomer.

### *There Was No Motivation to Use Tanaka's Formula VI Cross-Linking Agent with Gaylord's Tris Comonomer*

87.     Contrary to the Director's suggestion, the Board decision in this case never once refers to "ranges" or assertedly "broad ranges" in claim 1 of the Neefe patent.  Still less does the Board decision in this case purport to ground its invalidity determination on the "ranges" recited in claim 1 of the Neefe patent.  The idea that the "ranges" of claim 1 of the Neefe patent supported an invalidity determination in this case first surfaced during the government's opening statement in this case, when it was said:  "when you consider the breadth and range of how small amount of this oxygen permeable cross-linker you can have, clearly they would at least have been suggested to adjust that small amount."  1/28 am session, opening statement, 30:8-11.  The Director presented no evidence of any such "suggest[ion]", and indeed, its own expert, Dr. Benjamin, testified to precisely the opposite.  *See* 1/30 am session, Benjamin Testimony, 74:25-75:6 ("To offset the hydrophobicity of the standard Tris monomer, as in Gaylord and Tanaka, the crosslinking monomer would <u>necessarily</u> be <u>hydrophilic</u>, whether bearing siloxane units or not.") (emphasis added).

88.     Contrary to the Director's suggestion, the Board failed to make factual findings that are sufficient to support a legal conclusion of obviousness.  In particular, the Board wholly failed to make any findings that a person skilled in the art "would have had a reasonable expectation of success" if he or she tried making contact lens material utilizing the method described in claim 1 of the Neefe patent.  *OSRAM*, 701 F.3d at 706.  "Success" in this context would have meant, not merely getting two material constituents to link chemically with one another as the Board implied, but would require producing a material having a combination of

clarity, hardness, oxygen permeability, and wettability ("CHOW") that made it suitable for use as a contact lens material.  The trial record also supports a de novo finding that a person skilled in the art would not have been motivated to make contact lens material by combining a hydrophobic Tris monomer with a hydrophobic multifunctional siloxanyl alkyl ester cross-linking agent.

89.     Contrary to the Director's assertion, there could be no motivation in the prior art to combine Tris and hydrophobic siloxanyl alkyl esters to create a contact lens material with both improved oxygen permeability <u>and</u> satisfactory wettability.  *See* discussion in paragraphs 79 and 83 above.  Tanaka teaches that one could use either a hydrophobic or a hydrophilic cross-linking agent with his novel amphiphilic organosiloxane comonomer (which contains a hydrophilic functional group), although hydrophilic siloxanyl alkanol ester cross-linkers are still preferred. JTX-13 at col. 8 ll. 35-46.  To offset the hydrophobicity of Tris monomers, one would use hydrophilic cross-linking agents.  *see also* 1/30 am session, Benjamin Testimony, 74:24-75:6 (standing behind the statement: "To offset the hydrophobicity of the standard Tris monomer, as in Gaylord and Tanaka, the crosslinking monomer would necessarily be hydrophilic, whether bearing siloxane units or not.").  Thus, one skilled in the art would have had no reason to copolymerize a hydrophobic monomer such as Tris with a hydrophobic siloxanyl alkyl ester as required by claim 1 of the Neefe Patent, in order to make a polymer suitable for a contact lens.

90.     Dome disagrees with this proposed finding of fact for the reasons stated in paragraphs 70 and 77, above.

91.     Dome disagrees with this proposed finding of fact for the reasons stated in paragraphs 70 and 77, above.

92.     The Director misstates Dome's position by suggesting that Dome contends that all of Tanaka's "oxygen permeable crosslinking agents are hydrophobic." That is not the case, and Dome has never so contended. The siloxanyl **alkyl** ester cross-linking agents of Formula VI are hydrophobic, but the siloxanyl **alkanol** ester cross-linking agents of Formula V are hydrophilic, as Dome has consistently pointed out. The Director has conflated and confused siloxanyl alkyl ester cross-linking agents with siloxanyl alkanol ester cross-linking agents, as the Board did below.

93.     Dome disagrees with this proposed finding of fact for the reasons given above in paragraphs 42 to 45.

94.     The record is devoid of evidence that a person skilled in the art would have interpreted the Gaylord Patent in the manner now proposed by the Director's counsel.

95.     Dome disagrees with this proposed finding of fact for the reasons given above in paragraphs 70 to 86 and 89.

96.     The record is devoid of evidence that a person skilled in the art would have interpreted the Tanaka Patent in the manner now proposed by the Director's counsel.

97.     Dome disagrees with this proposed finding of fact for the reasons given above in paragraph 96. In addition, the Director attempts (unsuccessfully) to discredit Dr. Long by accusing him of "skipp[ing] over the sentence in lines 10-23 in column 3 of Tanaka." Director's F.F. 97. In fact, Dr. Long's testimony at trial addressed all the portions of the Tanaka Patent that he was questioned about. Counsel for the Director had every opportunity to question Dr. Long about the supposedly "skipped" sentence but never did so. Dr. Long's testimony regarding the Tanaka Patent stands uncontradicted.

98.     The record is devoid of evidence that a person skilled in the art would have interpreted the Gaylord Patent in the manner now proposed by the Director's counsel.

99.     The record is devoid of evidence that a person skilled in the art would have interpreted the Gaylord Patent and the Tanaka Patent in the manner now proposed by the Director's counsel.

100.    Dome disagrees with this proposed finding of fact for the reasons given in paragraphs 57, 64, and 99 above.

101.    Dome disagrees with this proposed finding of fact for the reasons given in paragraphs 57, 64, and 99 above.

102.    Dome disagrees with this proposed finding of fact for the reasons given in paragraphs 57, 64, 65, and 99 above.

103.    The record is devoid of evidence that a person skilled in the art would have interpreted the Tanaka Patent in the manner now proposed by the Director's counsel.   As Dr. Long testified, it is impossible to know what Tanaka meant by "long period of time."  1/28 pm session, Long Testimony, 80:24-25 ("I don't know about the period -- the length of time…."). "[W]orn continuously" does not necessarily mean "continuous wear."[6]  For example, Dr. Melamed, who has been practicing ophthalmology continuously since 1979 (1/28 am session, Melamed Testimony, 9:24, 11:3-5), testified that the term "prolonged daily wear" means "the ability to put a lens in first thing in the morning and <u>leave it in continuously</u> through the entire day, taking it out at bedtime, without the necessity to remove it during the course of the day to give your eye a break."  1/29 am session, Melamed Testimony, 19:20-20:3 (emphasis

---

[6]     The Director's expert defined "continuous wear" to mean the ability of a patient to wear a contact lens 24 hours a day, including while sleeping, for a number of days without removing the lens.  *See* 1/30 am session, Benjamin Testimony, 10:22-11:18; *see also* Director's F.F. 106.  This term is analogous to the term "extended wear."  1/30 am session, Benjamin Testimony, 11:2-9; *see also* 1/29 am session, Melamed Testimony, 28:10-12.

added); *see also id.* at 101:2-5 ("Prolonged daily wear to me indicates a lens that you put in first thing in the morning and you <u>wear continuously</u> throughout the day and take it out at bed time.") (Emphasis added).

104.    Dome disagrees with this proposed finding of fact for the reasons given above in paragraph 103.  The record is devoid of evidence that a person skilled in the art would have interpreted the Tanaka Patent in the manner now proposed by the Director's counsel.

105.    Dome disagrees with this proposed finding of fact for the reasons given above in paragraph 103.

106.    Dome does not dispute this proposed finding of fact.

107.    Contrary to the Director's suggestion, Dr. Long testified that he had seen the term "extended wear."  1/28 pm session, Long Testimony, 81:16-17.  He only refused to be drawn into discussing it because it was outside the field of synthetic polymer chemistry skills, in which he was testifying as an expert.  *Id.* at 81:18-21.  Furthermore, the Director's attempt to discredit Dr. Long's testimony fails in view of the evidence given at trial. First, Dr. Long testified that wettability was a critical property of a contact lens material that could be comfortably worn for a period of time (1/28 am session, Long Testimony, 50:7-13) and that oxygen permeability is important for the health of the eye (*Id.* at 54:7-19).  Dr. Long also testified that everyone in the field was trying to improve the "CHOW" properties of contact lens materials so that lenses could be comfortably worn longer.  1/28 pm session, Long Testimony, 81:6-13, 85:11-15.  Thus, Dr. Long was fully familiar with the importance of these properties of contact lens polymers properties.

108.    Dome does not dispute this proposed finding of fact.

109.   Dome disagrees with this proposed finding of fact for the reasons discussed above in paragraph 107.  In addition, even if Dr. Long declined to testify about whether a contact lens polymer made by the process of claim 1 of the Neefe Patent would result in a lens that satisfied the definition of the term "extended wear," this does not mean that he was unable to testify as to whether such a polymer exhibited properties that would fall within the definition as laid out by other witnesses.   Indeed, Dr. Long testified that the Neefe polymer had "markedly increased oxygen permeability" compared with prior art polymers.   1/28 pm session, Long Testimony, 85:16-19.

110.   Dome does not dispute this proposed finding of fact.

111.   Contrary to the Director's contention, Tanaka teaches away from substituting a hydrophobic multifunctional siloxanyl alkyl ester cross-linking agent (which is required by claim 1 of the Neefe Patent) for the hydrophilic cross-linker of Gaylord in order to make a polymer comprising hydrophobic Tris monomers.  As the Director's own expert, Dr. Benjamin testified, a person skilled in the art, in order to offset the hydrophobicity of the Tris monomer, would necessarily have used a hydrophilic cross-linking agent, whether it bears siloxane units (like Tanaka's hydrophilic Formula VI cross-linkers) or not (like Gaylord's hydrophilic cross-linkers). 1/30 am session, Benjamin Testimony, 74:15-75:6.

### *Bausch & Lomb Secondary Considerations Evidence*

112.   Dome does not dispute this proposed finding of fact.

113.   Dome does not dispute this proposed finding of fact.

114.   Dome does not dispute this proposed finding of fact.

115.   Contrary to the Director contention, Mr. Neefe testified that his polymer was eventually commercially sold as the contact lens product called TransAire, 1/30 am session,

Neefe Testimony, 79:24-80:4, 83:3-5, which had a Dk of 45.  1/30 am session, Neefe Testimony, 81:15-18; JTX-27 at 273.

116.    Dome does not dispute this proposed finding of fact.

117.    Contrary to the Director's suggestion, not all first generation RGP lenses had an oxygen permeability of between 12 and 14.  For example, Polycon I, which was the first commercially marketed product incorporating the Gaylord polymer (*see* 1/29 am session, Melamed Testimony, 19:1-4; JTX-4 at 17; JTX-10 at col. 2, ll. 29-32; JTX-12 at 238), only had a Dk of approximately 5.0.  JTX-12 at 238.

118.    Contrary to the Director's suggestion, patients had problems in wearing first generation RGP lenses, such as the Boston II lens, for a complete working day.  1/29 am session, Melamed Testimony, 20:19-25.

119.    Dome does not dispute this proposed finding of fact.

120.    Dome does not dispute this proposed finding of fact.

121.    Contrary to the Director's suggestion, the measured value for oxygen permeability of the Boston II and IV lenses is a range of values that depends on the technique used for the measurement.  1/29 am session, Melamed Testimony, 54:4-7.  When measured by one technique, the Dk values for the Boston II and Boston IV lenses were 12 and 19 respectively, a 50-plus percent increase.  1/29 am session, Melamed Testimony, 58:4-14, 58:25-59:3.  When measured by another technique, the Dk values for the Boston II and Boston IV lenses were 14 and 28 respectively.  1/29 am session, Melamed Testimony, 25:22-26:4; see also 1/30 am session, Benjamin Testimony, 66:12-13 (testifying that Dr. Benjamin had measured the Dk values of the Boston II and Boston IV lenses as 13.2 and 21.3, respectively); *id*. at 75:21-25 (testifying that his most accurate measurement for the Boston II lens was 13.8 and not 16.3 as the

government had sought to establish); *see also* JTX-4 at 66; JTX-21 at BL8556, BL8578; JTX-22 at BL8739; JTX-23; JTX-27 at 273; PTX-2 at BL4760, BL4776; PTX-3 at BL5507.  An increase in Dk value from 14 for the Boston II lens material to 28 for the Boston IV lens material would represent an increase in oxygen permeability of 100%.

122.  Contrary to the Director's contention, the change in oxygen transmissibility between the Boston II and Boston IV contact lens materials was not due to any difference in lens thickness, nor was it only a "modest" change.

a.  First, the testimony at trial showed that there was little or no difference in thickness between the Boston II and the Boston IV lens.  Dr. Melamed testified that he believed the Boston IV lens was approximately 0.01 millimeter thicker than the Boston II lens.  1/29 am session, Melamed Testimony, 64:25-65:3.  The manufacturer's documents showed that the recommended center thicknesses of the Boston II and Boston IV lenses were both the same, namely: 0.15 millimeters.  PTX-2 at BL4760.  Even if the thickness of the Boston II lens was 0.14 millimeters, the difference was "insignificant" in degree, as Dr. Melamed testified. 1/29 am session, Melamed Testimony, 65:4-6, 99:7-14.

b.  The insignificance of a change of thickness of 0.01 millimeter is confirmed by the actual oxygen transmissibility (Dk/L) values of the two products.  The Dk of the Boston IV contact lens material was 28,[7] which at the manufacturer's recommended thickness of 0.15 millimeters, gave a Dk/L of 18.7.  JTX-26 at 11.3 (Table 11.1); *see also* 1/29 am session, Melamed Testimony, 64:2-7; Director's F.F. 126.  The Dk of the Boston II contact lens material was 12,[8] which at a center thickness of 0.15 mm gave a Dk/L of 8.  PTX-2 at

---

[7]  The Dk of the Boston IV contact lens material varied from 19 to 28 barrers, depending on the measurement technique used.  Dome F.F. 384.

[8]  The Dk of the Boston II contact lens material varied from 12 or 14 barrers, depending on the measurement technique used.  Dome F.F. 291.

BL4760 (last row of table, in row denominated "B[oston] II"); *see also* Dome F.F. 291-297 (determining the Dk/L of the Boston II material to be 8.0 to 9.3). If the thickness of the Boston II lens was 0.14 millimeters, as Dr. Melamed recalled, *see* 1/29 am session, Melamed Testimony, 99:8-10, the Dk/L of the Boston II contact lens material would still be 8.6. Regardless of which of these thicknesses is used in the calculation, the oxygen transmissibility is still higher for the Boston IV material and the increase reflects the improved oxygen permeability of the Boston IV lens. 1/29 am session, Melamed Testimony, 99:11-14.

        c.     Recognizing that the improvement in oxygen transmissibility is due to an increase in oxygen permeability, the Director next attempts to downplay the improvement by describing this improvement as "modest." However, Dr. Benjamin's testimony, on which the Director relies, relied on a measurement of 16.3 for the Dk of the Boston II lens, *see* 1/30 am session, Benjamin Testimony, 67:6-10. On cross-examination, Dr. Benjamin admitted that this figure was affected by error from an "outlying point." *Id*. at 69:5-24. Correcting the data by omitting the outlier yielded a Dk value of 13.8 for the Boston II lens, *id*. at 69:25-70:2, showing that Dr. Benjamin had relied on erroneous data that falsely minimized the difference between the Boston II and the Boston IV lens. Dr. Melamed testified that the Boston IV contact lens material was a "dramatic improvement" over prior lens materials. 1/29 am session, Melamed Testimony, 24:9-19; *see also id.* at 68:1-3 (stating that "the Boston IV was the single biggest advance" in RGP lens materials since the Gaylord Patent). Consistent with Dr. Melamed's testimony, the manufacturer described the Boston IV material to the FDA as "afford[ing] the wearer additional hours of wearing comfort and enhanced safety," JTX-21 at BL8554, and to the public as having "twice the oxygen-permeability of Boston II while providing enhanced surface comfort properties, superior flexural resistance and reduced brittleness compared to Boston II." JTX-23

at BL 4303.   Third parties also noted the significant advance represented by the Boston IV material, opining that the Boston IV material "satisfie[d] a need in the market for extended wear."   JTX-30 at BL 6012; *see also* JTX-29 at 761 ("Gas permeable hard lenses can also be used for extended wear. . . . Sigband (1986) claimed an 85% success rate using Boston IV material.").   In fact, the Boston IV lens material represented such an improvement that it became the leading RGP lens material within a year of introduction in the United States.   1/29 am session, Melamed Testimony, 40:3-17, 46:12-13; PTX-3 at BL5513; *see also* JTX-4 at 17; JTX-31 at BL8309 (showing that total sales of the Boson IV lens displaced sales of the Boston II lens by over 6-fold (65% vs. 10%)).

     d.  Furthermore, by categorizing any improvement in oxygen permeability as "modest," the Director ignores the fact that the Boston II lens material was unsuitable for prolonged daily wear whereas the Boston IV lens material met the threshold value necessary for this use.   Any disruption of the cornea's ability to derive oxygen from the environment or the eyelids has immediate consequences for the cells of the epithelium.   1/29 am session, Melamed Testimony, 14:17-20, 14:25-15:11.   If the amount of oxygen available to the corneal epithelium becomes too low, the epithelial cells are deprived of oxygen (a condition known as hypoxia), which results in the cells undergoing degenerative changes (a condition known as corneal edema).   1/29 am session, Melamed Testimony, 15:2-6; 1/30 am session, Benjamin Testimony, 60:21-24; JTX-4 at 17; JTX-27 at 277.   To prevent these degenerative changes under prolonged daily wear conditions, a contact lens material must have a Dk/L of approximately 18 to 20.   1/29 am session, Melamed Testimony, 91:13-92:8; JTX-26 at 11.3.   The Dk/L of the Boston II material was 8 (PTX-2 at BL4760; *see also* Dome F.F. 291-297 (determining the Dk/L of the Boston II material to be 8.0 to 9.3)), which does not meet the threshold for prolonged daily wear.

On the other hand, the Dk/L of the Boston IV material was 18.7 (JTX-25 at 11.3; *see also* 1/29 am session, Melamed Testimony, 64:2-7; JTX-26 at 11.3, 11.4 (stating that the Dk/L of the Boston IV material is 18.7 based on other data)), which meets this threshold. The ability to wear the Boston IV material for a prolonged wearing day without corneal degeneration was far more than a "modest" improvement. *See* 1/29 am session, Melamed Testimony, 24:9-19, 68:1-3.

123. Contrary to the Director's suggestion, the evidence at trial did not show that the Boston IV contact lens could not be used for extended wear. While Dr. Melamed testified that he never used the Boston IV lens for extended wear, he stated that other ophthalmologists had. 1/29 am session, Melamed Testimony, 73:17-20, 75:7-10, 76:13-18. As discussed above, contemporaneous documents obtained in discovery showed that others in the field believed that the Boston IV lens "satisfie[d] a need in the market for extended wear." JTX-30 at BL6012; *see also* JTX-29 at 761. Dr. Melamed testified that the reason he never prescribed the Boston IV lens for extended wear was because he counseled his patients to not wear <u>any</u> lens overnight out of an abundance of caution. 1/29 am session, Melamed Testimony, 79:7-80:4, 88:10-20, 93:8-19.

124. Dome disagrees with this proposed finding of fact for the reasons given in paragraphs 122 and 123 above.

125. Dome disagrees with this proposed finding of fact for the reasons given in paragraphs 122 and 123 above.

126. Although Dr. Melamed did not recall the oxygen transmissibility of the Boston II lens material while testifying, the evidence presented in this case shows that it had an oxygen transmissibility of approximately 8.0 to 9.3. Dome F.F. 291-297. Furthermore, for materials of the same thickness, *see* PTX-2 at BL4760 (reporting that the recommended center thicknesses of

both the Boston II and Boston IV lenses were both 0.15 millimeters), any improvement in oxygen permeability (Dk) will improve the oxygen transmissibility (Dk/L) in the same proportion.  In any event, Dr. Melamed testified that any difference in thickness between the Boston II and Boston IV lenses was "insignificant" in degree.  1/29 am session, Melamed Testimony, 65:4-6, 99:7-14.  Since Dr. Melamed testified that the oxygen permeability of the Boston IV contact lens material represented a 50% to 100% improvement over that of the Boston II contact lens material (*see* 1/29 am session, Melamed Testimony, 62:6-13), it follows that the oxygen transmissibility (Dk/L) of the Boston IV polymer also represented a 50% to 100% improvement over that of the Boston II polymer.

127.    Dome disagrees with this proposed finding of fact for the reasons given in paragraphs 122 and 123 above.

128.    Contrary to the Director's suggestion, Dr. Melamed did not testify that "the oxygen transmissibility of the Boston IV lens exceeded the threshold required <u>only</u> for daily wear conditions."  Director's F.F. 128 (emphasis added).  In the testimony cited by the Director, Dr. Melamed testified that the Dk/L value of the Boston IV lens exceeds the threshold required for daily wear conditions.  *See* 1/29 am session, Melamed Testimony, 91:20-92:8.  Dr. Melamed also testified that others had used the Boston IV contact lens material for extended wear conditions with successful results.  *See* paragraphs 122 and 123 above.

129.    This proposed finding of fact is incomplete and misleading, for the reasons set forth in paragraphs 122 and 123 above.

130.    Contrary to the Director's suggestion, Dr. Melamed did not merely testify that he disagreed with the statement by Dr. Stein (JTX-30) that the Boston IV lens satisfied a need for extended wear in the marketplace; he explained the basis for his difference in approach from that

of Dr. Stein, which had nothing to do with the performance characteristics of the Boston IV lens. In the very same testimony that the Director relies on, Dr. Melamed stated that he does not believe that his patients should wear <u>any</u> contact lenses overnight, regardless of their oxygen permeability. *Id.* at 88:8-20. Dr. Melamed explained that he did not use the Boston IV lens for that purpose in his own medical practice because he was more conservative than other practitioners. *Id.* at 93:8-16. However, Dr. Melamed testified that just because he counseled his patients not to wear the Boston IV lenses overnight out of an "abundance of caution" does not mean that it could not be done. *Id.* at 93:8-19.

131.    Dome does not dispute this proposed finding of fact.

132.    The Director mischaracterizes Dr. Melamed's testimony regarding the reason the Boston IV lens material was so successful. While Dr. Melamed recognized consistency and reproducibility of the Boston IV lens as attractive features, 1/29 am session, Melamed Testimony, 68:11-24, he also testified that the reason the Boston IV contact lens was the single biggest advance in oxygen permeable RGP lenses since the Gaylord material was "[s]olely [due to] oxygen permeability." 1/29 am session, Melamed Testimony, 68:1-10. Dr. Melamed's testimony is supported by Bausch & Lomb's own documents, which reported that oxygen permeability was the "only parameter in the profiles that differs significantly" between the Boston II and Boston IV lens materials. JTX-21 at BL8557; *see also* 1/29 am session, Melamed Testimony, 27:1-4, 98:21-24; JTX-21 at BL8556, 8578; PTX-2 at BL4776.

133.    Dome disagrees with this proposed finding of fact for the reason given in paragraph 132 above.

134.    Dome disagrees with this proposed finding of fact for the reason given in paragraph 132 above.

135.    Dome disagrees with this proposed finding of fact for the reason given in paragraph 132 above.

136.    The Director asserts that the Court should discount the testimony of Dr. Mark Melamed on the grounds that he did not rely on "marketing studies" or "marketing surveys." The Director ignores that Dr. Melamed prescribed the Boston II lens to approximately 2,500 to 3,000 patients and the Boston IV lens to another approximately 6,000 to 7,000 patients.  1/29 am session, Melamed Testimony, 21:15-21, 24:2-8.  This is significantly more than the number of patients included in some clinical tests.  *See, e.g.,* JTX-30 (letter stating that data is attached for 13 patients that had been fitted with Boston IV lenses).  The Director also ignores that Dr. Melamed's testimony regarding the success of the Boston IV contact lens material is corroborated by independent documentary evidence, including contemporaneous documents obtained in discovery from the manufacturer of the Boston IV lens.  *See* 1/29 am session, Melamed Testimony, 24:20-22; 26:6-9, 40:3-17, 45:14-16, 46:12-13; JTX-4 at 17; JTX-31 at BL8309 (showing that total sales of the Boston IV lens displaced sales of the Boston II lens by over 6-fold (65% vs. 10%); PTX-3 at BL5513 ("Within a year of introduction, the BOSTON IV LENS became the leading RGP lens material in the United States.").

137.    Dome disagrees with this proposed finding of fact for the reasons given in paragraph 136 above.

### *Claim Construction Issue – Filtration is Not Required Before Distillation*

138.    Dome does not dispute this proposed finding of fact.

139.    Contrary to the Director's suggestion, Dr. Long has consistently testified that, in the context of the process described by claim 1 of the Neefe Patent, one would separate the top organic layer from the bottom aqueous layer prior to vacuum distillation.  Dr. Long testified that the "common practice in the laboratory" is to separate the layers before performing vacuum

distillation.   1/28 pm session, Long Testimony, 87:13-19.   In fact, it is so common that one skilled in the art assumes that one "need[s] to remove the organic layer" before "subject[ing] that to further purification."   *Id.* at 87:22-85:2; *see also id.* at 88:25-89:1 ("I would say that's how anyone skilled in the art would do it.").   Since no one skilled in the art purifies an organic layer by vacuum distillation or filtration prior to separating it from the aqueous layer, Dr. Long testified that he would have to attempt that sequence before determining whether it was even possible to perform the steps in the order posited by the Director.   *Id.* at 89:2-4.

140.   Contrary to the Director's assertion, Dr. Long's trial testimony was fully consistent with his deposition testimony regarding whether the process described by claim 1 of the Neefe Patent requires that filtration and vacuum distillation be performed in a specific order. When asked if he had testified at his deposition that the order of these steps mattered, Dr. Long emphatically responded:

> I testified that these are all steps.  I mean, there's some obvious, you know, steps.  You have to make something before you can purify it.  But I did not testify that every step has to be done in some exact particular order.

1/28 pm session, Long Testimony, 95:1-4.  The Director mischaracterizes Dr. Long's deposition testimony when she asserts otherwise.  First, Dr. Long testified at his deposition that the organic layer is separated from the aqueous layer and removed.  DTX-2 at 95:8-9 ("There again it separates, the organic layer is then removed.").  Next, Dr. Long testified at his deposition that organic layer is filtered.  *Id.* at 95:25-96:1 ("The organic layer is filtered in Step (d).")  Since only the organic layer is filtered, the filtration step must occur after the organic layer is separated from the aqueous layer.  Finally, Dr. Long also testified that the organic layer is subjected to vacuum distillation after separation from the aqueous layer.  *Id.* at 96:3-5 ("It's separated from the aqueous layer and then the organic layer is subjected to vacuum distillation.").  Dr. Long

never testified at his deposition that the filtration step must precede or follow the distillation step, only that both of these purification steps occur after the organic layer is separated and removed from the aqueous layer.

141.    Contrary to the Director's suggestion, Dr. Long did not testify at his deposition that "the 'Purification' steps in section 7.2" follow "the 'Reaction' steps in section 7.1" of the Bausch & Lomb procedure.  He only testified at his deposition that "[i]t appears the purification follows the synthesis.  DTX-2 at 101:21-22.  This is entirely consistent with his testimony at trial that "[o]bviously you have to make the molecule before you purify it."  1/28 pm session, Long Testimony, 94:8-9.  Dr. Long did not testify at deposition or trial that each and every step enumerated in the section headed "Purification" followed each and every step enumerated in the section headed "Reaction."  In fact, Dr. Long testified at his deposition that "[t]here's no mention in the document as to the order at which these are done."  DTX-2 at 101:8-9.

142.    Dome does not dispute this proposed finding of fact.

143.    Dome does not dispute this proposed finding of fact.

144.    Contrary to the Director's suggestion, Dr. Long's deposition testimony is fully consistent with his trial testimony regarding the order in which steps (d) and (e) of claim 1 of the Neefe Patent can be performed.  *See* paragraph 140 above.  Dr. Long explicitly stated at trial that he "did not testify [at his deposition] that every step has to be done in some exact particular order."  1/28 pm session, Long Testimony, 95:1-4.  It is entirely unsurprising that Dr. Long did not address at his deposition a claim construction theory that the government first advanced, years later, on the eve of trial.

145.    The Director improperly asks this Court to import a limitation from the specification of the Neefe Patent into the claims.  *Cf. Phillips v. AWH Corp.*, 415 F.3d 1303,

1320 (Fed. Cir. 2005) (en banc) (inveighing against "one of the cardinal sins of patent law—reading a limitation from the written description into the claims") (quotation omitted).   The scope of claim 1 of the Neefe Patent is not limited to the working examples by which the claimed process was exemplified in the specification.

### *Claim Construction Issue – Polymerization Requires Adding in Tris Dimer or Trimer*

146.   The Director misconstrues Dr. Long's testimony:

a.   Dr. Long testified that step (f) of claim 1 of the Neefe Patent explicitly requires "addition of that multifunctional siloxanyl alkyl ester as a crosslinking agent" because the term "copolymerization" means to a scientist "the addition of comonomers and crosslinkers into a polymerization process, which is the process of making a polymer or copolymer in this case."  1/28 pm session, Long Testimony, 96:1-2, 96:24-97:2.  Dr. Long also explained that steps (a) through (e) of claim 1 of the Neefe Patent – which describes a process for manufacturing the Tris monomer – must occur before the product of steps (a)-(e) is added in the copolymerization step.  1/28 pm session, Long Testimony, 97:4-9 ("[Y]ou have to have the monomer before you can make a polymer, there's no doubt about that."  *Id*. at 4-6.  Dr. Long's testimony accords with the plain language of claim 1 of the Neefe Patent and with common sense: the Tris to be added to the copolymerization mixture must be "prepared above" according to steps (a) through (e) before it exists to be added in step (f).[9]  JTX-1 at col. 5, ll. 55-57.

b.   Apart from the need to perform steps (a)-(e) before the product of those steps can be added to the copolymerization mixture, Dr. Long explained that step (f) does not require any particular order of adding the other components recited in step (f).  1/28 pm session, Long Testimony, 97:4-9.  That is to say, although Tris is the first-named component listed in step

---

9   The Tris as "prepared above" includes a small amount of Tris dimer and Tris trimer "as a spurious by-product."  *See* 1/28 pm session, Long Testimony, 97:23-24.

(f), it may be last ingredient added to the copolymerization mixture.  This would be the case if the other components listed in step (f) are added together before the vacuum distillation of step (e) is completed, since Tris "prepared above" cannot be added to the copolymerization mixture until steps (a)-(e) have been completed.  Regardless of the order in which the four components of step (f) – Tris, an ester of acrylic or methacrylic acid, a wetting agent, and a multifunctional siloxanyl alkyl ester cross-linking agent (*i.e.,* Tris dimer or Tris trimer) – are added together, step (f) is satisfied so long as "[y]ou're adding all of these reagents together."  *Id.* at 96:14-20.

147.    Dome does not dispute this proposed finding of fact.

148.    Dome does not dispute this proposed finding of fact.

149.    Contrary to the Director's assertion, the Boston II lens cannot "have more than 6.2% by weight Tris dimer and trimer."  In the Bausch & Lomb manufacturing process, the Tris monomer is designated as TX-91.  1/28 pm session, Long Testimony, 23:15-16; JTX-17 at BL31.  TX-91 must be contain no less than 85% of the Tris monomer, with the balance (up to 15%) being the Tris dimer and Tris trimer.  JTX-17 at BL31; 1/28 pm session, Long Testimony, 23:8-16.  TX-91 comprises 41.7% by weight of the Boston II contact lens material.  JTX-17 at BL24.  Thus, by simple arithmetic, there can be <u>no more</u> than 6.2% of Tris dimer and Tris Trimer in the Boston II polymer (41.7% by weight of TX-91 times up to 15% of Tris dimer and trimer in TX-91).

150.    Contrary to the Director's suggestion, the mere presence of some Tris dimer or Tris trimer "as a spurious by-product" in the product of steps (a)-(e) does not satisfy the requirement for "addition of that multifunctional siloxanyl alkyl ester as a crosslinking agent" to the copolymerization mixture.  1/28 pm session, Long Testimony, 96:1-28, 96:25-97:2.  As Dr. Long testified, step (f) of claim 1 of the Neefe Patent requires "adding all of these [four] reagents

together." *Id.* at 96:14-18.  The Boston II manufacturing process did not include the step of adding Tris dimer or Tris trimer to the other enumerated components of the polymerization mixture, which include the product of steps (a)-(e), and thus did not embody the process described in claim 1 of the Neefe Patent.  *Id.* at 58:7-14.  Indeed, the developer of the Boston II manufacturing process recognized "that dimer and trimer adversely affect the [Polymer Technology] formulation."  JTX-19 at BL68.  Hence, prior to the issuance of the Neefe Patent, precautions were taken to "ensure a minimum formation of dimer and trimer."  *Id.*

## II.  PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED CONCLUSIONS OF LAW[10]

### *Burden of Proof*

151.    Contrary to the Director's suggestion, Dome brought this civil action to preserve the status quo as it has existed for more than 30 years since the Neefe Patent issued and to defeat the Director's newly-made contention that claim 1 of the Neefe patent is assertedly invalid under 35 U.S.C. § 103(a).  This action is governed by "the provisions of" 35 U.S.C. § 145, *see* 35 U.S.C. § 306, but it is nevertheless is "the party asserting . . . invalidity."  35 U.S.C. § 282(a).

152.    Contrary to the Director's suggestion, this case involves an issued patent, not a mere claim in a patent application.  The issue here is not whether Dome should "receive a patent," 35 U.S.C. § 145, but whether an existing claim in an already-issued patent should now be declared invalid.  Under *Kappos v. Hyatt*, 132 S. Ct. 1690 (2012), the court is empowered and required to make a de novo determination of whether claim 1 of the Neefe patent has been proven invalid under 35 U.S.C. § 103(a).  35 U.S.C. § 307 makes clear that a Board decision like the one made below is not self-executing and does not strip a patentee of its rights, including its rights under 35 U.S.C. § 282.

---

10    As discussed in footnote 1 above, the Director erroneously styled as certain proposed conclusions of law what are really proposed findings of fact.  To the extent that these paragraphs make factual assertions, Dome addresses them here as "findings of fact."

153.    Contrary to the Director's suggestion, the *Fregau* decision is inapplicable here because this case involves an attempt to invalidate an existing patent claim, not a mere rejection of an application for a patent.  Further, in the intervening *Hyatt* decision, the Supreme Court explicitly rejected the Director's argument that, even when a district court receives new evidence in a case invoking § 145 procedures, a district court "should overturn the PTO's factual findings only if the new evidence clearly establishes that the agency erred."  132 S. Ct. at 1695-96.  The *Fregau* dictum that the Director cites and quotes is inconsistent with *Hyatt*.  A district court "cannot meaningfully defer to the PTO's factual findings if the PTO considered a different set of facts."  *Id*. at 1700.  That is precisely the case here.

154.    As set forth in paragraph 153, above, the Director here reasserts a position that the Supreme Court explicitly rejected in *Hyatt*.  If this action has an "essence," it is that the Director seeks to establish that claim 1 of the Neefe patent is invalid under 35 U.S.C. § 103(a).  The only party asserting invalidity in this case is the Director.  Under the plain terms of 35 U.S.C. § 282, "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."   The Director plainly failed to carry this burden at trial.   The Director's reliance on *Alberts v. Kappos*, No. 10-1727 (JEB), 2013 WL 204694 (D.D.C. Jan. 18, 2013), is very misplaced.  In the first place, *Alberts* involved a mere application for patent, not an issued patent, so that no question of the applicability of § 282 was even raised.  In the second place, *Alberts* did not involve any disputed issues of fact, but cross motions for summary judgment.  Third, *Alberts* notes the well-established principle that a PTO <u>legal conclusion</u> of obviousness is subject to de novo review even where, unlike here, no new evidence is presented to a court.  *See, e.g., In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

155.    Contrary to the Director's suggestion, the Patent Act is very clear in its assignment of the burden of proof where, as here, a party to a civil action asserts that a claim in an issued patent is invalid.  35 U.S.C. § 282(a) states in part: "A patent shall be presumed valid. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."  Here, the Director plainly is a "party asserting such invalidity" within the meaning of § 282.  In suggesting that Dome supposedly bore the burden of proving that its own patent was *valid*, the Director ignores long-settled law that:  "Courts should not declare patents valid.  There is never a need or occasion for such a declaration.  Patents are born valid and remain so until proven otherwise."  *Fromson v. Advance Offset Plate, Inc*., 755 F.2d 1549, 1555 n.1 (Fed. Cir. 1985) (emphasis added).  Here, Dome proved the issuance of the Neefe patent in 1981; that a request for reexamination was filed by counsel for a defendant in the Infringement Action; and that the Director subsequently embraced the alleged infringer's invalidity contention on a thin administrative record.  In this civil action, it is the Director on who rightly bears the burden of proving facts which establish that claim 1 of the Neefe patent is assertedly invalid.

### *Standard of Review*

156.    Dome does not dispute this proposed conclusion of law.

157.    Dome does not dispute this proposed conclusion of law.

158.    Contrary to the Director's suggestion, this civil action is not an "appeal,"  but was initiated by the filing of a complaint; the Director has served an answer to Dome's complaint, joining issue on factual issues; and the issue to be determined is whether the Director has authority to cancel claim 1 of the Neefe patent because the process that claim describes purportedly "would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).  Dome

contends that in order to support a legal conclusion of invalidity, the facts asserted to establish

such invalidity must be proved to a high degree of certainty, by "clear and convincing evidence,"

*see Microsoft Corp. v. i4i Ltd. P'Ship*, 131 S. Ct. 2238, 2242 (2011).  In this case, however, the

Director plainly failed to establish invalidity by even a preponderance of the evidence.

Statements made by examiners or Board members, who did not testify at trial or subject

themselves to cross-examination, are hearsay and inadmissible to prove the truth of their content.

*See* Fed. R. Evid. 801(c) (defining hearsay); Fed. R. Evid. 802 ("Hearsay is not admissible unless

any of the following provides otherwise: federal statute; these rules; or other rules prescribed by

the Supreme Court.").  The Court held that the Director's expert, Dr. Benjamin, was not qualified

to testify as to the contents of the prior art put forward by the Director as supporting an invalidity

conclusion.

159.    The Court denied the Director's motions in limine to preclude Dome's experts

from testifying at trial, and heard extensive testimony from Dome's experts with regard to the

content of prior art, the skill level in the art, the differences between the claimed Neefe process

and the prior art, substantially contemporaneous failures by others to solve the problem Neefe

solved, commercial success of the claimed Neefe process, and unexpected results achieved by

the claimed Neefe process.  There is, thus, no occasion to consider what standard of review

might apply if the question were whether an administrative record was sufficient to support an

agency action.  No such question is presented.

160.    New evidence was received at trial with respect to each of the factual inquiries

identified in *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966), as informing whether subject

matter claimed in a patent was "obvious" at the time of its making by a patentee.  There is, thus,

no occasion to consider what review standard might apply if the question were whether an administrative record was sufficient to support an agency action.  No such question is presented.

161.    The legal conclusions stated here are oversimplified and inaccurate for the reasons set forth in paragraphs 151-160, above, and in paragraphs 32-43 of Dome's originally proposed conclusions of law.

### *Legal Background of Obviousness Under 35 U.S.C. § 103(a)*

162.    Contrary to the Director's suggestion, it is well-settled that a court must consider all evidence of record bearing on alleged obviousness, not merely the three factors cited here. "As we have repeatedly held, 'evidence rising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness.'" *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc*., 699 F.3d 1340, 1349 (Fed. Cir. 2012) (quoting *Stratoflex, Inc. v. Aeroquip Corp*., 713 F.2d 1530, 1538 (Fed.Cir.1983)).

163.    Dome does not dispute the general legal proposition stated here, but it is patently inapplicable to this case.  The undisputed evidence shows that the art of the Neefe patent was and is highly unpredictable.  "[I]n cases involving new chemical compounds, it remains necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound." *In re Rosuvastatin Calcium Patent Litigation*, 703 F.3d 511, 518 (Fed. Cir. 2012) (quoting *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007)). *Accord Otsuka Pharm. Co. v. Sandoz, Inc*., 678 F.3d 1280, 1292 (Fed. Cir. 2012).  *See also* Dome's original proposed conclusions 34-36.

164.    Dome does not dispute this proposed conclusion of law.

165.    Dome does not dispute this proposed conclusion of law, but *see* paragraph 162 above.

166.    Dome does not dispute this conclusion of law, but *see In re Cyclobenzaprine Hydrochloride Extended Capsule Patent Litigation*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) ("Indeed, evidence of secondary considerations may often be the most probative and cogent in the record.") (quoting *Stratoflex*, 713 F.2d at 1538-39).

167.    Dome does not dispute this paragraph as far as it goes, but it is incomplete.  As Judge O'Malley recently wrote:  "Generally, a party seeking to invalidate a patent as obvious must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 706 (Fed. Cir. 2012) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).

168.    Contrary to the Director's suggestion, not just <u>any</u> "articulated reasoning" will suffice to support a legal conclusion of obviousness.  As noted in paragraph 163 above, "in cases involving new chemical compounds, it remains necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound."  *Rosuvastatin*, 703 F.3d at 518 (quoting *Takeda*, 492 F.3d at 1357).  *See also* Dome's original proposed conclusions 34-36.

169.    Dome does not dispute this proposed conclusion of law.

170.    The principle purportedly stated in this paragraph is inaccurate and incomplete.  A complete statement of the principle is:  "One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for

which there was *an obvious solution* encompassed by the patent's claims . . . . Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419-20 (2007) (emphasis added).   Here, there clearly was a long-felt need for an improved contact lens material with suitable CHOW properties, but the evidence of record showed there was no "obvious solution" to this problem.

171.   Dome does not dispute this proposed conclusion of law.

172.   Dome does not dispute this proposed conclusion of law.   In fact, the evidence of record strongly supports a finding that the Tanaka Patent would have led a skilled artisan in a direction divergent from the path that was taken by Mr. Neefe.   The Director proffered no competent evidence to the contrary.

173.   Dome does not dispute this proposed conclusion of law, but it is inapplicable here.

174.   Dome does not dispute this proposed conclusion of law, but it is inapplicable here.

175.   Dome does not dispute this proposed conclusion of law, but it is inapplicable here.

### *Combining Quaal, Gaylord, and Tanaka Does Not Render the Neefe Patent Obvious*

176.   Dome does not dispute this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law).

177.   Dome does not dispute this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law).

178.   Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 70 to 86

above.   In particular, the Director ignores Tanaka's express teaching that multifunctional siloxanyl ester cross-linking agents should only be used with Tanaka's novel non-Tris monomer.

179.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 70 to 86 above.   In particular, the Director ignores Tanaka's preference for the siloxanyl alkanol ester cross-linkers of Formula V with the novel non-Tris monomer over the siloxanyl alkyl ester cross-linkers of Formula VI because the former have hydrophilic hydroxyl groups in addition to siloxane bonds.   JTX-13 at col. 8, ll. 39-43.

180.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 70 to 86 above.

181.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraph 46 above, especially the Director's ignorance regarding the importance of the other "CHOW" properties.

182.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 70 to 86 above.   In particular, the known need for a contact lens material with increased oxygen permeability did not diminish the competing need for a contact lens material with sufficient wettability to be worn comfortably on the eye of the wearer.   One skilled in the art would have realized that using either Tanaka's Formula V or Formula VI cross-linking agents with a Tris monomer may have created a polymer with increased oxygen permeability, but that due to the properties of the Tris monomer the polymer would also have clarity or wettability so poor that the material would be unsuitable for use as a contact lens.   JTX-13 at col. 3, ll. 23-51.   Thus any

motivation to use the multifunctional siloxanyl esters described in Tanaka would only have been to use them with Tanaka's novel organosiloxane non-Tris monomer.  Furthermore, the Director ignores that of two siloxane-containing  classes of cross-linking agents identified in the Tanaka Patent, only the siloxanyl alkanol esters of Formula V contain hydrophilic hydroxyl groups in addition to siloxane bonds.  JTX-13 at col. 8, ll. 10-46.  Thus, as the Director's own expert witness testified, if one skilled in the art was to combine one of Tanaka's cross-linking agents with the Tris monomer – which one would not have been motivated to do – "the crosslinking monomer would necessarily be hydrophilic, whether bearing siloxane units or not."  1/30 am session, Benjamin Testimony, 74:25-75:6.  The multifunctional siloxanyl alkyl esters of Formula VI are hydrophobic (1/28 pm session, Long Testimony, 13:20-21), thus one skilled in the art would <u>not</u> have been motivated to combine them with a Tris monomer and would not have reasonably expected such a combination to result in a polymer with sufficient clarity, hardness, and wettability to serve as a commercially viable contact lens material.

183.    Dome does not dispute this proposed conclusion of law, but it is inapplicable here.

184.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 70 to 86, 88 and 182 above.  In particular, the Director misunderstands the issue to be decided by this Court.  The issue is not whether it would be physically possible to chemically cross-link hydrophobic Tris monomers with the hydrophobic siloxanyl alkyl esters of Formula VI as cross-linking agents, i.e., whether one would understand that Tanaka's Formula VI siloxanyl alkyl ester cross-linkers <u>could</u> be used with Tris.  Rather, the issue is whether one skilled in the art <u>would</u> have done so to obtain a material suitable for use as a contact lens (*i.e.,* a material that is

wettable and has sufficient oxygen permeability).  The issue is two-fold:  (1) would one skilled in the art be motivated to do so and, if such motivation existed, (2) would one skilled in the art have a reasonable expectation of successfully combining a siloxanyl alkyl ester cross-linker with Tris to create a polymer with improved oxygen permeability while maintaining sufficient clarity, hardness, and wettability to be useful as a contact lens material?  As explained above, the answer to both of these questions is no.  As Dr. Benjamin testified at trial, "[t]o offset the hydrophobicity of the standard Tris monomer . . . the crosslinking monomer would necessarily be hydrophilic." 1/30 am session, Benjamin Testimony, 74:25-75:6.  Siloxanyl alkyl ester cross-linkers (the cross-linkers of the Neefe Patent) are hydrophobic.  1/28 pm session, Long Testimony, 13:20-21.

185.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraph 184 above.

186.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraph 184 above.

187.    Dome disagrees with this proposed finding of fact for the reasons given in paragraphs 70 to 86, 89, 103, 111, 115, 122 and 123 above.

### Nexus Between Secondary Considerations Evidence and the Neefe Patent

188.    Dome does not dispute this proposed conclusion of law.

189.    Contrary to the Director's suggestion, this action is governed by "the provisions of" 35 U.S.C. § 145 (2006), see 35 U.S.C. § 306 (2006), but involves an issued patent, not a mere application, and different burdens and standards of proof apply as set forth in paragraphs 151-158, above, and in paragraphs 1-13 of Dome's original proposed conclusions of law. Additionally, Rule 802 of the Federal Rules of Evidence limits the purposes for which statements made in the administrative record may be used.

190.    Dome does not dispute this proposed conclusion of law. And indeed, hearsay statements made by PTO personnel are not "competent" evidence in this case.

191.    Dome disagrees with the Director's suggestion for the reasons given in paragraphs 112 to 137 above.  In addition, Dome disagrees with this proposed finding of fact to the extent that the Director attempts to disparage Dr. Long's testimony regarding whether the processes used to manufacture the Boston II and Boston IV contact lens materials fall within the scope of claim 1 of the Neefe Patent.  The Director presented no evidence at trial to contradict Dr. Long's conclusion that the chemical process set forth in the Bausch & Lomb protocols for the Boston II contact lens material did not fall within the scope of claim 1 of the Neefe Patent. Neither did the Director present any evidence at trial to contradict Dr. Long's conclusion that the chemical process set forth in the Bausch & Lomb protocols for the Boston IV contact lens material embodies the invention of claim 1 of the Neefe Patent.

192.    Contrary to the Director's suggestion, the evidence presented by Dome is relevant as objective indicia of non-obviousness.  *See* Dome F.F. 235-245, 321-340, 360-402 and paragraphs 136 and 137 from above.

193.    Dome does not deny that construing disputed terms in the claim of a patent is within the province of the Court.  Contrary to the Director's suggestion, Dr. Long's testimony regarding the technological background of the Neefe Patent and regarding the ordinary meaning of terms as used in the art of polymer chemistry is correct, and moreover is not contradicted by any competent evidence.

194.    Dome disagrees with the Director's suggestion that claim 1 of the Neefe Patent requires that the vacuum distillation procedure in step (e) must be performed after the filtration procedure of step (d).  *See* paragraphs 138 to 140 above.  The Director presented no evidence at

trial to contradict Dr. Long's expert testimony that one skilled in the art would understand that, chemically, it does not matter whether filtration occurs before or after distillation.  Furthermore, the evidence presented at trial does not support the Director's assertion that "the process used to make the Boston IV lens admittedly performs those actions in a different order than required in claim 1."  Moreover, even if claim 1 of the Neefe Patent required filtration to precede vacuum distillation – which it does not – the record is devoid of evidence that filtration occurs after vacuum distillation in the Bausch and Lomb process.  Dr. Long testified that there was no mention in the Bausch & Lomb documents as to the order in which the steps were required to be done.  DTX-2, 101:19-22; *see also* paragraphs 141 and 144 above.  Moreover, Dr. Long testified that it is immaterial whether the process of step (e) – vacuum distillation – occurs before or after filtration.  1/28 pm session, Long Testimony at 40:12-15; see also *id.* at 54:13-14 ("[W]hether you filter and then vacuum distill, or you vacuum distill and filter, is equivalent in my mind.").  Since the Director failed to present any evidence contradicting the testimony of Dome's polymer chemistry expert that the process used to manufacture the Boston IV contact lens material embodies the process of claim 1 of the Neefe Patent, or its equivalent, the nexus between the superiority of the Boston IV lens and the invention of Neefe claim 1 has been established and Dome's evidence of commercial success is relevant to prove non-obviousness.

195.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 146 to 150 above.  The Director failed to present any evidence contradicting Dr. Long's testimony that the manufacturing protocol for the Boston II contact lens material does not satisfy step (f) of claim 1 of the Neefe Patent.  For this additional reason, the superiority and commercial success of the Boston IV lens over the Boston II lens is relevant to prove non-obviousness.

196. Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 112 to 137 above.

197. Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 132 to 135 above. Contrary to the Director's suggestion, Dr. Melamed testified that the reason the Boston IV lens was the single biggest advance in oxygen permeable RGP lenses since the Gaylord Patent was "[s]olely [due to] oxygen permeability." 1/29 am session, Melamed Testimony, 68:4-10. This is supported by Bausch & Lomb's own documents, which reported that oxygen permeability was the "only parameter in the profiles that differs significantly" between the Boston II and Boston IV lens materials. JTX-21 at BL8557; *see also* 1/29 am session, Melamed Testimony, 27:1-4, 98:21-24; JTX-21 at BL8556, 8578; PTX-2 at BL4776. Since the improvement in oxygen permeability was due to the change to a manufacturing process within the scope of the Neefe invention, *see* Dome F.F. 381-387 and 395, a nexus between the Boston IV contact lens material and the Neefe Patent has been established.

198. Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 136 and 137 above. In particular, the Director ignores that Dr. Melamed's testimony was based on the large number of patients he fitted with either the Boston II or the Boston IV lens. *Compare* 1/29 am session, Melamed Testimony, 21:15-21, 24:2-8 *with* JTX-30. The Director also ignores the other evidence in the record that corroborates Dr. Melamed's testimony, including Bausch & Lomb's own documents. *See* 1/29 am session, Melamed Testimony, 24:20-22; 26:6-9, 40:3-17, 45:14-16, 46:12-13; JTX-4 at 17; JTX-31 at BL8309; PTX-3 at BL5513.

**_Nexus – Order of the Steps_**

199.   Dome disagrees with the Director's suggestion.  As shown in paragraphs 138 to 145, 191, and 194 above, Dome presented compelling evidence of a nexus between the commercial success of the Boston IV lens and the process of claim 1 of the Neefe Patent. Furthermore, the Director presented no competent evidence that rebuts Dome's showing of such a nexus.  No evidence was presented at trial that the commercial success of the Boston IV product was due to any factor other than the increased oxygen permeability of the Boston IV lens over earlier products.  The Director relies on conjecture and mere attorney argument.  This is insufficient to overcome the presumption of nexus that arises from Dome's evidence that the Boston IV lens was made by the process of Neefe claim 1 or its substantial equivalent, and the testimony of Dome's expert demonstrating that such a nexus exists.  *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000).

200.   Dome does not disagree with this proposed conclusion of law, but it is not applicable here.

201.   Dome does not disagree with this proposed conclusion of law, but it is not applicable here.

202.   Dome does not disagree with this general legal proposition, but disputes the gloss that the Director seeks to place on the legal authorities cited, or its application to the facts of this case.

203.   Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 138 to 145, 191, and 194 above.

204.     Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 138 to 145, 191, and 194 above.

205.     Dome does not disagree with this general legal proposition, but disputes its application to this case. The Neefe Patent nowhere states that the order of reaction by-product removal, whether vacuum distillation followed by filtration or vice versa, has any importance to the process described by claim 1 of the patent.  "Nowhere, however, is there any statement that this order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps."  *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed Cir. 2003).  *See* Dome's Proposed Conclusion of Law 28.

206.     Dome does not disagree with this general legal proposition, but disputes its application to this case.

207.     Dome does not disagree with this general legal proposition, but disputes its application to this case. Claim 1 of the Neefe Patent does not "actually recite" that the vacuum distilling must be performed after the filtering.  Accordingly, this issue turns on whether the claim implicitly requires these operations be performed in the same order.  *Mantech Environmental Corp. v. Hudson Services, Inc.*, 152 F.3d 1368 (Fed. Cir. 1998) illustrates the proper analysis and does not support the Director's position.  In *Mantech*, each step of claimed process recited a single operation and required the presence of something that was provided in the immediately proceeding step, the claim was construed as requiring that the steps be performed in the order recited in the claim.  In contrast, claim 1 of the Neefe patents does not implicitly require any specific order of vacuum distilling and filtering steps.  Accordingly,

applying the mode of analysis in *Mantech* correctly, claim 1 of Neefe Patent should be construed as without any requirement that filtering precede vacuum distillation.

208.    Dome disagrees with the Director's assertion, for the reasons given in paragraphs 138 to 145, 191, and 194 above.

209.    Dome disagrees with the Director's assertion, for the reasons given in paragraphs 138 to 145, 191, and 194 above.  Dr. Long's testimony about the technological background of the invention is highly relevant to the interpretation of a claim directed to a manufacturing process in the technically complex field of polymer chemistry.

210.    Dome does not disagree with this general legal proposition, but disputes its application to this case.

211.    Dome disagrees with the Director's assertion for the reasons given in paragraphs 140 and 141 above.  In particular, the Director misquotes Dr. Long's deposition testimony.  Dr. Long did not testify about when the filtration step occurs relative to the distillation step, but only that both of these purification steps must occur after the organic layer is separated and removed from the aqueous layer.  DTX-2 at 95:8-9, 95:25-96:1, 96:3-5.

212.    Dome disagrees with the Director's assertion. The Director misconstrues and misquotes Dr. Long's testimony in a feeble attempt to discredit him.  It should be noted that the Director did not offer any evidence to contradict Dr. Long's testimony that one skilled in the art would understand that the order of the filtration and vacuum distillation steps are immaterial. The fact that filtration and vacuum distillation can be performed in any order is entirely distinct from the issue of whether those two purification steps must occur after separation and removal of the organic layer from the aqueous layer.

213.    Dome does not disagree with the general principle that disputed claim terms should be construed consistently with the intrinsic record, but disputes its application to this case. "Nowhere, however, is there any statement that this order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d at 1371.   An inventor's disavowal, or intentional disclaimer, of claim scope must be clear and explicit.   *See* Dome's Proposed Conclusion of Law 29.   There is no clear and explicit disavowal of performing the method of filtering before vacuum distillation in the Neefe Patent's prosecution history.   Furthermore, contrary to the Director's assertion, the intrinsic evidence of the Neefe Patent does not contradict Dr. Long's testimony regarding the specified order (or lack thereof) of the filtration and vacuum distillation steps.   *See* paragraphs 138-145 and 194 above.

214.    Dome does not disagree with the general principle that expert testimony cannot be used to vary or contract the terms of the claims, but disputes its application to this case.   It is well established that claims must be construed from the vantage point of one skilled in the art.   As the Federal Circuit explained in its authoritative opinion on claim construction: "[P]atents are addressed to and intended to be read by others of skill in the pertinent art."   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).   Contrary to the Director's assertion, Dr. Long does not ignore the word "then" in claim 1 of the Neefe Patent.   Rather, Dr. Long explained to the court how one skilled in the art would understand the process defined by claim 1 of the Neefe Patent, in the light of background principles of polymer chemistry.

215.    Contrary to the Director's suggestion, Dr. Long's testimony is not inconsistent with the specification or the language of claim 1.   Dr. Long's testimony is in full accord with, and explains how one skilled in the art would understand, claim 1 of the Neefe Patent.

Furthermore, the Director did not present any evidence to contradict Dr. Long's testimony that the relative order of the filtration and distillation steps is immaterial from a technical point of view.

216. Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 141 to 144 above.

217. Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 138 to 145, 191, and 194 above. Contrary to the Director's assertion, the manufacturing process of the Boston IV lens embodies the Neefe invention and therefore a nexus exists between the commercial success of the Boston IV product and the Neefe invention. *See also Altiris, Inc. v. Symantec Corp.*, 318 F.3d at 1371 ("Nowhere, however, is there any statement that this order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps.")

### *Nexus - Polymerization*

218. Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 146 to 150 and 195 above. In particular, the Director ignores Dr. Long's testimony that the term "copolymerized" in step (f) of Neefe claim 1 requires that the four enumerated components must be added together. 1/28 pm session, Long Testimony, 96:14-20. In the Boston II manufacturing process no Tris dimer or Tris trimer is added to the Tris produced by steps (a) - (e); accordingly, the Boston II manufacturing process does not embody the invention of Neefe claim 1. *See* 1/28 pm session, Long Testimony, 21:24-22:9. The Director did not present any evidence to contradict Dr. Long's testimony on this issue.

219.    Dome disagrees with the Director's contention for the reasons stated in paragraph 218 above.

220.    Dome does not dispute this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law).

221.    Dome does not dispute this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law).

222.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 146, 150, and 195 above.

223.    Dome disagrees with the Director's assertion for the reasons given in paragraphs 146, 150, and 195 above.  In particular, the Director fails to acknowledge the technical meaning of the term "copolymerizing" in claim 1 of the Neefe Patent when she states that claim 1 does not require "that any chemicals be 'added' during step (f)."  Director's F.F. 223.  Dr. Long testimony on the art-recognized meaning of the term "copolymerizing" in polymer chemistry, *see* 1/28 pm session, Long Testimony, 96:14-97:1, is uncontradicted by any competent evidence. One skilled in the art of polymer chemistry would understand claim 1, step (f) of the Neefe Patent to require adding the following components together:  Tris as "prepared above" by steps (a)-(e), an ester of acrylic or methacrylic acid, a wetting agent, and a multifunctional siloxanyl alkyl ester (for example, Tris dimer or Tris trimer).  1/28 pm session, Long Testimony, 55:4-8. A process that fails to add Tris dimer or Tris trimer to the Tris resulting from steps (a)-(e) constitutes does not embody the invention of claim 1 of the Neefe Patent

224.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraph 146, 150,

195, and 223 above.  Contrary to the Director's assertion, Dr. Long was not "reluctant" to testify that Tris dimer and Tris trimer, if present, would be copolymerized during the manufacturing process of the Boston II contact lens material.  Rather, Dr. Long explained that the incidental presence of Tris dimer or trimer "as a spurious by-product" of steps (a)-(e) would be insufficient to satisfy the "copolymerizing" requirement of step (f), which requires "adding" the Tris product of steps (a)-(e) to the other recited components of the copolymerization mixture.   1/28 pm session, Long Testimony, 96:14-18.

225.   Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraph 146 above. The Director misinterprets Dr. Long's testimony to manufacture a purported inconsistency that does not exist.

226.   Dome disagrees with the Director's assertion for the reasons set forth in paragraphs 146 to 150 above. As Dr. Long explained, "copolymerizing" means the "adding of all these [four] reagents together."  *Id.* at 96:14-18.  Tris dimer and Tris trimer are not added to the copolymerization mixture in the Boston II manufacturing process, hence this process does not embody the invention of Neefe claim 1.

227.   Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 146 to 150 and paragraphs 218 to 226 above.  The undisputed testimony at trial showed that the Boston IV manufacturing process includes each and every step of claim 1 of the Neefe Patent, or its substantial equivalent, and that the Boston II manufacturing process fails to perform step (f) of Neefe claim 1.  Accordingly, the differences between the Boston II and Boston IV lenses are probative of nonobviousness.

228.    Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 146 to 150 and paragraphs 218 to 227 above.   In particular, the Director did not present any evidence to contradict Dr. Long's testimony that the Boston II manufacturing process does not embody the Neefe invention while the Boston IV manufacturing process does.

### *Nexus – Commercial Success of Boston IV Due to New Polymerization Process*

229.    Contrary to the Director's assertion, Dr. Melamed's testimony does not fail to meet the nexus requirement.  *See* paragraphs 121 to 123, 126 to 129, and 132 to 137.  Dome agrees that "a prima facie case of nexus is generally made out when the patentee shows both there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent."  *Demaco Corp. v. F. Von Langdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

230.    Dome agrees with this proposed conclusion of law.  However, Dome notes that, once prima facie case of nexus has been made out – as Dome has done here, the "burden shifts to the [patent] challenger to prove that commercial success is instead due to other factors extraneous to the patented invention, such as advertising."  *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).   "The presumed nexus cannot be rebutted with mere argument; evidence must be put forth."  *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000); *see also Demaco*, 851 F.2d at 1393 ("[I]t is thus the task of the [patent] challenger to adduce evidence to show that the commercial success was due to extraneous factors. . . . [A]rgument and conjecture are insufficient.").   The Director proffered no competent evidence to rebut Dome's prima facie case of nexus.

231.   Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 132 to 135 and 197 above.

### Nexus – Dr. Melamed's Testimony was Reliable

232.   Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 136, 137, and 198 above.

233.   Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) and proposed conclusion of law.  With regard to the conclusion of law, the Supreme Court has explained that an expert's personal experiences and observations can be a valid and reliable basis for expert testimony.  *See Kumho Tire Co., Ltd. v. Cormichael*, 526 U.S. 137, 148-149, 151 (1999).  The critical inquiry is whether "the underlying basis or methods of an expert's opinion are of a type reasonably relied on by the experts in the field."  *Ambrosini v. Labarraque*, 101 F.3d 129, 138 (D.C. Cir. 1996) (citation omitted).  With regard to the finding of fact, Dr. Melamed did not base "his opinion solely on his experience with, and hearsay statements made by, his patients."  Rather, Dr. Melamed's opinions was based, in part, on three different sources of evidence: 1) his own experiences with almost 10,000 patients – a number significantly more than the number of patients included in some clinical studies (e.g. 13 patients); 2) Bausch & Lomb's own business records (showing displacement of Boston II sales by Boston IV sales); and 3) authoritative textbooks in the contact lens field.  *See* paragraphs 136, 137 and 198, *supra*.  Furthermore, Dome objects to the Director's mischaracterization of the statements of Dr. Melamed's patients as hearsay.  As the Director recognizes, Dr. Melamed is a medical doctor with medical training who fits patients with contact lenses.  Under Fed. R. Evid. 803(4), statements made for medical diagnosis or

treatment are exceptions to the rule against hearsay; therefore, the statements made by Dr. Melamed's patients regarding his prescription of contact lenses are exceptions to the rule against hearsay.  Fed. R. Evid. 803(4).  In addition, a physician's reliance on statements by patients was one of the specific examples mentioned in the advisory committee's notes on Rule 703 regarding the types of information that may underlie an expert's testimony.  ("Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including <u>statements by patients</u> and relatives, reports and opinions from nurses, technicians and others doctors, hospital records, and X rays")  Fed. R. Evid. 703 advisory committee's note (emphasis added).

234.   Dome does not disagree with this proposed conclusion of law.   In fact, Dr. Melamed based his testimony on sufficient data and facts.   His testimony was a product of generally accepted, reliable principles and methods applied to the facts of this case.

235.   Dome does not disagree with this proposed conclusion of law, but as the Court pointed out, in a bench trial there is "no gate to keep."  *See* November 20 Transcript (D.I. 91) at 4:7-9.  ("The purpose of Daubert is for the trial judge to be a gatekeeper, and in a bench trial, there is no one for whom to keep the gate.")

236.   Dome does not disagree with this proposed conclusion of law, but Dome regards this conclusion as inapplicable here.

237.   Dome disagrees with this proposed finding of fact (which the Director mischaracterized as a proposed conclusion of law) and proposed conclusion of law for the reasons given in paragraphs 136, 137, and 198 above.  In particular, Dr. Melamed's testimony was not based solely on "a small universe of contact lens consumers."   Director's F.F. 237. Rather, Dr. Melamed's testimony was based on his experience with 8,500 to 10,000 patients over

the course of approximately 8 years.  1/29 am session, Melamed Testimony, 21:15-21, 24:2-8.
The Director also overlooks the fact that Dr. Melamed's testimony regarding the success of the
Boston IV contact lens material is corroborated by other evidence in the record, including
evidence produced by the manufacturer of the Boston IV lenses in this case.  *See* 1/29 am
session, Melamed Testimony, 24:20-22; 26:6-9, 40:3-17, 45:14-16, 46:12-13; JTX-4 at 17; JTX-
31 at BL8309; PTX-3 at BL5513.

238.    Dome disagrees with this proposed finding of fact (which the Director
mischaracterized as a proposed conclusion of law) and proposed conclusion of law for the
reasons given in paragraphs 136, 137, and 198 above.

239.    Dome disagrees with this proposed finding of fact (which the Director
mischaracterized as a proposed conclusion of law) for the reasons given in paragraphs 136, 137,
and 198 above.  Most importantly, Dr. Melamed did not "only speculate as to the specific
reasons why the Boston IV lens was more successful than the Boston II lens . . . ."  Rather, Dr.
Melamed provided his opinion based on three separate sources – his experience with thousands
of his own patients, information provided in Bausch & Lomb's own documents, and information
gleaned from authoritative textbooks in the field.  His conclusions after reviewing all of the
evidence were clear – the reason the Boston IV contact lens was the single biggest advance in
oxygen permeable RGP lenses since the Gaylord material was "[s]olely [due to] oxygen
permeability."  1/29 am session, Melamed Testimony, 68:1-10.  *See also* paragraph 132, *supra*.

240.    Dome disagrees with this conclusion of law for the reasons set forth above in
paragraphs 136, 137, 198, 232-239.

241.    Dome disagrees with this conclusion of law as explained in paragraphs 232-240.

### *Secondary Considerations Overcome Prima Facie Case of Obviousness*

242.    Contrary to the Director's assertion, even if the Director had succeeded in presenting a *prima facie* case of obviousness – which she did not – Dome's evidence of objective indicia of non-obviousness was sufficient to overcome it.  *See* paragraphs 112 to 137 above.  In particular, the Boston IV contact lens material was not merely a "modest" improvement over the Boston II contact lens material.  *See* paragraph 122 above.

243.    Dome does not disagree with this proposed conclusion of law.

244.    Contrary to the Director's assertion, the Board did <u>not</u> make extensive findings regarding whether claim 1 of the Neefe Patent was obvious over the prior art.  *See* Dome's Proposed Findings of Fact and Conclusions of Law (D.I. 101) at 2-57 (demonstrating that of Dome's 402 proposed findings of fact, the Board only made corresponding findings for 25 of them).  Furthermore, the Board's findings were hardly unchallenged in this case.  *See, e.g.,* Dome F.F. 265-271 (contesting the Board's Finding of Fact 26 in detail).  Dome disagrees with the Director's factual assertions regarding the Gaylord Patent, and any similar findings of fact from the Board, for the reasons given in paragraphs 52 to 69, 94, and 98 to 102 above.  Dome disagrees with the Director's factual assertions regarding the Tanaka Patent, and any similar findings of fact from the Board, for the reasons given in paragraphs 70 to 86, 89 to 111, and 178 to 187 above.  Dome disagrees with the Director's factual assertions regarding the level of skill in the art, and any similar findings of fact from the Board, to the extent that the Director overlooks the importance of the other "CHOW" properties in addition to oxygen permeability.  *See* paragraph 46 above.

245.    Dome agrees that a court must consider objective indicia of non-obviousness at the same time it considers the *prima facie* case of obviousness.  Furthermore, "it is thus the task of the [patent] challenger to adduce evidence to show that the commercial success was due to

extraneous factors. . . . [A]rgument and conjecture are insufficient." *Demaco*, 851 F.2d at 1393. Contrary to the Director's assertion, the Director has not made a strong *prima facie* case of obviousness.  *See* Dome F.F. 1-278 and paragraphs 1-111, 176-187 above.  Even if she had, the objective indicia of non-obviousness presented by trial – which includes evidence on long-felt unmet need, failure of others, and commercial success – was more than sufficient to overcome this *prima facie* case.  *See* Dome F.F. 279-402 and paragraphs 112-150, 188-241 above.

### III. CONCLUSION

The Director has failed to prove facts that would support invalidation of claim 1 of the Neefe Patent under 35 U.S.C. § 103(a).  Therefore, judgment should be entered enjoining the Director to issue a certificate confirming claim 1 of the Neefe Patent in accordance with 35 U.S.C. § 307.

Dated:  May 1, 2013

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP


By:  _/s/ James W. Dabney_____
       James W. Dabney
       Stephen S. Rabinowitz
       Randy C. Eisensmith
       Kristin M. Whidby

1001 Pennsylvania Ave, N.W.
Washington, D.C. 20004
(202) 639-7000

Attorneys for Plaintiff
Dome Patent LP

8955573

8955573